1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2     Including Professional Corporations
ROBERT D. ROSE, Cal. Bar No. 62559
3  FRANK J. POLEK, Cal. Bar No. 167852
VINCENT J. BROWN, Cal. Bar No. 226105
4  501 West Broadway, 19th Floor
San Diego, California 92101-3598
5  Telephone:   619-338-6500
Facsimile:   619-234-3815
6

**FILED**

SEP 0 5 2006

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

7  Attorneys for Defendant John J. Todd

8  McDERMOTT WILL & EMERY LLP
JAMES L. SANDERS, Cal. Bar No. 126291
9  BRANDON J. ROKER, Cal. Bar No. 205292
2049 Century Park East, 34th Floor
10  Los Angeles, California 90067-3208
Telephone:   310-277-4110
11  Facsimile:   310-277-4730

12  Attorneys for Defendant Robert D. Manza

13

14  UNITED STATES DISTRICT COURT

15  SOUTHERN DISTRICT OF CALIFORNIA

16

17  SECURITIES AND EXCHANGE
COMMISSION,

18                Plaintiff,

19     v.

20  JOHN J. TODD, ROBERT D. MANZA,
21  and JEFFREY WEITZEN,

22                Defendants.

Case No. 03-CV-2230 BEN (WMc)

**DEFENDANTS' MOTION IN LIMINE
TO EXCLUDE EVIDENCE OR
TESTIMONY REGARDING A
CHANGE IN THE PRICE OF
GATEWAY'S SHARES**

**DATE:**   **October 16, 2006**
**TIME:**   **10:30 a.m.**
**PLACE:**   **Courtroom of the Honorable
Roger T. Benitez
(Courtroom 3)**

23

24

25

26

27

28



Defendants John J. Todd ("Todd") and Robert D. Manza ("Manza") hereby submit this Motion in Limine to exclude any evidence or testimony regarding a change in the price of Gateway's shares.

## I.

## INTRODUCTION

The SEC claims that, a day after an October 12, 2000 press release, Gateway's share price surged and that the increase was attributable to allegedly-false statements in the press release: "The market reacted positively to Gateway's public disclosures.  On October 13, 2000, Gateway's share price jumped from $43.63 to $53.11." Complaint at ¶ 123.

In its Introduction, the Complaint also contains a more general reference to the stock price: "In October 2000, just after Gateway's third quarter earnings press release, the Company's stock price increased, in stark contrast to the Company's competitors' falling stock prices during the same period.  In early 2001, after defendants' departure from the Company, Gateway reversed most of its "close the gap" transactions, resulting in large reductions in reported revenue for the period and a dramatic decrease in Gateway's stock price."  Complaint at ¶ 8.

This notion of an increase in Gateway's share price is also found in the SEC's Memorandum of Contentions.  "By misrepresenting revenues and earnings, the defendants caused Gateway's securities to be valued by the market at a higher price than they otherwise would have been valued."  SEC Memorandum of Contentions at 46:7-9.[1]

---

[1] The SEC's Memorandum of Contentions also takes this one step further, arguing a drop in the price of Gateway's shares following the restatements.  "This is evidenced by the dramatic decline in Gateway's stock price in early 2001 after Gateway reversed most of its "close the gap" transactions, resulting in large

-1-

DEFS' MO IN LIMINE TO EXCLUDE EVIDENCE RE
CHANGE IN THE PRICE OF GATEWAY'S STOCK
03-CV-2230 BEN (WMc)

1   However, the SEC has no evidence to support this claim that the "jump" was

2   attributable to the press release. No exhibit demonstrates this. No witness will testify to

3   this. The SEC has no expert witness who will opine on causation, that is, testify that the

4   press release caused the price of the shares to rise. Defendants, on the other hand, have

5   retained an expert who will testify to the contrary, that the share price increase was not

6   caused by the press release. Further, no one is alleged to have lost any money attributable

7   to Defendants with respect to any fluctuations in Gateway's shares. The relevance of any

8   change in share price is marginal at best.

9

10   Given the lack of evidence from the SEC on this point, and the fact that any

11   change in share price is irrelevant or at most marginally relevant, Defendants submit that

12   any such evidence or allegation will lead to an enormous waste of time and a mini-trial

13   over a collateral issue. Evidence of a change in Gateway's share price should be excluded

14   under Federal Rule of Evidence 403.

15

16   **II.**

17   **EVIDENCE OF A CHANGE IN GATEWAY'S STOCK PRICE SHOULD BE**

18   **EXCLUDED UNDER FEDERAL RULE OF EVIDENCE 403**

19

20   Evidence pertaining to a surge in Gateway's share price is, at best, marginally

21   relevant. No one is alleged to have lost any money pertaining to fluctuations in the price

22   of the shares. The SEC seeks no damages as a result of any change in price. There is no

23   allegation of insider trading.

24

25

26   _____

27   reductions in reported revenue for 2000." SEC Memorandum of Contentions at
     46:9-11.

28

-2-

DEFS' MO IN LIMINE TO EXCLUDE EVIDENCE RE
CHANGE IN THE PRICE OF GATEWAY'S STOCK
03-CV-2230 BEN (WMc)

1    The evidence from the SEC will be scarce—merely the change in share
2  price.  But, the SEC has no proof of causation, that an increase in price can be attributed to
3  the October 12th press release.  The SEC's lone expert witness, Dr. Jerry Arnold, has been
4  designated to testify on a variety of topics, but the change in the share price is not among
5  them.  Attached hereto as Exhibit "A" is a true and correct copy of Dr. Arnold's expert
6  witness report.[2]  In it, Dr. Arnold mentions nothing about the causes of a change in the
7  share price, let alone that a change was caused by the press release.

8

9    Defendants, by contrast, have designated Professor Frank Partnoy, who was
10 tasked with "assess[ing] the conclusion that Gateway, Inc.'s public disclosures on October
11 12, 2000, led to this market reaction — an increase of almost 22% in the price of Gateway
12 shares."  Expert Report of Professor Frank Partnoy at 4 (hereinafter "Partnoy Report") (a
13 true and correct copy of which is attached hereto as Exhibit "B").

14

15   Professor Partnoy employed three methods of study.  He: (1) analyzed
16 trading data for Gateway shares; (2) examined publicly available information and
17 compared it with trading data; and (3) performed a "statistical event study approach" to
18 determine if an econometric analysis of share price changes during the relevant period was
19 consistent with his other two methods.  Partnoy Report at 5.

20

21   According to Professor Partnoy, "[a]ll three methodologies led to the same
22 result:  it would be wrong to conclude that the 22% increase in Gateway's stock was
23 related to the company's public disclosures on October 12, 2000."  *Id.*

24

25

26
---
[2]    Dr. Arnold did not submit a supplemental or rebuttal report.  At his deposition, Dr. Arnold
27    testified that he was not asked by the SEC to submit a supplemental or rebuttal report.

28

-3-

1    Professor Partnoy analyzed the "after-hours" electronic market and European

2  markets and studied the changes in the price of Gateway shares. *Id.* While the price of

3  Gateway's shares increased slightly, only 4.3 percent following the press release, the bulk

4  of the increase in the price of shares occurred well after the release. Under an efficient

5  capital markets hypothesis ("ECMH"), publicly available information disseminates very

6  rapidly. If the full 22% rise in the price of shares was properly attributable to the press

7  release, it should have occurred much more quickly in the after-hours electronic markets

8  and in Europe. *Id.* at 5-8.

9

10    Other public information also tends to disprove the SEC's assertion.

11  Principally, "October 13, 2000, was one of the best-performing days in history for shares

12  of technology companies." *Id.* at 9. Various other technology companies' share prices rose

13  significantly that day. "Other public information also suggests that the increase in

14  Gateway's share price on October 13, 2000, was due to factors other than Gateway's

15  disclosures from the previous day." *Id.*

16

17    Finally, Professor Partnoy "collected daily price data for Gateway and

18  several of its competitors, as well as price data for several stock indices, including the S&P

19  500 Index and the Nasdaq 100 Index." *Id.* at 10 and exhibit "C" thereto. He "then

20  performed a series of statistical regressions to determine which variables had the greatest

21  explanatory power relative to the changes in Gateway's share price during the time period

22  surrounding the events in question." *Id.* at 10. Professor Partnoy concluded that "**if**

23  **Gateway shares had simply mimicked the performance of the relevant market, the**

24  **price of Gateway shares would have increased by roughly the same amount as the**

25  **price actually increased on October 13, 2000.**" *Id.* at 11 and exhibit "C" thereto

26  (emphasis in original).

27

28

-4-

DEFS' MO IN LIMINE TO EXCLUDE EVIDENCE RE
CHANGE IN THE PRICE OF GATEWAY'S STOCK
03-CV-2230 BEN (WMc)

1         Professor Partnoy's conclusions, and the bases therefor, are detailed and

2   complicated.  Presentation of these opinions will be extraordinarily time consuming.  The

3   time spent on the issue at trial will dwarf the marginal relevance of the SEC's allegation.

4

5         The standard for exclusion of this evidence under F.R.E. 403 has been met:

6

7         Although relevant, evidence may be excluded if its probative value is
      substantially outweighed by the danger of unfair prejudice, ***confusion***
      ***of the issues***, or misleading the jury, ***or by considerations of undue***

8         ***delay, waste of time***, or needless presentation of cumulative evidence.

9

10   *See also United States v. Allen*, 341 F.3d 870, 886 (9th Cir. 2003) (setting forth F.R.E. 403

11   standard); *In re Agent Orange Prod. Liab. Litig.* 611 F.Supp. 1223, 1256 (E.D.N.Y. 1985)

12   (discussing "waste of time" as ground for exclusion under 403);  *Manna Pro Partners, L.P.*

13   *v. NLRB,* 986 F.2d 1346, 1354 (10th Cir. 1993) (testimony properly excluded because of

14   its low probative value, unlikely effect on the outcome of the case and "to allow the

15   evidence would be a waste of time").

16

17         Allowing into evidence the unexplained fact that Gateway's share price rose

18   on October 13, 2000 would only serve to confuse the issues at trial and cause undue delay

19   and a waste of time.  This case is not about changes in share price.  It is supposed to be

20   about improper accounting.  The evidence should be excluded.

21

22

23

24

25

26

27

28

-5-

**III.**

**CONCLUSION**

For all of the foregoing reasons, this Court should disallow at trial any evidence or allegation of a change in Gateway's share price attributable to the October 12, 2006 press release.

DATED:  September ___5___, 2006

                SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By                                  

                ROBERT D. ROSE
                FRANK J. POLEK
                VINCENT J. BROWN

                Attorneys for Defendant
                John J. Todd

DATED:  September ___5___, 2006

                McDERMOTT WILL & EMERY LLP

By                                (For)

                JAMES L. SANDERS
                BRANDON J. ROKER

                Attorneys for Defendant
                Robert D. Manza

W02-WEST:8FP1\400066516.1

DEFS' MO IN LIMINE TO EXCLUDE EVIDENCE RE
CHANGE IN THE PRICE OF GATEWAY'S STOCK
03-CV-2230 BEN (WMc)

## Expert Report of Jerry L. Arnold
## C.P.A., Ph.D.

**Securities and Exchange Commission v. John J. Todd, Robert D. Manza, and Jeffrey Weitzen**

## I. Background and Overview.

### A. Engagement.

I have been engaged by the United States Securities and Exchange Commission ("SEC") to render an opinion as to whether various transactions recorded by Gateway Inc. ("Gateway") during quarters two and three of its fiscal year ended December 31, 2000, were in violation of generally accepted accounting principles ("GAAP"), disclosure requirements under Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") and/or of the internal control, books and records and lying to accountants provisions of Section 13(b)(2) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC rules thereunder. In regard to the Exchange Act provisions, I base my conclusions on my background and expertise in accounting and offer no opinions regarding legal interpretations. The defendants in the case are John J. Todd, formerly Chief Financial Officer, Robert D. Manza, formerly Controller, and Jeffrey Weitzen, formerly Chief Executive Officer. I will be opining on the following actions that inappropriately increased reported revenues and/or income, or resulted in inadequate disclosure, during the second and third quarters of Gateway's fiscal year ending on December 31, 2000:[1]

Second quarter.

- The incorrect presentation of the customer loan receivables portfolio and the inadequate disclosure of the increase in the size and decrease in the credit quality of the customer loan receivables portfolio, and

- The incorrect application of GAAP to a sale of customer loan receivables, especially in light of a concurrent loan at below market interest rates to the purchaser of the receivables.

Third quarter.

---

[1] Due to time constraints, I have not formulated opinions on, and do not address the following issues: Rent-Way, ALR legal reserve, and Gateway warranty reserves.

**EXHIBIT** A 7

- The incorrect presentation of the customer loan receivables portfolio and the inadequate disclosure of the continuing increase in the size and decrease in the credit quality of the customer loan receivables portfolio,

- The incorrect application of GAAP to the estimation of customer loan loss reserves, and the resulting inadequacy of the reserve for loan losses, especially in light of the decreasing quality of the customer loan receivables portfolio,

- The incorrect application of GAAP to a "round trip" bundling arrangement with America On Line ("AOL"),[2]

- The incorrect application of GAAP to a sale of computer equipment to Gateway's information technology provider, and

- The incorrect application of GAAP to a commercial sale of computers.

In performing my analysis, I reviewed the complaint, other relevant: filings in the case, GAAP, generally accepted auditing standards ("GAAS"), and Federal securities laws and regulations.  I further reviewed relevant portions of the depositions and testimonies of the defendants as well as those of other relevant parties to the transactions and exhibits bearing on the occurrence and recording of the transactions.  The materials which I relied upon in reaching my opinions are enumerated in Appendix A.  My compensation is at the rate of $400 per hour.

## B.  Credentials.

I hold a Ph.D. in Business, with a concentration in accounting, from the University of Michigan in Ann Arbor.  I hold bachelor's and master's degrees in accounting from the University of Missouri in Columbia.  I have been a faculty member at the Leventhal School of Accounting at the University of Southern California ("USC") since 1979.  Previous to joining the faculty at USC, I served for four years as a faculty member at the University of California at Los Angeles.  During the 1988-89 academic year, I served as a Visiting Professor at the Wharton School.  I was the founding director in 1982 of USC's SEC and Financial Reporting Institute and served as director until 1988.  I have written extensively in the area of accounting and SEC regulation.  Since 1989, I have been instructing the SEC

---

[2] As discussed and illustrated later, "round-tripping" describes situations where two companies pay for their own "revenue generating activities" by paying out cash to the other party and simultaneously receiving the cash back from the other party.

A-8

reporting and compliance course for the professional staff of a "Big Four" accounting firm.  My

complete curriculum vitae is attached as Appendix B.

### C.  Background.

This report relates to various transactions during the second and third quarters of Gateway's fiscal

year ended on December 31, 2000.  I have concluded that these transactions violated GAAP, and/or the

disclosure requirements of MD&A, the books and records, internal control, and/or lying to accountants

provisions under Section 13(b)(2) of the Exchange Act and related rules.  The nature and impact of

specific GAAP violations are discussed on an issue by issue basis.  It is worth noting, however, that

Gateway consistently violated GAAP through the use of "round-trip" transactions.  Further, I have

concluded that each of the GAAP violations was material.  I have reached this conclusion for the

reasons described below.

### D.  Materiality.

GAAP only applies to material items.  According to the SEC's Staff Accounting Bulletin ("SAB")

No. 99, *Materiality*,

Among the considerations that may well render material a quantitatively small misstatement

of a financial statement item are:

- Whether the misstatement masks a change in earnings or other trends,

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the
  enterprise, and

- Whether the misstatement concerns a segment or other portion of the registrant's business that
  has been identified as playing a significant role in the registrant's operations or profitability
  (e.g., computers). (example added)

As illustrated below, each GAAP violation was material.  In the absence of any of the violations,

Gateway would have missed the analyst targets for revenues and/or earnings for the second and third

A -9

quarters of 2000.[3]  This factor alone renders an item material.[4]

The MD&A, books and records, internal control, and lying to accountants violations each contain a common thread.  Accordingly, I provide a discussion of the relevant sections of the MD&A, books and records, internal control, and lying to accountants provisions and indicate the nature of the violations.

### E.  Management's Discussion and Analysis.[5]

Under the MD&A rules, management must provide information that assists the reader in viewing the financial statements through the eyes of management.  The required disclosures must address changes in underlying facts or circumstances as compared to historical activities.  Further, the information must identify factors that are likely to cause future financial condition or performance to differ from that currently reported.  The following are among the specific requirements with which management must comply:

- Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.

- Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.[6]

Thus, the registrant must describe situations that impact the comparability of performance data from period to period.  These required disclosures explicitly extend to interim information.  In addressing requirements for interim-period MD&A content, the Commission requires that registrants:

- Discuss any material changes in financial condition from the end of the preceding fiscal year to the date of the most recent interim balance sheet provided.  If the interim financial

---

[3]  Appendix A includes a list of firms whose analyst reports on Gateway were examined

[4]  For example, SEC Release 33-8579, In the Matter of Huntington Bancshares, Inc., Thomas E. Hoaglin, Michael J. McMennamin, and John Van Fleet, CPA.  June 2, 2005.

[5]  Significant MD&A releases:  33-6349 (9-28-81), 33-6711 (4-21-87), 33-6791 (8-1-88), and 33-6835 (5-18-89).

[6]  Regulation S-K, Item 303.a.3.i.-ii., 17CFR229.303.a.3.i.-ii.

A 70

statements include an interim balance sheet as of the corresponding interim date of the preceding fiscal year, any material changes in financial condition from that date to the date of the most recent interim balance sheet provided also shall be discussed.

- Discuss any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided and the corresponding year-to-date period of the preceding fiscal year. If the registrant is required to or has elected to provide an income statement for the most recent fiscal quarter, such discussion also shall cover material changes with respect to that fiscal quarter and the corresponding fiscal quarter in the preceding fiscal year.[7]

Further, the Commission explicitly requires registrants to identify the factors that cause dollar sales to increase as compared to prior periods.

- To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services.[8]

Gateway systematically violated the above disclosure requirements in its presentations in MD&A for the second and third quarters of fiscal year 2000. These violations relate to:

- Failure to disclose the impact of the incorrect recognition of Sales revenue from the sale of customer loan receivables, and the lack of recognition of a discount on a below-market rate loan to the purchaser of those receivables during the second quarter,

- Failure to disclose the growth of and increasing risk in the composition of the loan portfolio in the second and third quarters,

- Failure to disclose the impact of the incorrect application of GAAP that resulted in an inadequate customer loan loss reserve in the third quarter,

- Failure to disclose the impact of the incorrect recognition of Sales revenue and Cost of goods sold from a bundling arrangement with AOL that was structured into a "round trip" arrangement at the start of the third quarter,

- Failure to disclose the impact of the incorrect recognition of Sales revenue and Cost of goods sold from a sale of fixed assets, and

- Failure to disclose the impact of the incorrect recognition of Sales revenue and Cost of goods in a transaction with a commercial customer.

**F.   Requirements of Section 13 (b)(2) of the Exchange Act and Underlying  SEC Rules.**

---

[7]  Regulation S-K, Items 303.b.1 and 303.b.2, 17CFR229.303.b.1 and 303.b.2.

[8]  Regulation S-K, Item 303.a.3.iii., 17CFR229.303.a.3.iii.

A-11

Section 13 (b)(2)(A) of the Exchange Act requires that registrants, "make and keep books of records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."[9] SEC Rule 13b2-1 provides that "No person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities and Exchange Act."[10] These requirements are known as the "books and records" provisions of the Exchange Act.

Section 13 (b)(2)(B) of the Exchange Act requires registrants to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that —

- Transactions are executed in accordance with management's general or specific authorization, and

- Transactions are recorded as necessary (1) to permit preparation of financial statements in conformity with generally accepted accounting principles or other criteria applicable to such statements.[11]

These requirements are known as the "internal control" provisions of the Exchange Act.

SEC Rule 13b2-2(a) prohibits registrants from lying to their outside accountants. Specifically, the rule states:

(a) No director or officer of an issuer shall, directly or indirectly:

  (1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

  (2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

    (i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or

    (ii) The preparation or filing of any document or report required to be filed with the

---

[9] Section 13(b)(2)(A) *Securities Exchange Act of 1934*, 15USC78m(b)(2)(A).

[10] Rule 13b2-1, 17CFR240.13b2-1.

[11] Section 13(b)(2)(B), *Securities Exchange Act of 1934*, 15USC78m(b)(2)(B)

A-12

Commission pursuant to this subpart or otherwise.

Gateway issued Management Representation letters to PricewaterhouseCoopers ("PwC"), regarding the financial statements included in its Forms 10-Q for the second and third quarters of 2000. These letters, dated August 14, 2000, and November 14, 2000, respectively, each included the following statements (dates in November 14 letter are in parentheses):

> We confirm, to the best of our knowledge and belief, as of August 14 (November 14, 2000) the following representations made to you during your review:

> 1. The interim consolidated financial statements referred to above have been prepared on a basis consistent with the corresponding interim periods ended June 30, 1999 (September 30, 1999) and, to the degree appropriate, with the audited financial statements for the year ended December 31, 1999 (December 31, 2000). [sic]

> 2. The interim consolidated financial statements referred to above are fairly presented in conformity with accounting principles generally accepted in the United States, and include all disclosures necessary for such fair presentation and disclosures otherwise required to be included therein by the laws and regulations to which the Company is subject. . . .[13]

The first paragraph above was not accurate. The financial statements for the third quarter of 2000 were not prepared in a manner consistent with those of the corresponding periods of the prior year, nor with the December 31, 1999 balance sheet. Specifically, during the third quarter of 2000:

- Gateway changed the timing of recognizing revenue on the bundling arrangement with AOL. Prior to that period, revenue had been recognized at the time of customer registration for the AOL service.[14] Effective July 1, 2000, the triggering event for revenue recognition was the date of shipment of the computers to the customer.

- Gateway recorded the proceeds from the sale of fixed assets as Sales. This treatment did not agree with Gateway's stated policy regarding such sales, included in its Form 10-K for the year ended December 31, 1999.[15]

- Gateway changed its method of accounting for loan losses on customer loans receivable.

---

[12] Rule 13b2-2(a), 17CFR240.13b2-2(a).

[13] Exhibits 2459 and 2465

[14] Footnote 1(l), 1999 Form 10-K.

[15] Footnote 1(g), 1999 Form 10-K.

A-13

The items listed below caused Gateway to violate the books and records and internal control provisions. Further, in light of these items, Gateway's representations to PwC in the second paragraph above also violated the lying to accountants provisions for the second and third quarters of 2000. The violations include:

- The incorrect recognition of Sales revenue from the sale of customer loan receivables, and the lack of recognition of a discount on a below-market-rate loan to the purchaser of those receivables during the second quarter,

- The incorrect presentation of the customer loan receivables in the balance sheet for the second and third quarters,

- The incorrect application of GAAP, that resulted in an inadequate customer loan loss reserve in the third quarter,

- The incorrect recognition of Sales revenue and Cost of goods sold from a bundling arrangement with AOL that was structured into a "round trip" arrangement at the start of the third quarter,

- The incorrect recognition of Sales revenue and Cost of goods sold from a sale of fixed assets in the third quarter, and

- The incorrect recognition of Sales revenue and Cost of goods sold from a transaction with a commercial customer in the third quarter.

Gateway's interaction with PwC regarding the above-referenced sale of fixed assets, to Lockheed Martin Integrated Business Solutions ("LM"), warrants special consideration. Gateway told PwC accountants that they should look at the transaction, but did not inform them as to the "unique" manner in which it was recorded.[16] In fact, the underlying journal entries requested by the accountants during their third quarter review were not provided until January 2001.[17] Further, although the assets sold were recorded on Gateway's books as fixed assets, Gateway was able to cause the transaction to be treated as if it involved a sale of inventory. As a result, Gateway violated both the books and records and internal control provisions.

## II.  Analysis of Specific Issues — Second Quarter, 2000.

---

[16]  Manza Testimony, 134:10-134:25 and McLaughlin Testimony, 423:10-423:15

[17]  Foote Deposition, 83-84.

A-14

**A.   Non-Disclosure of Increases in Size and Risk of the Customer Loan Receivables Portfolio.**

   **1.   Inadequate MD&A disclosures.**

Gateway had since early 1999 provided financing for the purchase of personal computers to customers meeting certain credit standards.[18]  During the second quarter of fiscal year 2000, Todd approved the "buy deeper," "outbound" sales strategy to generate additional sales.[19]  Under the "buy deeper" program, personnel from Gateway contacted customers who had previously been declined credit by Gateway.  The callers offered these customers the opportunity to purchase a specially-configured Gateway computer.[20]  The special configuration was created to provide a higher gross margin than customary on these higher-risk sales.  The higher gross margin was necessary to offset the higher expected loan losses on these higher-risk customers.

During the second quarter of 2000, sales to Tier 5[21] customers were $33.2 million and sales to Tier 6 and above customers were $58.2 million, totaling $91.4 million.[22]  The Tier 5 and above sales for the three previous quarters combined were $72 million.[23]  This trend to a higher-risk customer base and its impact on revenues and net income exemplify the type of information that should be disclosed in MD&A.  Gateway, however, did not address the above changes in its Form 10-Q for the quarter ended June 30, 2000.  To the contrary, it explained its sales growth as follows:

---

[18]  Rai Deposition, 14:6-14:11.

[19]  Exhibit 2037, a June 1, 2000, letter from John Richards, President of the Gateway bank to David Rai, VP Client Development, Associates Commerce Solutions.  A paragraph in the letter states:

> The risks were presented to Mr. John Todd, CFO of Gateway, and he has instructed us to move forward with product sales and the extension of credit to these identified segments.

[20]  Bodeen Deposition, 67:17-68:1, and G 408973.

[21]  Tiers reflect the relative risk associated with customer receivables.  The lower the Tier, the lower the risk. The "higher risk tiers" begin at Tier 5.

[22]  Exhibit 2091, Gateway Finance Portfolio, pages G 165775-G 165777.  See also Appendix D.

[23]  See Appendix D for quarterly data and sources.  Q3, 1999 ($20,443,697 + $57,048) + Q4, 1999 ($33,307,289 + 6,931,402) + Q1, 2000 ($1,969,219 + $9,275,964) = $71,894,619.

9

A-15

Gateway consolidated net sales increased to $2.1 billion and $4.5 billion in the second quarter and first six months of 2000, respectively, representing an increase in unit shipments of 17% over the comparable periods of 1999. For the second quarter, domestic sales grew by 11% while international sales increased by 20% during the same period....

In the United States, net sales growth was led by the consumer segment with an increase of 32% over the second quarter of 1999 while the business segment declined 10%. Consumer sales growth was driven by growth in telephone, Gateway Country-Registered Trademark-store expansion and Internet sales.

No reader of these disclosures, or of others included in the MD&A section of Gateway's Form 10-Q as of and for the period ended June 30, 2000, could have known that a significant portion of the increased sales resulted from a lowering of the credit standards for new customers. The absence of this information constituted a material omission from the MD&A disclosures.

2. **Gateway's Inaccurate Presentation of Customer Loan Receivables in its Balance Sheet.** Rule 10-01(a)(2) of Regulation S-X permits the combination of balance sheet captions[24] only if they are less than 10% of total assets, and have not changed by more than 25% since the end of the preceding fiscal year.[25] Gateway's customer loan receivables at June 30, 2000, were approximately $459.28 million, representing approximately 11.3% of its total assets of $4.077 billion on that date, and they increased by approximately 53.4% since the end of the preceding fiscal year.[26] Gateway's June 30, 2000, balance sheet that was included in its second quarter 2000 Form 10-Q did not include a separate caption for its customer loans receivable.[27] The omission of this caption deprived the reader of material information regarding the substantial increase in Gateway's consumer loan portfolio.

B. **Gateway Sells Best Performing Consumer Loans to Increase Second Quarter Revenue and Earnings.**

Gateway had an agreement with Associates Commerce Solutions ("ACS") since early 1999 to

---

[24] Regulation S-X, Rule 5-02, 17CFR210.5-02.

[25] Regulation S-X, Rule 10-01(a)(2), 17CFR210.10-01(a)(2).

[26] See Appendix C for computations and sources.

[27] Form 10-Q for the second quarter of 2000.

A-16

assist in the establishment and management of its lending activities with customers that purchased

Gateway-branded computers.[28]  At the end of the second quarter of 2000, Gateway approached ACS

regarding a possible sale of loans from Gateway's portfolio of customer loan receivables to ACS.

After negotiating terms for such a sale, the parties agreed that there would be two simultaneous

transactions — one for the purchase of some of Gateway's customer loan receivables by ACS, and one

for a cash loan from Gateway to ACS.[29]  ACS would not have purchased the customer loan receivables

from Gateway without a cash loan from Gateway to ACS that contained economic value (i.e., a below

market interest rate loan).[30]  On June 30, 2000, Gateway wired $50,000,000 to effect its cash loan to

ACS and ACS wired $58,428,000 to Gateway to purchase its customer loan receivables.[31]  Several

factors are relevant in providing a context for the above transactions:

- ACS "cherry picked" the loans to be included.  Such loans were the least risky and best performing loans in Gateway's customer loan receivables portfolio.[32]

- ACS paid $58.428 million for customer loan receivables that had a carrying amount of $52.39 million (i.e., $58.428 million minus $6.038 million recognized gain).[33]

- The $50 million loan from Gateway to ACS was made at a below market rate of interest.  This is what provided the economic value that induced ACS to purchase customer loan receivables from Gateway.[34]

1.  **Generally Accepted Accounting Principles.**

   a.  **Violations of GAAP.**  Gateway violated numerous requirements of GAAP in its

treatment of the above transactions.

---

[28]  Rai Deposition, 13:5-14:11.

[29]  Exhibit 2017 (Purchase agreement) and Exhibit 2016 (Loan agreement).

[30]  Rai Deposition, 153:7-153:15.

[31]  Rai Deposition, 157:16-158:9, 158:11-158:20 and 158:23.  See also Exhibits 3032 and 3033 regarding the money transfers.

[32]  Rai Deposition, 126:15-126:17.

[33]  Footnote 2, amended 2001 Form 10-K filed on April 14, 2003, and Government Exhibit 2090, Gateway Finance Portfolio, page G 149506.

[34]  Rai Deposition, 153:7-153:15.

A77

- Gateway incorrectly recorded a $6.038 million "gain" on the sale of the loan portfolio, which was included in "Sales."[35]  Even if this "Gain" had been in conformity with GAAP, it should not have been included in "Sales."  Applicable GAAP is very specific about this.[36]  Further, "Sales" reflect the ongoing or central activity of Gateway.  The sale of the loan portfolio clearly did not reflect such activity.

- The loan to ACS was recorded as a separate transaction from the purchase of the loans by ACS.  These transactions were, in fact, related.[37]

- The loan to ACS should have been recorded by Gateway at its present value based on the market yield rate, rather than at the $50 million face value.  The resulting "loss" from this below-market loan should have been offset against the "gain" from the sale of the loan portfolio.  The discount on the loan to ACS should have been amortized to interest income over the term of that loan.[38]

- Gateway acknowledged its error in 2003 when it filed a restated Form 10-K.  In that restatement, Gateway states:

  > Gateway also restated the 2001 and 2000 financial statements to account for the excess cash proceeds received on the sale of a portfolio of financing receivables as an adjustment to the yield on a loan that was made to an affiliate of the purchaser of the portfolio.  Gateway originally recorded the excess proceeds as net sales and has revised the accounting to recognize the difference in other income (loss), net, over the period from the third quarter of 2000 through the fourth quarter of 2001.[39]

  **b.   Impact of GAAP Violations.**  The improper reporting of the loan portfolio sale to

ACS overstated Gateway's second quarter 2000 results as follows:

- Sales revenue was overstated by $6.038 million, and

- Income after income tax was overstated by approximately $3.895 million, or 1.17 cents per share.[40]

---

[35]  Footnote 2, amended 2001 Form 10-K filed on April 14, 2003, and Government Exhibit 2090, Gateway Finance Portfolio, page G 149506.

[36]  Financial Accounting Standards Board, "No. 125, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities," *Statements of Financial Accounting Standards*, paragraph 11.d. states that the transferor should "Recognize in earnings any gain or loss on the sale."

[37]  Rai Deposition, 153:7-153:15.

[38]  Accounting Principles Board, "No. 21, Interest on Receivables and Payables," *Opinions*, requires the imputation of market interest when the stated rate of interest does not equal the market rate.

[39]  Footnote 2, amended 2001 Form 10-K filed on April 14, 2003.

[40]  $6.038 million adjusted for Gateway's annualized effective tax rate of 35.5% (i.e., Income tax of $141,819 thousand divided by $399,490 thousand pretax income) for the second quarter of 2000 is $3.895 million.  That adjusted amount divided by 331,727 thousand weighted average shares for diluted EPS is 1.17 cents per share.

A-18

### III. Analysis of Specific Issues — Third Quarter, 2000.

**A. Substantial Increase in Outbound-Generated High-Risk Loans and Understatement of Corresponding Loan Loss Reserve.**

The "deep buy outbound" program was continued and expanded during the third quarter of 2000.

Eric Bodeen, the chief credit officer at Gateway's bank, coined the expression "deep, deep shit or

DDS," to reflect his categorization of such loans.[41]  By the end of the third quarter, Gateway's Tier 5

loans had grown to $100.8 million and Tier 6 loans had grown to $142.7 million, or 15.3% and 21.7%

of Gateway's total customer loan portfolio balance.  This compares to $20.4 million and $0.1 million

of such loans at September 30, 1999, or 13.2% and 0% of total customer loans.[42]

Concurrent with this increasing magnitude of high risk customer loans receivable, Todd instructed

Robert Manza and Mark Scoular, Director of Global Finance at Gateway, to change the method

Gateway used to determine provisions for loan losses.[43]  The method was ultimately changed from:

- 1% of the receivable for standard loans, and 19% of the receivable for high-risk loans at the origination of the loans, and

- an additional 7% for standard loans, and a significantly higher percent for high-risk loans over the lives of the loans.[44]

to:

- no provision at origination of the loans, and

- an allocation of estimated remaining loss-curve-based provisions over the life of the loans.[45]

By the end of September 2000, the loan loss reserve was $34.6 million, or 51.6% lower than it

---

See the second quarter 2000 Form 10-Q for the pretax income, income tax, and number of shares.

[41]  Bodeen Deposition, 152:13-153:4.

[42]  Appendix D includes schedules and charts that provide information about Gateway's customer loan receivables and the related loan loss reserve.  Source references are cited in the appendix.

[43]  Manza Testimony,138:9-138:19, 140:3-140:13, and 140:20-23.

[44]  Manza Testimony, 55:16-55:17 and 56:7-56:11.

[45]  The loan loss curve methodology is described in a PwC working paper referenced as PWC 000932-000933. 36-month loan loss curve schedules for Tier 5 are shown in PwC working papers referenced PWC 001077 - 001081, and for Tier 6 at PWC 001085 - 001089.

A-19

would have been under Gateway's prior methodology for estimating loan losses.[46]

Gateway's change in the methodology used to compute loan loss provisions was not driven by, nor was it consistent with the changing nature of the customer loan portfolio. Under these circumstances, the adoption of the revised method represented a change to a method of accounting that was not preferable to its previous method. Under GAAP, a change in accounting method must result in adoption of a method that is preferable to the current one. Specifically, GAAP states that:

There is a presumption that an accounting principle once adopted should not be changed in accounting for events and transactions of a similar type. Consistent use of accounting principles from one accounting period to another enhances the utility of financial statements to users by facilitating analysis and understanding of comparative accounting data.[47]

The presumption that an entity should not change an accounting principle may be overcome only if the enterprise justifies the use of an alternative acceptable accounting principle on the basis that it is preferable.[48]

Further, the SEC requires that the independent auditor must provide a letter to be filed with the SEC that indicates whether the firm concurs that the new method is preferable.[49] No such letter was ever filed. Because of the reduced allowance balance the new method generated during the period of increasing size and risk of the loan portfolio, I have concluded that the revised method was not preferable under GAAP.

Because Gateway's third quarter 2000 change in its method of computing loan loss reserves was to an unacceptable method, it constituted an error in accounting.

1. **Generally Accepted Accounting Principles.** GAAP requires that loan losses be recognized when:

---

[46] During August and September of 2000, loan loss provisions were arbitrarily capped. These caps reduced the loan loss reserve by $5,987,267 for August and $6,436,965 for September, or a total of $12,424,232. Then in September of 2000, an additional $22,200,000 reduction to the loan loss reserve was recorded to implement the new methodology. The sum of these adjustments is $34.6 million. See Appendix D for details.

[47] Accounting Principles Board, "No. 20, Accounting Changes," *Opinions*, paragraph 15.

[48] *Ibid.*, paragraph 16.

[49] Regulation S-K, Item 601(18), 17CFR.229.601(18).

*A-20*

- information available prior to issuance of the financial statements indicates that it is probable that the loan receivable has been impaired at the date of the financial statements, and

- the amount of the loss can be reasonably estimated.[50]

GAAP further provides that:

- a loan loss reserve should be recorded even though the particular receivables that are uncollectible may not be identifiable.[51]

  **a.   Violations of GAAP.** The new method used by Gateway to estimate loan loss

reserves violated the requirements of GAAP.

- Analysis of the underlying data indicates that the allowance for loan losses was materially understated at the end of the third quarter.

- A provision for loan losses should have been recorded when the high-risk customer loans were made. The criteria for recognition of impairment of customer loan receivables clearly were met at that time. In fact, under the revised methodology, no provision was recognized at the time that customer loans were originated. This is in spite of the fact that the high risk customers were known to be in financial positions that made it probable that they would default on their loans.

- As part of its audit of Gateway for the year ended December 31, 2000, PwC reviewed the allowance balance for the third quarter. As a result of its review, PwC recommended that the allowance balance at the end of the third quarter be increased by $13,987,000. Gateway accepted this recommendation, increasing the allowance balance by this amount, as noted in its footnotes to financial statements,[52] and in restating its previously filed Form 10-Q for the third period.[53]

GAAP defines an error as follows:

> Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared.[54]

Gateway's retroactive restatement of its previously filed Form 10-Q for the third quarter of 2000 is

---

[50] Financial Accounting Standards Board, "No. 5, Accounting for Contingencies," *Statements of Financial Accounting Standards*, paragraph 8.

[51] *Ibid.*, paragraph 22.

[52] Footnote 14, 2000 Form 10-K.

[53] Restated Form 10-Q for third quarter 2000, filed March 1, 2001.

[54] Accounting Principles Board, "No. 20, Accounting Changes," *Opinions*, paragraph 13.

A-21

consistent with a correction of an accounting error.[55]

Gateway's modification of method to recognize loan losses reduced loan loss reserves at the same time that the risk level of the customer receivable portfolio was increasing substantially. That result is counter-intuitive. If Gateway had applied the original method, the allowance for loan losses and current expense each would have increased by $34.6 million, or 6.69 cents per share.[56] That increase to expense would have caused Gateway to miss analyst earnings consensus of 46 cents[57] for the third quarter of 2002. Gateway reported a 46 cent diluted Earnings Per Share ("EPS") for the quarter ended September 30, 2000, in its Form 10-Q.

I conclude that the change in loan loss reserve method and reduction in loan loss expense were material departures from GAAP and SEC disclosure rules.

2.   **Gateway's Inaccurate Presentation of Customer Loan Receivables in its Balance Sheet.** Rule 10-01(a)(2) of Regulation S-X permits the combination of balance sheet captions[58] only if they are less than 10% of total assets, and have not changed by more than 25% since the end of the preceding fiscal year.[59] Gateway's customer loan receivables at September 30, 2000, were approximately $624.81 million, or approximately 14.0% of its total assets on that date, and they increased by approximately 108.7% since the end of the preceding fiscal year.[60] Gateway's September 30, 2000, balance sheet that was included in its third quarter 2000 Form 10-Q did not include a

---

[55] Financial Accounting Standards Board, "No. 16, Prior Period Adjustments," *Statements of Financial Accounting Standards*, paragraph 11 (as amended by FAS 109, paragraph 288(n)) requires that the correction of errors be accounted for as prior period adjustments.

[56] $34.6 million adjusted for Gateway's annualized effective tax rate of 35.5% (i.e., Income tax of $209,973 thousand divided by $592,480 thousand pretax income) for the third quarter of 2000 is $22.32 million. That adjusted amount divided by 333,681 thousand weighted average shares for diluted EPS is 6.69 cents per share. See the third quarter 2000 Restated Form 10-Q for the pretax income, income tax, and number of shares.

[57] Todd Testimony, 531:8-533:25 and Exhibit 2630.

[58] Regulation S-X, Rule 5-02, 17CFR210.5-02.

[59] Regulation S-X, Rule 10-01(a)(2), 17CFR210.10-01(a)(2).

[60] See Appendix C for computations and sources.

*A-22*

separate caption for its customer loans receivable.[61]  The omission of this caption deprived the reader

of material information regarding the substantial increase in Gateway's consumer loan portfolio.

    **3.**   **Management's Discussion and Analysis.**  As indicated above, two significant and

related trends were evident in connection with Gateway's product sales during the third quarter of

2000.  First, a material portion of sales was to high-risk customers.  Further, the sales to high-risk

customers altered both the nature and magnitude of the customer loan receivable portfolio.  To make

informed decisions, investors needed to be aware of the changes in Gateway's sales strategy and its

impact on customer loan receivables.  Such information was essential to investors in assessing

Gateway's performance as compared to prior periods and to others in the industry.  As is clear from the

following excerpts, Gateway did not disclose the nature and implications of its sales to high-risk

customers in the MD&A portion of its third quarter Form 10-Q.  Accordingly, the reader was unaware

of the change in trend of the customer base, and the attendant increase in risk of non-collectibility.

NET SALES

Gateway consolidated net sales increased to $2.5 billion and $7.0 billion in the third quarter
and first nine months of 2000, respectively.  For the third quarter of 2000, domestic sales
grew by 17% while international sales increased by 10% as compared to the third quarter of
2000. [sic]

The following table summarizes Gateway's net sales, for the periods indicated, by geographic
region:

| | THREE MONTHS ENDED SEPTEMBER 30, | | | NINE MONTHS ENDED SEPTEMBER 30, | | |
|---|---|---|---|---|---|---|
| | 1999 | CHANGE | 2000 | 1999 | CHANGE | 2000 |
| | | | (dollars in thousands) | | | |
| Net sales | | | | | | |
| United States | $1,899,761 | 17.0% | $2,223,621 | $5,306,240 | 12.0% | $5,944,319 |
| Europe | 118,835 | 12.9% | 134,204 | 372,803 | 22.2% | 455,596 |
| Asia Pacific | 159,900 | 7.7% | 172,268 | 514,973 | 18.4% | 609,937 |
| Consolidated | $ 2,178,496 | 16.1% | $ 2,530,093 | $6,194,016 | 13.2% | $ 7,009,852 |

In the United States, net sales growth was led by the consumer segment with an increase of
27% over the third quarter of 1999 while the business segment increased 2%.  Consumer sales
growth was driven by growth in all sales channels.

    **4.**   **Inadequate Footnote Disclosures.**  Rule 10-01(a)(5) of Regulation S-X requires that:

---

[61]  Form 10-Q for the third quarter of 2000.

*A-23*

...disclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant. Disclosures should encompass for example, significant changes since the end of the most recently completed fiscal year in such items as: accounting principles and practices; estimates inherent in the preparation of financial statements; status of long-term contracts; capitalization including significant new borrowings or modification of existing financing arrangements; and the reporting entity resulting from business combinations or dispositions.[62]

Gateway's third quarter 2000 footnote disclosure about its customer loan receivables made no mention of the substantial increase in high-risk loans or about its change in the method used to compute loan loss reserves.  Footnote 2 from Gateway's Form 10-Q for the third quarter of 2000 follows:

### 2. FINANCE RECEIVABLES:

Finance receivables, included in other current assets and other assets, consist of receivables due from customer installment purchases of the Company's products and services net of allowance for losses. Finance charges on the receivables are recognized using the interest method. Finance charge accruals are generally suspended on accounts when they become 60 days contractually delinquent. Receivable origination and commitment fees are deferred and amortized as a component of finance charges over the life of the related receivable.

The Company maintains an allowance for losses on finance receivables at an amount that it believes is sufficient to provide for losses in its existing receivables portfolio. The allowance is evaluated on a regular basis by management and is based upon management's periodic review of the collectibility of the receivables with respect to historical experience, the nature and volume of the portfolio, adverse situations that may affect the customer's ability to repay and general economic conditions. Finance receivables are charged to the allowance for losses when they are deemed to be uncollectible, generally when the receivable becomes 180 days delinquent. Although the allowance for losses on finance receivables reflected in the Company's consolidated balance sheet at September 30, 2000 is considered adequate by the Company s management, there can be no assurance that this allowance will prove to be adequate over time to cover ultimate losses in connection with the Company's finance receivables.

### B. Treatment of a Sale of Fixed Assets to an Information Technology Provider as Ordinary Sales Revenue and Cost of Goods Sold.

At a meeting of Gateway's financial executives in September of 2000, Manza suggested to Todd that Gateway could increase sales and income by selling computer equipment used internally by

---

[62] Regulation S-X, Rule 10-01(a)(5), in part, 17CFR210.10-01(a)(5), in part.

A-24

Gateway to Lockheed Martin Integrated Business Solutions ("LM"), its information technology provider.[63]  The equipment was included under fixed assets on Gateway's books, with an original cost of $46.39 million.[64]  At Todd's instruction, Manza instructed a Gateway employee to contact a LM representative to effect the transaction.[65]  After negotiations, an agreement was reached[66] by which LM would purchase the equipment for $47.26 million, and Gateway would "rent" the equipment back from LM for an equal amount.[67]  After Gateway made an up front, lump sum payment, of $47.26 million to LM, consistent with a prepayment provision in the contract,  LM made the five monthly payments to Gateway.[68]

Manza indicated to Todd that revenue recognized from the proposed sale should involve only Gateway-manufactured equipment.[69]  All of the equipment was included under fixed assets on Gateway's books, at an original cost of $46.39 million.[70]  The Gateway-manufactured equipment comprised $14 to $15 million of this amount.[71]  The remainder consisted of Sun and IBM servers.[72]  At Todd's instruction, Manza, despite his awareness of the underlying GAAP issue and potential challenge by PwC,  caused $46.39 million ($47.26 million less $0.87 million sales tax) to be recorded

---

[63]  Manza Testimony, 393:20-394:20.

[64]  Exhibit 2174, Memo from Julie Paustain to Mike Kramer, Bob Manza, and Theresa Knutson, dated October 3, 2000, and Exhibit 2175 containing journal entries to record the "sale" of equipment to LM and to subsequently "correct" these entries.

[65]  Manza Testimony, 403:10-403:14.

[66]  Exhibit 2418, and Biddle Testimony, 49:8-49:13 and 68:21-69:6.

[67]  Exhibit 2005.

[68]  Paustain Testimony, 225:22-229:12 and Exhibit 2177.

[69]  Manza Testimony, 415:12-415:16.

[70]  Exhibit 2175 containing journal entries to record the "sale" of equipment to LM and to subsequently "correct" these entries.

[71]  Manza Testimony, 415:12-415:13.

[72]  Manza Testimony, 415:12-415:13 and 415:20-415:23.

19

A-25

as ordinary Sales revenue. On March 1, 2001, Gateway filed an amended Form 10-Q for its third quarter of 2000. In that filing Gateway removed the $46.39 million from third quarter 2000 Sales revenue because it "represented a sale of computers and other equipment that represented a sale of fixed assets."[74] This restatement was an admission by Gateway that the sale should not have been recorded as ordinary Sales revenue.

1. **Generally Accepted Accounting Principles.**

   a. **Violations of GAAP.** Gateway violated several aspects of GAAP through its treatment of the above transaction.

   - According to GAAP, sales of fixed assets should generate a net gain or loss instead of gross Sales revenues and Cost of goods sold.

   - According to a Financial Accounting Standards Board *Statement of Financial Accounting Concepts*, the classification of an item as "Revenues" is limited to:

     > inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's **ongoing major or central operations**. (Emphasis added)[75]

   - Gateway furnished the cash up front to LM, who returned the cash to Gateway in five monthly payments. This circular flow of cash reflected "round-tripping."

   - "Round-tripping" violates a fundamental tenet of GAAP that the substance of a transaction cannot be subordinated to its form.[76]

Gateway's sale of fixed assets could not be properly classified as Sales revenue. The violation is magnified by the fact that approximately two-thirds of the assets involved were not even manufactured by Gateway. Gateway's subsequent restatement of the transaction is consistent with the argument that

---

[73] Manza Testimony, 415:25-416-9 and 416:15-416:18.

[74] Footnote 3, Restated Form 10-Q for third quarter 2000, filed March 1, 2001.

[75] Financial Accounting Standards Board, "No. 6, Elements of Financial Statements," *Statements of Financial Accounting Concepts*, paragraph 78. In this context "Revenues" and "Sales" are deemed to be synonymous in reflecting the major activities of Gateway.

[76] Financial Accounting Standards Board, "No. 2, Qualitative Characteristics of Accounting Information," *Statements of Financial Accounting Concepts*, paragraph 160.

A-26

the original recording was done in error.

    **b.  Financial Statement Misstatements.**  As a result of the above GAAP violations, the financial statements of Gateway were misstated as of and for the period ended September 30, 2000. The Net sales revenue was overstated by approximately $46.39 million,[77] or around 2.5% of net sales for the quarter ended September 30, 2000.[78]

### C.  Gateway's Improper Recognition of Revenue from AOL Bounty Payments.

    Gateway entered into an agreement with AOL in December 1999 to bundle the AOL subscription service with the sale of certain configurations of Gateway's computers.[79]  The agreement provided for Gateway to pay $219.45 to AOL for each purchaser who subscribed to twelve months of AOL service, or ISP payment.  Conversely, AOL was obligated to pay to Gateway $132.06 (November subscriptions) or $164.56 (December subscriptions) as a fee, or "bounty," for each such twelve month subscriber.[80]  Gateway applied the "gross method" to record the above payments, by including the bounty receipts from AOL in Sales revenue and the ISP payments to AOL in Cost of goods sold.[81]

    In the third quarter of 2000, the parties twice renegotiated the terms of the agreement.  The initial revision, effected in July 2000, raised the bounty receipts to $219.45, the precise amount of the ISP payments.[82]  That is, Gateway and AOL were exchanging the exact amount of cash, on a concurrent basis.  Later in the quarter, on September 30, the parties agreed to alter the contract, effective July 1, 2000, to change the event that triggered payments.  Under the amended contract, receipts and payments

---

[77]  Exhibit 2175 containing journal entries to record the "sale" of equipment to LM and to subsequently "correct" these entries.

[78]  2% equals $64.39 million divided by $2.530 billion.  See Form 10-Q for the third quarter of 2000 for the $2.530 billion net sales number.

[79]  Exhibit 2577, Agreement for Distribution of AOL Software dated December 29, 1999, amended and restated a December 22, 1999 agreement.  Effective date of the agreement was October 1, 1999.

[80]  *Ibid.*

[81]  Footnote 2, Restated Form 10-Q for third quarter 2000, filed March 1, 2001.

[82]  Exhibit 2583.

between Gateway and AOL were to be based on the sales of computers to customers, not on registrations for subscriptions to AOL's internet services.[83]  In conjunction with the change in payment terms, Gateway, retroactive to July 1, 2000, revised when it recognized Sales revenues and Cost of goods sold to the time when computers were sold to customers, instead of when customers registered for subscriptions with AOL.[84]

Historically, approximately forty-five percent of purchasers subscribed to the AOL service.[85]  As a result of the change from registration to sales of computers as the point of recognition of Sales revenue and Cost of goods sold, each increased $72.1 million for the third quarter of 2000.[86]  These changes were motivated by Gateway's goal of increasing reported revenues.[87]  The resulting cash payments were clearly inflated and underscored the lack of economic substance of the amended payment terms under the contract.  That is, Gateway was paying AOL for customers who did not activate their ISP service, and AOL was paying Gateway a bounty for non-subscribers.

      1.   **Generally Accepted Accounting Principles and SEC Footnote Disclosure Violations.**

         a.   **Violations of GAAP.**  Gateway violated GAAP in its financial statement treatment of the AOL transactions.

- Once the receipts from AOL were raised to equal the payments to AOL, the cash flows between the parties reflected round-trip transactions.  At that point, the use of the "gross method" to record the receipts as Sales revenue and the payments as Cost of goods sold was unsupportable under GAAP.  AOL was paying for its own promotion program and Gateway was paying for its own promotion program.  GAAP requires that such arrangements be reported on a net basis, which in the AOL bundled agreement case would result in zero Sales revenue and zero Cost of good sold.[88]

---

[83]  Exhibit 2787.

[84]  G 635310, G 6350308, and G 635313 containing journal entries.

[85]  G 023903

[86]  G 635310, G 6350308, and G 635313 containing journal entries.  The adjustments were $20,308,035 for July, $25,414,764 for August, and $26,332,212 for September, 2000.  This totals $72,055,011.

[87]  Exhibit 2636 showing how AOL would help to meet the their quarter 2000 Revenue consensus.

[88]  Emerging Issues Task Force, "No. 99-17, Accounting for Advertising Barter Transactions," *Abstracts*.

- AOL was the other party to the round-tripping transaction and it used the net method.[89]

- The impropriety of the use of the gross method is confirmed by Gateway's restatement of the financial statements included in its restated 2001 Form 10-K that was filed on April 14, 2003. As Gateway indicated in amending the original filing:

> Gateway restated 2001, 2000 and 1999 net sales to reduce the amounts of bounty income recognized, and cost of goods sold by the costs incurred for AOL bundled internet service sold to our customers, of $131 million, $337 million and $8 million, respectively. The amounts received from AOL were previously included in net sales and the amounts paid to AOL were previously included in cost of goods sold.... In view of the nature of the relationships which Gateway maintained with the (AOL) ..., Gateway determined that it is more appropriate to present such amounts on a net basis.[90]

**b.  Inadequate Footnote Disclosures.**  Rule 10-01(a)(5) of Regulation S-X requires that:

> ...disclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant.  Disclosures should encompass for example, significant changes since the end of the most recently completed fiscal year in such items as: accounting principles and practices; estimates inherent in the preparation of financial statements; status of long-term contracts; capitalization including significant new borrowings or modification of existing financing arrangements; and the reporting entity resulting from business combinations or dispositions.[91]

Gateway's third quarter 2000 Form 10-Q did not include any footnote disclosure about its round-trip arrangement with AOL.

This lack of disclosure is further evidenced by the significant change from Gateway's footnote disclosure in its 1999 financial statements.  Gateway included the following regarding its revenue recognition policy for providing access to the Internet:

> Gateway recognizes revenue from services, such as training and **Internet service**, upon delivery of the service. (Emphasis added)[92]

This footnote comprised the only disclosure related to the AOL arrangement.  Although the

---

[89]  Exhibit 9AOL310195.  An internal AOL memo.

[90]  Footnote 2, amended 2001 Form 10-K filed on April 14, 2003

[91]  Regulation S-X, Rule 10-01(a)(5), in part, 17CFR210.10-01(a)(5), in part.

[92]  Footnote 1(k), 1999 Form 10-K.

A 29

information provided was very limited and did not refer to the inclusion of bounties from AOL in revenues, it clearly stated that Gateway's policy was to recognize revenue at the time the Internet service was provided. As noted above, Gateway and AOL agreed to change the contractual arrangement between the parties, such that revenue was recognized and cash exchanged at the time the computer was shipped, not when the customer elected the Internet service.

**2. Impacts of GAAP Violations.** The gross method overstated Sales revenue and Cost of goods sold by approximately $140 million during the third quarter of 2000.[93] This resulted in an overstatement of third quarter 2000 net sales by 5.8%.[94]

**D. Gateway's Improper Recognition of Revenue on a Transaction with a Commercial Customer.**

During September 2000, Gateway negotiated a transaction with VenServe ("VS"), whereby VS would purchase computers from Gateway and store them in a third-party warehouse. VS' plan was to serve as an intermediary between potential Gateway customers with poor credit and underwriters who would finance such customers. Ultimately, on September 22, 2000, the parties executed a Reseller Agreement and a Referral Agreement ("the Agreements"), resulting in a "sale" to VS of approximately $21 million of computers.[95] Under these agreements, VS was to select a third-party warehouse in which to store the computers. The Agreements provided that Gateway was obligated to provide enough referrals of potential customers to enable VS to resell the computers by December 31, 2000, or VS had the right to terminate the arrangement. Further, VS was not obligated to pay for any of the computers until the earlier of 24 hours after each was sold or 120 days from September 22, 2000.[96]

---

[93] Footnote 15, amended 2001 Form 10-K filed on April 14, 2003. $2,548,290 thousand previously reported Net sales for the third quarter of 2000, minus the $2,406,024 thousand restated Net sales equals $142.3 million. A small portion of this amount was related to the restatement of warranty service revenues, leaving approximately $140 million that was related to the restatement of the AOL revenues.

[94] 5.8% = $140 million divided by $2.406 billion.

[95] Exhibits 1029 and 1030.

[96] This arrangement is essentially a "consignment sale" arrangement where Gateway should recognize Sales revenue and Cost of goods sold only at the time that VS completed sales to ultimate customers.

The payment terms were subsequently extended to March 30, 2001.

VS' obligation as a reseller of Gateway computers was conditioned on sufficient customer referrals from Gateway and VS securing the necessary financing for the customers.  Further, in spite of the Agreements, Gateway secured the warehouse in which the computers were stored and paid all related costs.[98]  In fact, Gateway manufacturing employees removed computers allegedly earmarked for VS from the warehouse to meet demands for sales to other customers.[99]  In addition, Gateway was required to perform additional activities after the approximate $21 million sale on September 22, 2000. Specifically, Gateway leased employees to VS to assist in the resale of the computers by VS.[100]  Further, when a computer was sold by VS, it was returned to Gateway for recording by Gateway of warranty information.[101]  Gateway then re-invoiced VS for the sale of that computer and sent the computer to the end customer.

As discussed below, the above factors caused Gateway to violate both GAAP and SEC rules by recognizing the approximate $21 million of revenue in the third quarter of 2000.

   1.   **Generally Accepted Accounting Principles and SEC Rules.**  In general under GAAP, revenue is recognized at the point at which the earning process is completed by the seller and collection is assured, or any uncollectible portion can be reasonably estimated.  These criteria are identified and more specifically described in Staff Accounting Bulletin ("SAB") 104, *Revenue Recognition*, as follows:[102]

   The staff believes that revenue generally is realized or realizable and earned when all of the

------

[97]  Exhibit 2143 and G 244187.

[98]  Exhibits 1119 and 2414.

[99]  Exhibits 2237 and 2241.

[100]  Exhibit 1030.

[101]  Exhibit 2409.

[102]  Note that SAB 104 (originally SAB 101) was effective in the fourth quarter of 2000.  The criteria cited for revenue recognition, however, are drawn from specific GAAP standards that existed prior to that date.

A-31

following criteria are met:

- Persuasive evidence of an arrangement exists,[103]

- Delivery has occurred or services have been rendered,[104]

- The seller's price to the buyer is fixed or determinable,[105] and

- Collectibility is reasonably assured.[106]

Normally, these criteria are satisfied at the point of sale and physical transfer of the inventory.

There are, however, circumstances in which GAAP permits revenue recognition, based on the

substantive satisfaction of the above criteria. Two such situations are relevant to consideration of the

VenServe transaction.

---

[103] Financial Accounting Standards Board, "No. 2, Qualitative Characteristics of Accounting Information," *Statements of Financial Accounting Concepts*, paragraph 63 states "Representational faithfulness is correspondence or agreement between a measure or description and the phenomenon it purports to represent." The staff believes that evidence of an exchange arrangement must exist to determine if the accounting treatment represents faithfully the transaction. See also American Institute of CPAs, "No. 97-2, Software Revenue Recognition, *Statements of Position*, paragraph 8. The use of the term "arrangement" in this SAB Topic is meant to identify the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction.

[104] Financial Accounting Standards Board, "No. 5, Recognition and Measurement in Financial Statements of Business Enterprises," *Statements of Financial Accounting Concepts*, paragraph 84(a), (b), and (d). Revenue should not be recognized until the seller has substantially accomplished what it must do pursuant to the terms of the arrangement, which usually occurs upon delivery or performance of the services.

[105] Financial Accounting Standards Board, "No. 5, Recognition and Measurement in Financial Statements of Business Enterprises," *Statements of Financial Accounting Concepts*, paragraph 83(a); Financial Accounting Standards Board, "No. 48, Revenue Recognition When Right of Return Exists," *Statements of Financial Accounting Standards*. paragraph 6(a); SOP 97-2, paragraph 8. American Institute of CPAs, "No. 97-2, Software Revenue Recognition," *Statements of Position*, defines a "fixed fee" as a "fee required to be paid at a set amount that is not subject to refund or adjustment. A fixed fee includes amounts designated as minimum royalties." Paragraphs 26-33 of American Institute of CPAs, "No. 97-2, Software Revenue Recognition," *Statements of Position*, discuss how to apply the fixed or determinable fee criterion in software transactions. The staff believes that the guidance in paragraphs 26 and 30-33 is appropriate for other sales transactions where authoritative guidance does not otherwise exist. The staff notes that paragraphs 27 through 29 specifically consider software transactions, however, the staff believes that guidance should be considered in other sales transactions in which the risk of technological obsolescence is high.

[106] Committee on Accounting Procedure, "No. 43, Restatement and Revision of Accounting Research Bulletins," *Accounting Research Bulletins*, Chapter 1A, paragraph 1 and Accounting Principles Board, "No. 10, Omnibus Opinion—1966," *Opinions*, paragraph 12. See also Financial Accounting Standards Board, "No. 5, Recognition and Measurement in Financial Statements of Business Enterprises," *Statements of Financial Accounting Concepts*, paragraph 84(g) and American Institute of CPAs, "No. 97-2, Software Revenue Recognition," *Statements of Position*, paragraph 8.

A-3 ∠

   **a.   "Bill-and-Hold" Transactions.** In certain circumstances in which the buyer asks

the seller to delay shipment of the inventory, revenue can be recognized by the seller.  According to

SAB 104, the criteria to be met in order to recognize revenue when delivery has not occurred

include:[107]

1.   The risks of ownership must have passed to the buyer,

2.   The customer must have made a fixed commitment to purchase the goods, preferably in
     written documentation,

3.   The buyer, not the seller, must request that the transaction be on a bill and hold basis.[108]  The
     buyer must have a substantial business purpose for ordering the goods on a bill and hold
     basis,

4.   There must be a fixed schedule for delivery of the goods.  The date for delivery must be
     reasonable and must be consistent with the buyer's business purpose (e.g., storage periods are
     customary in the industry),

5.   The seller must not have retained any specific performance obligations such that the earning
     process is not complete,

6.   The ordered goods must have been segregated from the seller's inventory and not be subject
     to being used to fill other orders, and

7.   The equipment [product] must be complete and ready for shipment.

The above listed conditions are the important conceptual criteria that should be used in evaluating

any purported bill and hold sale.

   **b.   Sales with A Right of Return.**  Under very limited circumstances, revenue can be

recognized under GAAP when the buyer has a right of return of the product.  The following criteria for

revenue recognition in such circumstances are enumerated in the FASB's Statement of Financial

---

[107]  As noted above, SAB 104 (originally 101) was effective in the fourth quarter of 2000.  The criteria for
revenue recognition in "bill-and-hold" transactions were enumerated by the SEC previously.  See In the Matter
of Stewart Parness, AAER 108 (August 5, 1986); SEC v. Bollinger Industries, Inc., et al, LR 15093 (September
30, 1996); In the Matter of Laser Photonics, Inc., AAER 971 (September 30, 1997); In the Matter of Cypress
Bioscience Inc., AAER 817 (September 19, 1996).  Also see Financial Accounting Standards Board, "No. 5,
Recognition and Measurement in Financial Statements of Business Enterprises," *Statements of Financial
Accounting Concepts*, paragraph 84(a).  and SOP 97-2, paragraph 22.

[108]  Such requests typically should be set forth in writing by the buyer.  This is the actual footnote from SAB
104.

*A-33*

Accounting Standards No. 48, *Revenue Recognition When a Right of Return Exists*:

- The seller's price to the buyer is substantially fixed or determinable at the date of sale.

- The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.

- The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

- The buyer acquiring the product for resale has economic substance apart from that provided by the seller.[109]

- The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

- The amount of future returns[110] can be reasonably estimated.

Sales revenue was not properly recognized on the VenServ transaction because the above conditions for "bill-and-hold" and/or sales with a right of return were satisfied.  Accordingly, Gateway overstated its Net sales revenue, Net income, and Earnings per share for the third quarter of 2000.

## IV. Conclusion.

As a result of the above GAAP and disclosure violations, I have concluded that Gateway presented information that systematically misled investors.  Based on my analysis of the facts and circumstances in this matter and in the context of a career of examining financial statements and disclosures, I further believe that the weight of evidence suggests that Gateway engaged in a patten of deception.


_____                    _____
    Jerry L. Arnold, Ph.D., CPA                              Date


---

[109] This condition relates primarily to buyers who exist "on paper," that is, buyers who have little or no physical facilities or employees.  It prevents enterprises from recognizing sales revenue on transactions with parties that the sellers have established primarily for the purpose of recognizing such sales revenue.

[110] Exchanges by ultimate customers of one item for another of the same kind, quality, and price (for example, one color or size for another) are not considered returns for purposes of this Statement.

*A 34*

Appendix A

A 35

Appendix A
Documents Relied Upon

1.  The Complaint and other selected pleadings in the case, including, but not limited to:
    • Statement of Uncontroverted Facts in Support of Motion for Partial Summary Judgment by Plaintiff Securities and Exchange Commission Against Defendant Robert D. Manza, including exhibits
    • Statement of Uncontroverted Facts in Support of Motion for Partial Summary Judgment by Plaintiff Securities and Exchange Commission Against Defendant John J. Todd, including exhibits
    • Statement of Uncontroverted Facts in Support of Motion for Partial Summary Judgment by Plaintiff Securities and Exchange Commission Against Defendant Jeffrey Weitzen, including exhibits
    • Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment by Plaintiff Securities and Exchange Commission Against Defendant Robert D. Manza
    • Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment by Plaintiff Securities and Exchange Commission Against Defendant John J. Todd
    • Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment by Plaintiff Securities and Exchange Commission Against Defendant Jeffrey Weitzen

2.  Testimonies:
    • Manza Testimony
    • Todd Testimony
    • Biddle Testimony
    • Paustian Testimony
    • McLaughlin Testimony

3.  Depositions:
    • Bodeen Deposition
    • Rai Deposition

4.  Analyst Reports:
    • A.G. Edwards
    • Argus
    • Bank of America Securities
    • Bear Stearns
    • Credit Suisse First Boston
    • Gerard Klauer Mattison
    • Lehman Bros.
    • Merrill Lynch
    • Morgan Stanley Dean Witter
    • Pershing Investment Research
    • Prudential Securities
    • Salomon Smith Barney
    • Sands Bros.
    • US bancorp Piper Jaffray
    • UBS Warburg-Paine Webber
    • Wit Soundview

5.  Documents and Exhibits:
    • Exhibit 2459
    • Exhibit 2465
    • Exhibit 2037
    • Exhibit 2091
    • Exhibit 2016
    • Exhibit 2017
    • Exhibit 2174

A-36

- Exhibit 2418
- Exhibit 2005
- Exhibit 2175
- Exhibit 2577
- Exhibit 2583
- Exhibit 2787
- Exhibit 2636
- Exhibit 1029
- Exhibit 1030
- Exhibit 2090
- Exhibit 2171
- Exhibit 2143
- Exhibit 1119
- Exhibit 2414
- Exhibit 2237
- Exhibit 2241
- Exhibit 2409
- Exhibit 3032
- Exhibit 3033
- Bates Numbers PWC 000932-000933
- Bates Numbers PWC 001077-001081
- Bates Numbers PWC 001085-001089
- Bates Number 9AOL310195
- Bates Numbers G635310; G6350308; G635313
- Bates Number G023903
- Bates Number G244187

5.   Gateway SEC Filings:
- Forms 10-K for Years Ending December 31, 2001, 2000, 1999, as originally filed and as restated
- Forms 10-Q for Quarters Ending September 30, June 30, 2000, as originally filed and as restated, and for Quarter Ending March 31, 2000
- Forms 10-Q for Quarters Ending September 30, June 30, and March 31 in 1999

6.   Authoritative Literature and SEC Enforcement Actions:
- SEC Release 33-8579, In the Matter of Huntington Bancshares, Inc., Thomas E. Hoaglin, Michael J. McMennamin, and John Van Fleet, CPA.  June 2, 2005.
- Significant MD&A releases: 33-6349 (9-28-81), 33-6711 (4-21-87), 33-6791 (8-1-88), and 33-6835 (5-18-89)
- Regulation S-K, Item 601(18)
- Regulation S-K, Item 303.a.3.i.-ii
- Section 13(b)(2)(A) *Securities Exchange Act of 1934*
- Rule 13b2-1
- Section 13(b)(2)(B), *Securities Exchange Act of 1934*
- Rule 13b2-2(a)
- Regulation S-X, Rules 5-02 and 10-01
- Financial Accounting Standards Board, "No. 125, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities," *Statements of Financial Accounting Standards*
- Accounting Principles Board, "No. 21, Interest on Receivables and Payables," *Opinions*
- Accounting Principles Board, "No. 20, Accounting Changes," *Opinions*
- Financial Accounting Standards Board, "No. 5, Accounting for Contingencies," *Statements of Financial Accounting Standards*
- Financial Accounting Standards Board, "No. 16, Prior Period Adjustments," *Statements of Financial Accounting Standards*, (as amended by FAS 109, paragraph 288(n))
- Staff Accounting Bulletin 99, *Materiality*

A-37

- Staff Accounting Bulletin 104, *Revenue Recognition* (formerly SAB 101)
- Financial Accounting Standards Board Statement of Financial Accounting Concepts No. 6, *Elements of Financial Statements*
- Financial Accounting Standards Board, "No. 2, Qualitative Characteristics of Accounting Information," *Statements of Financial Accounting Concepts*
- Emerging Issues Task Force. "No. 99-17, Accounting for Advertising Barter Transactions, " *Abstracts*
- Financial Accounting Standards Board, "No. 2, Qualitative Characteristics of Accounting Information," *Statements of Financial Accounting Concepts*
- American Institute of CPAs, "No. 97-2, Software Revenue Recognition," *Statements of Position*
- Financial Accounting Standards Board, "No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, " *Statements of Financial Accounting Concepts*
- Financial Accounting Standards Board, "No. 48, Revenue Recognition When Right of Return Exists," *Statements of Financial Accounting Standards*
- Committee on Accounting Procedure, "No. 43, Restatement and Revision of Accounting Research Bulletins," *Accounting Research Bulletins*
- Accounting Principles Board, "No. 10, Omnibus Opinion—1966," *Opinions*
- Financial Accounting Standards Board, "No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, *Statements of Financial Accounting Concepts*
- In the Matter of Stewart Parness, AAER 108 (August 5, 1986)
- SEC v. Bollinger Industries, Inc., et al, LR 15093 (September 30, 1996)
- In the Matter of Laser Photonics, Inc., AAER 971 (September 30, 1997); In the Matter of Cypress Bioscience Inc., AAER 817 (September 19, 1996)

A-38

Appendix B

# CURRICULUM VITAE
## JERRY L. ARNOLD

I.   GENERAL INFORMATION

    A.   Personal Data

        1.   Home Address:

           16646 Calle Jermaine
           Pacific Palisades, CA 90272
           (310) 459-6177 (home address)

           (310) 702-6177 (cell)

        2.   Business Address:

           School of Accounting
           University of Southern California
           Los Angeles, CA  90089-1421
           (213) 740-4860

        3.    Date of Birth:  03-11-47

    B.   Formal Education

        1.   University of Michigan, Doctor of Philosophy (Ph.D), 1975. Major - Accounting.  Dissertation Title - "Accounting for the Investment Tax Credit as a Potential Causal Factor in the Corporate Equipment Investment Decision:  An Empirical Analysis."

        2.   University of Missouri- Columbia, Masters of Arts in Accountancy, 1972.

        3.   University of Missouri - Columbia, Bachelor of Science  in Business Administration (Accounting), 1969.

A-40

C.    Experience

  1.    Academic

      a.    University of Pennsylvania, Wharton School
            Visiting Professor of Accounting, 1988-89

      b.    University of Southern California
            Professor, 2001-present
            Accounting Associates Professor, 1995- 2001
            Price Waterhouse Professor, 1990-1995
            Professor of Accounting, 1988-1995
            Associate Professor of Accounting (with tenure),
            1982-1987
            Founding Director, SEC and Financial Reporting Institute,
            1981-1988
            Assistant Professor of Accounting, 1979-1982

      c.    University of California, Los Angeles
            Assistant Professor of Accounting, 1975-1979.

      d.    University of Michigan
            Graduate Teaching Fellow, Graduate School of Business
            Administration, 1972-1975.

      e.    University of Missouri
            Graduate Teaching Assistant, School of Accountancy,
            1971-1972.

  2.    Other

      a.    Academic Fellow, Office of the Chief Accountant,
            Securities and Exchange Commission, Washington, D. C.,
            summer 1981. Contributed to Accounting Series Release
            No. 299 on management's discussion and analysis of
            financial condition and results of operations, which was
            adopted September 1981.

      b.    Independent Certified Public Accountant, Ernst & Young,
            1970-71, currently licensed in Missouri.

      c.    Only academic among five finalists for the position of
            Chief Accountant, Securities and Exchange Commission,
            1988.

A-41

II.     BUSINESS AND CONSULTING ACTIVITIES

    A.     Litigation Support
I have been engaged numerous times as an expert witness in commercial litigation and in cases involving the SEC.  The commercial cases have focused on SEC and accounting issues, as well as on matters involving valuation and assessment of damages.  I have also been retained on several occasions by the SEC to serve as an expert witness on accounting and disclosure issues, as well as by the Department of Justice.  In addition, I prepared a report in a Wells submission on behalf of large, public company being investigated by the SEC for possible accounting and disclosure violations.

    B.     Instructing KPMG SEC Reporting and Compliance Course
Since 1989, I have instructed a comprehensive two-day seminar for KPMG professionals and clients.   On average, I have conducted this course more than ten times per year.  The course involves detailed discussion and interpretation of SEC rules and activities.  During the conduct of the course, I provide recommendations and insights regarding implications of various reporting and capital formation strategies.  My activities have included instructing a comparable course in Canada, Brazil and in Europe for the Firm and for selected international clients.

    C.     Consulting for Specific Companies on SEC Compliance and Capital Formation
I have been engaged by several companies to offer advice and recommendations on specific SEC-related issues.  Recent efforts have included compliance with SOX 404.   My efforts have involved entities ranging from the start-up phase to large, multi-nationals.

III.    SEC AND FINANCIAL REPORTING INSTITUTE

    A.     I was the founding director of the Institute in 1981 and served in that capacity from its inception until 1988.  Serving as director required that I devote a majority of my time to administering Institute activities. The purpose of the Institute is to promote interaction between policy setters, their constituencies, and researchers in academia.  The Institute is a unique organization.  Its research efforts have resulted from requests from the SEC and the National Commission on Fraudulent Financial Reporting as well as from national calls for proposals.  I created a management structure for the Institute that includes an Executive Committee and Advisory Council.  I worked closely with these groups and the administration of the Schools of Accounting and Business in formulating and implementing Institute policies. The advisory groups include representatives from the SEC, at both the Commission and staff level, as well as the chairman of the Financial Accounting Standards Board and

A-42

other private-sector policy setters, and senior executives from the business and accounting communities.

B.   I was responsible for all fundraising activities of the Institute.  In addition to the annual conference, these activities include seeking annual Institute membership from corporations and CPA firms and larger individual donations.  As a result of these activities, the Institute raised over four hundred thousand dollars during my directorship and has been self-sustaining financially from its inception.

C.   I was responsible for planning, developing, and managing the Institute's annual major conference in Los Angeles.  Twenty-four such conferences have been held to date.  Average attendance is six hundred, drawn largely from corporate financial and CPA communities.

Program participants have included SEC Chairmen, Commissioners and senior staff, leaders from private-sector policy-setting units, senior financial executives, prominent attorneys and financial analysts.  The keynote address at one conference was delivered by Walter Wriston, then chairman of Citicorp.  The annual conference has attracts national attention and recognition.

D.   I was responsible for planning and overseeing all research activities of the Institute, including topic identification, selection of researchers, generating funding, and project management.

IV.   RESEARCH AND PUBLICATIONS

A.   Works Published

1.   Research Monographs

a.   Corporate Financial Policies:  A Review and Analysis of Existing Literature, Financial Executives Research Foundation, Fall 1989 (with Michael A. Diamond).

b.   Proceedings of the October 8, 1987 Roundtable Discussion on Generally Accepted Accounting Principles and Regulatory Accounting Practices, SEC and Financial Reporting Institute, January 1988.

(i)   Project included roundtable discussion on the use of regulatory accounting practices vs GAAP primarily for financial institutions.  Those in attendance included the Comptroller General of the United States, who directs the GAO, the Comptroller of the Currency, a member of the Federal Home Loan Bank Board, the  Chairman and Vice Chairman of

A-43

the FASB, the then Chief Accountant of the SEC and twenty other business and government executives.

(ii)   Report was sent by the Comptroller General to all members of Congress. I was responsible for all aspects of the project, including preparation of the discussion paper, inviting attendees, moderating the session, and editing the final report. Report was referenced in numerous financial publications.

c.   <u>The Impact of Electronic Technology at the S.E.C.: An Analysis of Policies Governing the Content and Dissemination of Corporate Disclosures, Financial Executives Institute and SEC and Financial Reporting Institute</u>, July 1987, (with Edward F. Greene and Earl C. Keller).

(i)   Project included a blue-ribbon roundtable discussion on key issues of regulation and financial reporting. Those participating included four SEC Commissioners (other Commissioner was ill), private-sector policy setters, and leaders from the CPA, business, legal, financial analysis, and academic communities. The discussion paper for this session was written by my co-authors and myself and is included in the final report.

(ii)   The Director of the Division of Corporation Finance at the SEC recently cited the monograph as very important as a predictor of the future disclosure system.

(iii)   Results presented to Financial Executives Institute's Committee on Corporate Reporting, December 1986 and March, 1987.

d.   <u>EDGAR: The SEC's Pilot Program and Its Impact,</u> Financial Executives Research Foundation, January 1987 (with Michael A. Diamond).
Report is widely cited by the SEC personnel and was referenced in their testimony before Congress.

e.   <u>Impact of Statement 52 on Decisions, Financial Reports, and Attitudes,</u> Financial Executives Research Foundation, July 1986 (with William W. Holder).

A-44

f.   <u>The Market for Compilation, Review, and Audit Services,</u>
Auditing Research Monograph 4, American Institute of
Certified Public Accountants, December 1981 (with
Michael A. Diamond).  Citations include:

(i)     Rocky Mountain News, Denver, 4/8/81.

(ii)    Denver Post, 4/8/81.

(iii)   The Executive, Orange County Edition, 3/81.

(iv)    Journal of Accountancy, 2/81 and 10/80.

(v)     The Los Angeles Business Journal, 1/5/81.

(vi)    Financial Times, World Accounting Report, 1/81.

(vii)   The CPA Journal, 11/80.

(viii)  Midlands Business Journal, 9/26/80.

(ix)    The American Banker, 8/18/80.

(x)     Wall Street Journal, 8/15/80.

g.   <u>Public Accounting Report</u>, 2/80.
Presented to the National American Institute of CPAs
Accounting and Auditing Conference, August, 1981.
Presented to bank executives and media in New York and
Newport Beach, August 1980 and January 1981,
respectively.

h.   <u>Accounting Policy Formulation:  A Study of User
Preferences, California Society of Certified Public
Accountants</u>, Summer 1980 (with Durwin Sharp).

2.   Articles

a.   "Improving Pro Forma Financial Information," <u>Financial
Executive</u>, May 2002, with J. Duggan

b.   "What Foreign Filers Need to Know," <u>Financial Executive</u>,
May 2001, with W. Holder and J. Duggan, KPMG

c.   "Disclosure of Measurement Uncertainties: Guide to a
Financial Reporting Evolution in Progress," <u>Journal of
Accountancy</u>, 1999 (with Bill Holder)

A-45

d.    "The SEC's Audit Requirements for Companies Acquired And Equity Investees," <u>Research in Accounting Regulation</u>, 1997, (with Bill Holder)

e.    "Electronics Opens a New Door to SEC Filings", <u>Financial Executive</u>, January/February 1988, (with Edward F. Greene and Earl C. Keller).

f.    "SEC Form S-18:  A Boon to Small Business," <u>Journal of Accountancy</u>, May 1986 (with James G. Manegold and Michael A. Diamond).

g.    "An Easier Way to Go Public," <u>Harvard Business Review</u>, January-February 1986 (with James G. Manegold).

h.    "Small Firm Securities Registration in the S-18 ERA:  Perceptions of Professionals," <u>The Corporation Law Review</u>, February 1985 (with Merle W. Hopkins).

i.    "The Exempt Offering:  An Alternative to Going Public," <u>Harvard Business Review</u>, January-February 1985.

j.    "Small Business:  An Area Ripe for Practice Development," cover article in <u>Journal of Accountancy</u>, August 1984 (with Alan A. Cherry, Michael A. Diamond and James A. Walker).  Study, sponsored by Peat Marwick Main & Co. was cited in over one hundred periodicals.

k.    "The FASB Should Establish An Accounting Laboratory," <u>Management Accounting</u>, March 1983 (with William W. Holder and Jan R. Williams).

l.    "The Accounting Review:  A Happy Compromise," <u>Harvard Business Review</u>, May-June 1982 (with Michael A. Diamond).

m.    "Loan Officers' Experiences With and Reactions to Compilation and Review of Financial Statements," <u>Journal of Commercial Bank Lending</u>, December 1981 (with Michael A. Diamond and Earl C. Keller).

n.    "International Reporting Aspects of Segment Disclosures, <u>The International Journal of Accounting</u>, Fall 1980 (with William W. Holder and Herschel Mann).

o.    "Competition in Public Accounting:  Issues and Controversies," <u>Georgia Journal of Accounting</u>, Spring 1980 (with Doyle Z. Williams).

A-46

p.      "The Influence of Accounting Rules on Tax Policy
        Objectives: An Empirical Investigation" <u>Journal of the
        American Taxation Association</u>, Winter 1980 (with Earl C.
        Keller).

q.      "Using Replacement Cost Data in the Bank Lending
        Decision," <u>Journal of Commercial Bank Lending</u>,
        November 1979 (with Michael A. Diamond).

r.      "Accounting for Oil and Gas:  The FASB Faces Political
        Realities," <u>California CPA Quarterly</u>, June 1979 (with
        Michael A. Diamond).

s.      "Guidelines for Computer Software Selection," <u>California
        CPA Quarterly</u>, June 1977 (with Bennet P. Lientz).

3.  Study Commissioned by SEC

"A Report on a Survey Conducted for the Government-Business
Forum," <u>SEC Government-Business Forum on Small Business
Capital Formation:  Final Report</u>, November 1982.

Study was requested by SEC and served as basis for selection of
issues discussed at session, which was mandated by Congress.
Final report, including study, was submitted to Congress.

4.  Proceedings

a.      "The SEC's Disclosure System: Its Objective, Its
        Evolution, and Its Future," <u>A Profession is Transition:  The
        Ethical and Legal Responsibilities of Accountants</u>, Belverd
        E. Needles, Jr., Editor, DePaul University, 1988

b.      "An Analysis of the Nature and Quality of Services
        Provided by CPAs to Middle-Market Clients," <u>Proceedings
        of the DePaul University Research Symposium on the
        Accounting Profession and the Middle Market</u>, September
        1985, (with Michael A. Diamond and Alan A. Cherry).

c.      "The SEC's Preferability Rule and Managements'
        Consistency in the Selection of Accounting Alternatives:
        An Empirical Investigation," <u>Proceedings of the Southwest
        American Accounting Association</u>, March 1981 (with Earl
        C. Keller).

d.      "Toward Knowledge-Based Accounting Policy,"
        <u>Proceedings of the UCLA Accounting - Information
        Systems Conference, Accounting Research:  Bridging the</u>

A 47

Gap Between Theory and Practice, May 1976 (with Earl C. Keller).

5.    Journal Articles Reprinted

    a.    "SEC Form S-18: A Boon to Small Business," reprinted from Journal of Accountancy (May, 1986); reprinted in Accounting in Action: New Opportunities, Developments, and Challenges for the Professional Accountant, American Institute of CPAs, 1986 (with James G. Manegold and Michael A. Diamond).

    b.    "Small Business: An Area Ripe for Practice Development," reprinted from Journal of Accountancy (August 1984); reprinted in New Approaches to Accounting Success, American Institute of CPAs, 1984 (with Alan A. Cherry, Michael A. Diamond, and James A. Walker).

    c.    "The Accounting Review: A Happy Compromise," reprinted from Harvard Business Review (May-June 1982); reprinted in Growing Concerns: Building and Managing the Smaller Business, edited by David E. Gumpert for the Harvard Business Review, John Wiley & Sons 1984, (with Michael A. Diamond).

    d.    "Using Replacement Cost Data in the Bank Lending Decision," reprinted from Journal of Commercial Lending (November 1979); reprinted in The Development of SEC Accounting, edited by Gary John Previts, Addison-Wesley, 1981 (with Michael A. Diamond).

B.    Invited Testimony Before Governmental Authorities

    1.    September 1983 - Before Joint SEC - NASAA (State Securities Administrator Hearing)

    2.    Discussed findings of study into Form S-18 Companies (with Merle W. Hopkins)

    3.    February 1983 - Before U.S. Senate Small Business Committee

    4.    Discussed findings of study into needs of small companies, sponsored by Peat Marwick.

    5.    September 1982 - Before SEC Government-Business Forum

A-48

6.   Discussed findings of study commissioned by SEC to identify key issues facing small business.

## V.   SERVICE

A.   Professional

1.   Member, Executive Committee, Sixteenth Annual SEC Government-Business Forum on Small Business Capital Formation

2.   Managing Editor, Accounting Horizons, 1992-1994

3.   Member, AICPA Committee on SEC Regulations, 1989-1992

4.   Member, American Accounting Association's Subcommittee to respond to the FASB Discussion Memorandum on "Employers' Accounting for Pensions and Other Postemployment Benefits"

5.   Member, American Accounting Association's SEC Liaison Committee, 1983-85

6.   Member, American Institute of Certified Public Accountants

7.   Member, California Society of Certified Public Accountants

8.   Member, Editorial Board, Research in Accounting Regulation, JAI Press, 1986-1991

9.   Ad Hoc Reviewer, Accounting Review, Accounting Horizons

10.   I have made numerous presentations before professional and academic audiences on a wide variety of financial reporting and regulatory topics, 1976-Present.

11.   I was interviewed on KNBC - TV in Los Angeles in April 1987 regarding insider-trading issues.

12.   Reviewer. Methodological Foundations of Central Standardsetting for Corporate Financial Reporting by James C. Gaa, published in the American Accounting Association's Studies in Accounting Research Series (No. 28).

13.   Consultant to National Commission on Fraudulent Financial Reporting (Treadway Commission) 1986

A-49

B.     Schools of Accounting/Business

   1.    Member, MBA-PM Task Force, 1997

   2.    Coordinator/Instructor, GSBA 514-Foundations of Business I & II, 1997- 2003

   3.    Chairman, School of Accounting Personnel Committee, 1994-1997

   4.    Member, School of Accounting Personnel Committee, 1989-1997

   5.    Member, School of Business Personnel Committee, 1994-1997

   6.    Chairman, Masters Task Force, 1989-1991

   7.    Member, School of Business Strategic Planning Committee, 1984-1991

   8.    Chairman, School of Accounting Strategic Planning Committee, 1989-1992

   9.    Chairman, Two Faculty Review and Promotion Committees, November, 2002

A-50

Appendix C

A-51

Appendix C

Analysis of Customer Loan Receivable Percentages

|                                        | 12/31/1999   | 6/30/2000    | 9/30/2000    |
|----------------------------------------|--------------|--------------|--------------|
| Customer loan receivable balance       | 315,135,612  | 483,455,894  | 657,691,039  |
| Percent owned by Gateway               | 0.95         | 0.95         | 0.95         |
| Amount owned by Gateway                | 299,378,831  | 459,283,099  | 624,806,487  |
|                                        |              |              |              |
| Amount of increase from 12/31/1999     |              | 159,904,268  | 325,427,656  |
| Increase as % of 12/31/1999 balance    |              | 53.41%       | 108.70%      |
|                                        |              |              |              |
| Gateway's total assets at 6-30-00      |              | 4,077,043,000 |             |
| Gateway's total assets at 9-30-00      |              |              | 4,462,515,000 |
| Loan receivables as % of Total assets  |              | 11.27%       | 14.00%       |

Sources:
  Exhibit 2091, pages G165717 and G165718
  Original Quarter 2, 2000 Form 10-Q
  Original Quarter 3, 2000 Form 10-Q

A-52



# Quarterly Portfolio (by Tier) and Reserve Balances
### In Millions

Data Sources: Portfolio balances from exhibit 2091 page 1 (G 165714) less 5%. Reserve balances from G 026342 & G 026343

Legend: ■ Tier 1  ▨ Tier 2  ☐ Tier 3  ▦ Tier 4  ▩ Tier 5  ☐ Tier 6 +  ■ Reserve

X-axis: Q1 2000  Q2 2000  Q3 2000

Y-axis: $0  $20  $40  $60  $80  $100  $120  $140  $160

X004679

A-54



## Quarterly Portfolio (by Tier) and Reserve Balance Changes
### In Millions

Data Sources: Portfolio balances from exhibit 2091 page 1 (G 165714) less 5%, Reserve balances from G 026342 & G 026343

A-55



# Quarterly Loan Originations by Tier
In Millions

Data Source: Exhibit 2091 pages 1-64 (G 165714 - G 165777)

A-56

## Portfolio Balances by Tier

|        | Q2 1999 | Q3 1999 | Q4 1999 | Q1 2000 | Q2 2000 | Q3 2000 |
|--------|--------:|--------:|--------:|--------:|--------:|--------:|
| Tier 1 | 15,708,592 | 29,346,045 | 55,364,858 | 72,078,978 | 73,552,258 | 94,752,978 |
| Tier 2 | 11,623,156 | 22,737,434 | 41,176,590 | 54,217,582 | 53,678,483 | 69,679,904 |
| Tier 3 | 12,256,347 | 25,237,919 | 47,227,011 | 62,537,904 | 62,661,704 | 81,577,956 |
| Tier 4 | 27,304,285 | 49,606,139 | 98,517,632 | 127,923,199 | 123,697,743 | 147,488,006 |
| Tier 5 | 0 | 19,366,437 | 50,469,169 | 49,515,897 | 75,103,530 | 95,748,006 |
| Tier 6 + | 0 | 54,196 | 6,623,571 | 15,443,477 | 70,589,383 | 135,559,636 |
|        | 66,892,380 | 146,348,170 | 299,378,831 | 381,717,038 | 459,283,100 | 624,806,487 |
| Reserve | | | 3,634,775 | 8,685,451 | 35,399,494 | 32,462,511 |

## Portfolio Balance Changes by Tier

|        | Q2 1999 | Q3 1999 | Q4 1999 | Q1 2000 | Q2 2000 | Q3 2000 |
|--------|--------:|--------:|--------:|--------:|--------:|--------:|
| Tier 1 | 15,708,592 | 13,637,453 | 26,018,813 | 16,714,120 | 1,473,280 | 21,200,721 |
| Tier 2 | 11,623,156 | 11,114,278 | 18,439,156 | 13,040,992 | -539,099 | 16,001,421 |
| Tier 3 | 12,256,347 | 12,981,572 | 21,989,091 | 15,310,894 | 123,799 | 18,916,253 |
| Tier 4 | 27,304,285 | 22,301,853 | 48,911,494 | 29,405,567 | -4,225,456 | 23,790,263 |
| Tier 5 | 0 | 19,366,437 | 31,102,732 | -953,272 | 25,587,633 | 20,644,477 |
| Tier 6 + | 0 | 54,196 | 6,569,375 | 8,819,906 | 55,145,906 | 64,970,253 |
|        | 66,892,380 | 79,455,789 | 153,030,662 | 82,338,206 | 77,566,063 | 165,523,387 |
| Reserve | | | 3,634,775 | 5,050,676 | 26,714,043 | -2,936,983 |

Data Sources: Portfolio balances from exhibit 2091 (G 165714) less 5%. Reserve balances from G 026342 & G 026343

A-59

XG6463

## Monthly Originations by Tier

| | Apr 99 | May 99 | Jun 99 | Jul 99 | Aug 99 | Sep 99 | Oct 99 | Nov 99 | Dec 99 |
|---|---|---|---|---|---|---|---|---|---|
| Tier 1 | 4,404,230 | 12,062,385 | 2,365,484 | 6,025,958 | 7,099,531 | 9,252,710 | 9,939,594 | 11,547,730 | 18,113,063 |
| Tier 2 | 3,065,979 | 8,629,567 | 1,761,073 | 4,018,753 | 5,461,400 | 6,690,566 | 6,903,814 | 8,301,785 | 11,310,985 |
| Tier 3 | 3,162,573 | 8,675,497 | 1,856,557 | 4,202,470 | 5,461,793 | 7,103,479 | 7,211,966 | 10,120,522 | 11,107,703 |
| Tier 4 | 4,133,856 | 12,547,416 | 12,568,106 | 6,920,404 | 8,214,734 | 10,875,241 | 12,161,117 | 22,154,038 | 22,058,539 |
| Tier 5 | | | | 4,713,787 | 7,009,551 | 8,720,359 | 8,330,181 | 14,436,937 | 10,540,171 |
| Tier 6 + | | | | | | 57,048 | 73,026 | 1,226,496 | 5,631,880 |
| | 14,766,638 | 41,914,865 | 18,551,220 | 25,881,372 | 33,247,009 | 42,699,403 | 44,619,698 | 67,787,508 | 78,762,341 |

| | Jan 00 | Feb 00 | Mar 00 | Apr 00 | May 00 | Jun 00 | Jul 00 | Aug 00 | Sep 00 |
|---|---|---|---|---|---|---|---|---|---|
| Tier 1 | 14,015,779 | 14,005,795 | 18,018,557 | 11,593,491 | 14,124,462 | 18,500,277 | 15,877,173 | 21,751,246 | 15,194,451 |
| Tier 2 | 7,866,344 | 9,045,198 | 11,494,617 | 7,912,087 | 8,664,349 | 10,610,261 | 8,929,566 | 13,745,352 | 10,457,868 |
| Tier 3 | 7,352,905 | 8,893,246 | 10,922,155 | 7,190,087 | 8,869,335 | 10,050,812 | 8,356,449 | 13,688,441 | 10,455,709 |
| Tier 4 | 12,747,070 | 15,625,747 | 16,666,660 | 10,087,804 | 11,635,779 | 12,896,721 | 11,473,587 | 17,519,096 | 14,430,604 |
| Tier 5 | (158,361) | (36,029) | 2,163,609 | 9,091,295 | 11,604,709 | 12,518,411 | 8,719,808 | 15,040,827 | 6,692,349 |
| Tier 6 + | 182,608 | (144,623) | 9,237,979 | 6,337,978 | 6,566,197 | 45,277,142 | 23,085,376 | 13,043,570 | 32,382,918 |
| | 42,006,345 | 47,389,334 | 68,503,577 | 52,212,742 | 61,464,831 | 109,853,624 | 76,441,959 | 94,788,532 | 89,613,899 |

## Quarterly Originations by Tier

| | Q2 1999 | Q3 1999 | Q4 1999 | Q1 2000 |
|---|---|---|---|---|
| Tier 1 | 18,832,099 | 22,378,199 | 39,600,387 | 46,040,131 |
| Tier 2 | 13,456,619 | 16,170,719 | 26,516,584 | 28,406,159 |
| Tier 3 | 13,694,627 | 16,767,742 | 28,440,191 | 27,168,306 |
| Tier 4 | 29,249,378 | 26,010,379 | 56,373,694 | 45,039,477 |
| Tier 5 | | 20,443,697 | 33,307,289 | 1,969,219 |
| Tier 6 + | | 57,048 | 6,931,402 | 9,275,964 |
| | 75,232,723 | 101,827,784 | 191,169,547 | 157,899,256 |

| | Q2 2000 | Q3 2000 |
|---|---|---|
| Tier 1 | 44,218,230 | 52,822,870 |
| Tier 2 | 27,186,697 | 33,132,786 |
| Tier 3 | 26,110,234 | 32,500,599 |
| Tier 4 | 34,620,304 | 43,423,287 |
| Tier 5 | 33,214,415 | 30,452,984 |
| Tier 6 + | 58,181,317 | 68,511,864 |
| | 223,531,197 | 260,844,390 |

Data Source: Exhibit 2091 pages 1-64 (G 165714 - G 165777)

A-58

Customer Loan Loss Reserves – Third Quarter of 2000
Source: G 026342, G 026343, and G165870 (Exhibit 2091)

| Month | Item | With Adjustments Standard | Promotional | Total | Notes | Without Adjustments Total |
|---|---|---|---|---|---|---|
| **July** | Beginning Reserve | 5,661,799 | 29,737,695 | 35,399,494 | | 35,399,494 |
| | Less Writeoffs | (5,099,761) | | (5,099,761) | | (5,099,761) |
| | Plus GW Bank promo-COGS | 6,152,311 | 6,152,311 | 6,152,311 | = 7,872,882 (6,152,311 + 1,720,571), Ex 2091 (G 165870) | 6,152,311 |
| | Plus Bad debt expense | 7,157,373 | 1,720,571 | 8,877,944 | = 7,157,373, Ex 2091 (G 165870) | 8,877,944 |
| | Ending Reserve | 7,719,411 | 37,610,577 | 45,329,988 | | 45,329,988 |
| **August** | Beginning Reserve | 7,719,411 | 37,610,577 | 45,329,988 | | 45,329,988 |
| | Less Writeoffs | (4,646,812) | | (4,646,812) | | (4,646,812) |
| | Plus GW Bank promo-COGS | | 5,369,819 | 5,369,819 | Same as in Ex 2091 (G 165870) | 5,369,819 |
| | Plus Bad debt expense | 6,984,074 | 2,003,193 | 8,987,267 | = 5,987,267 + 3,000,000 | 8,987,267 |
| | Expense adjustment | (1,019,594) | (4,967,673) | (5,987,267) | From Exhibit G 026342 | |
| | Net Bad debt expense | 5,964,480 | (2,964,480) | 3,000,000 | Same as in Ex 2091 (G 165870) | 8,987,267 |
| | Ending Reserve | 9,037,079 | 40,015,916 | 49,052,995 | | 55,040,262 |
| **September** | Beginning Reserve | 9,037,079 | 40,015,916 | 49,052,995 | | 55,040,262 |
| | Less Writeoffs | (4,856,034) | | (4,856,034) | | (4,856,034) |
| | Plus GW Bank promo-COGS | | 7,465,552 | 7,465,552 | = 22,200,000 - 14,434,448 (Same as in G 026343) | 7,465,552 |
| | Change in methodology adjustment | | (22,200,000) | (22,200,000) | From Exhibit G 026343 | |
| | Net Cost of goods sold | | (14,734,448) | (14,734,448) | Same as in Ex 2091 (G 165870) | 7,465,552 |
| | Plus Bad debt expense | 7,329,856 | 2,107,108 | 9,436,965 | = 6,436,965 + 3,000,000 | 9,436,965 |
| | Expense adjustment | (1,185,888) | (5,251,077) | (6,436,965) | From Exhibit G 026343 | |
| | Net Bad debt expense | 6,143,968 | (3,143,969) | 3,000,000 | Same as in Ex 2091 (G 165870) | 9,436,965 |
| | Ending Reserve | 10,325,013 | 22,137,499 | 32,462,513 | | 67,086,745 |

A-59

X0046685

Appendix E

A-60

# Jerry L. Arnold

## Testimony Since January 1, 2000

| Case | Jurisdiction | Dates Deposition | Trial |
|------|--------------|------------------|-------|
| Goodman v. Tickets.com | LASC | October, 2000 | May 2002 |
| Oakland Raiders v. NFL | LASC | January, 2001 | April, 2001 |
| Meris Financial Incorporated v. ViTech America, Inc. et. al | USDC, District of Arizona | | June, 2001 |
| Focus Affiliates v. Cellular Wholesalers | AAA Case No. 72Y1680055900 | | Dec.,2001 Arbitration |
| U.S. v. Boren | USDC, Central District of California | | Oct., 2002 |
| Pegasus v. Direc TV | USDC, Central District of California | March, 2003 | |
| U.S. V. Khan | USDC, Central District of California | | Nov. 2003 |
| SEC v. Global Timber | USDC, Southern District of California | | March, 2004 |
| Nixon v. 2KSounds | LASC | | May, 2005 |

A-61

**UNITED STATED DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>    v.<br><br>JOHN J. TODD, ROBERT D. MANZA, and JEFFREY WEITZEN,<br><br>      Defendants. | ) ) ) ) ) ) Case. No. 03-CV-02230 K (RBB) ) ) ) ) ) ) ) ) ) ) |

**EXPERT REPORT OF PROFESSOR FRANK PARTNOY**

January 17, 2006

**I.**  <u>**Background and Qualifications**</u>

  1.  I am a Professor of Law at the University of San Diego School of Law, and a graduate of Yale Law School.  Since 1997, I have taught various courses in the areas of corporate and securities law, including corporations, corporate finance, deals, international finance, and white collar offenses.  I also have taught a course in regulation and innovation at the Rady School of Management at the University of California, San Diego, and have lectured on a range of corporate governance, finance, and securities issues in the United States and abroad.

  2.  I am the author of several dozen articles and two books in these areas.  My book, <u>Infectious Greed: How Deceit and Risk Corrupted the Financial Markets</u> (Henry


**EXHIBIT** *B*

Holt/Times Books 2003), discussed numerous issues related to corporate governance and federal securities disclosure, with a particular focus on the financial complexities of large public corporations. I am co-author of one of the leading corporate law casebooks, Corporations Law and Policy: Materials and Problems (2005 Supp.; 6th ed. forthcoming, with Jeffrey D. Bauman and Alan R. Palmiter), which covers, among other topics, corporate governance and various financial and securities issues. I also have written several articles addressing the areas discussed in this report, including corporate governance and financial markets.

3.       Before 1997, I practiced law at Covington & Burling, and worked in investment banking at Morgan Stanley and CS First Boston. I have degrees in mathematics and economics, and have done graduate work in economics and finance. I passed the Series 3, 7, and 63 registered securities, options, and futures licensing examinations, and am a member of the New York and District of Columbia bars. I currently co-chair the American Bar Association Securities Litigation Subcommittee on Futures and Derivatives Litigation, and am a board member of the Business Law Committee of the Association of American Law Schools. A copy of my resume is attached as Exhibit A.

4.       During the previous four years, I have given trial and deposition testimony as an expert in *Rossco Holdings Inc., et al. v. Bank of America*, No. 1220031401 (JAMS Los Angeles County, CA), *Tustin Nissan, et al. v. Bank of America*, No. 73 Y 181 00138 03 (AAA Orange County, CA), and *Body Perfection, Inc. v. Fitness Warehouse, Inc.*, Case No. GIC 800781 (Superior Court, San Diego County), and I have given deposition testimony as an expert in *Daehan Investment Trust Management Co., Ltd. and Daehan*

2

B-62

*Global Bond II Investment (L) Limited v. J.P. Morgan Chase Bank*, No. 02 Civ. 12175

(S.D.N.Y.), *Federico Javier Duran Perez and Nora Franco de Duran v. Citibank, N.A.*,

No. 02 Civ. 9793 (S.D.N.Y.), and *R4 Holdings, LLC, and Hill International, Inc. v.*

*General Atlantic Partners 46, L.P., et al.*, No. 02 CC 06740 (Superior Court, Orange

County).  I testified at trial, but not at deposition, in *United States v. Illya Bond*, CR-05-

66-PA (C.D. Ca.)  *In re The Heritage Organization, L.L.P.*, No. 04-35574-SAF-11

(Bankr. N.D. Tex.).  I also have submitted reports as an expert on various financial and

securities matters, including numerous comments to the Securities and Exchange

Commission, and I have given sworn expert testimony on issues related to corporate

governance and federal securities disclosure before committees of both the United States

Senate and House of Representatives.

     5.     I have been retained as an expert in this matter by Sheppard Mullin

Richter & Hampton LLP, and am being compensated at the rate of $850 per hour.  In

preparing my report, I reviewed the complaint and the documents referred to in this

report, as well as the documents listed in Exhibit B.  I reserve the right to modify or

expand my opinions based on additional information that becomes available during this

litigation.

## II.    Assignment and Summary of Opinions

     6.     My assignment is this matter was twofold.  First, I was asked to examine

the statement by the Securities and Exchange Commission in the complaint in this matter

that "[t]he market reacted positively to Gateway's public disclosures.  On October 13,

B-63

2000, Gateway's stock jumped from $43.63 to $53.11."[1]  Specifically, I was asked to assess the conclusion that Gateway, Inc.'s public disclosures on October 12, 2000, led to this market reaction – an increase of almost 22% in the price of Gateway shares.

7.      In my opinion, this conclusion is wrong, for two reasons.  First, publicly available information, including statistical data and news reports, suggest that Gateway's disclosures on October 12, 2000, **already were reflected in Gateway's share price by the time trading opened the next morning, if not before**.  Second, although Gateway's share price increased dramatically during the day on October 13, 2000, after trading opened, so did the prices of other technology shares, as well as the market overall. October 13, 2000, was a near-record day for technology stocks.  For example, the intraday increase in the price of shares of Dell Inc., a competitor of Gateway, was even higher than the intraday increase in Gateway's share price.  These data suggest that the increase in Gateway's stock price that day **was due to factors other than Gateway's disclosures**.

8.      My second assignment was to assess the quality of Gateway's system of corporate governance during the period covered in the SEC's complaint.  In my opinion, **Gateway's corporate governance processes were exemplary**.  In 2000, Gateway's board included highly-qualified, independent, and experienced directors.  Gateway's governance structure was appropriate and included the relevant board committees, which were led by independent directors.  The governance process relevant to Gateway's

---

[1] Securities and Exchange Commission v. John J. Todd, Robert D. Manza, and Jeffrey Weitzen, Complaint for Violations of the Securities Laws, Case No. 03-CV-02330 K (RBB), November 13, 2003, at 36.  Specifically, the complaint alleges that on October 12, 2000, Gateway issued a press release announcing record third quarter profits of $152.6 million on revenues of $2.53 billion, precisely meeting analysts' earnings per share expectations of 46 cents and exceeding analysts' revenue expectations by $30 million.  See id. at 35.

4

B - 64

officers also was appropriate, particularly given the size and complexity of the company,

and the officers' approach to the audit function in particular was reasonable.

### III.     Analysis of Gateway's Stock Price Changes

9.      I used three different methodologies to assess the SEC's conclusion that

Gateway's public disclosures on October 12, 2000, led to an increase of almost 22% in

the price of Gateway's stock.  First, I analyzed trading data for Gateway shares.  Second,

I examined other publicly available information to determine if such information was

consistent with the trading data.  Third, I used a statistical event study approach to

determine if an econometric analysis of share price changes during the relevant period

was consistent with the first two methods.  All three methodologies led to the same result:

it would be wrong to conclude that the 22% increase in Gateway's stock was related to

the company's public disclosures on October 12, 2000.

### A.     Trading Data

10.     The price of Gateway shares at 4:00pm on October 12, 2000, when trading

closed on the New York Stock Exchange, was $43.63.  Gateway issued the press release

describing its quarterly results at approximately 4:30pm that day.  During the next several

hours, Gateway shares were traded in the so-called "after-hours" electronic market and in

Europe.   Available evidence shows that roughly thirty minutes after Gateway's

disclosures, the price of Gateway shares had increased to $45.50 – **an increase of**

5

B-65

**approximately 4.3 percent.**[2] There also were later reports of Gateway shares trading in these markets at prices as high as $47.25.[3]

11.    On October 13, 2000, Gateway shares opened for trading on the New York Stock Exchange at a price of $47.75. Then, during the day on October 13, 2002, Gateway shares rose from $47.75 to $53.11.

12.    These price changes are shown in five stages in the chart below. Note that **the initial increase in the price of Gateway shares following the disclosures is only about one-fifth of the total price increase through the closing of trading on October 13, 2000.**

---

[2] See Patricia Sagba, Charles Molineaux & Pat Kiernan, After Hours Update, CNNfn, Transcript # 102207cb.107, 5:00am, October 12, 2000 ("Gateway with those numbers up $1.87 trading at 4550 [45.50] here on Instinet."); see also Andrew Heavens, Gateway Beats Forecast to Buck Tech Trend, Financial Times, October 13, 2000, at 21 ("Gateway shares closed official trade yesterday at Dollars 43.63, down more than 2 per cent, following a month of declines which saw it hitting 52-week lows. But following the earnings announcement, in after-hours trade, the stock rose to Dollars 46.37."); John Fraher, U.S. Stocks Rise in Europe, Led by PMC-Sierra, Gateway on Sales, Bloomberg News, 6:56AM, October 13, 2000 (reporting that "Gateway advanced 2.245 to 45.875").

[3] See Loren Steffy, Gateway's 3rd-Qtr Net Income Rises 35% to $152.6 MLN, Bloomberg News, 6:40pm, October 12, 2000 (reporting that "[s]hares of San Diego-based Gateway climbed as high as 47.25 in trading after results were reported"); Sara Barton, U.S. Equity Preview: Arthrocare, Boeing, Doubleclick, Power-One, Bloomberg News, 8:08am, October 13, 2000 (reporting that "Gateway Inc. (GTW) rose as high as 47.25 in after-hours trading").

B-66

Gateway Share Price



13.     Three decades of academic research in finance have established that, in an efficient market, information typically becomes reflected quickly in market prices.[4] Numerous academic researchers have shown that securities prices generally incorporate all publicly available information, a finding known as the efficient capital markets hypothesis (ECMH).[5]  Although there are exceptions to the ECMH, and markets are not always efficient, in general it is a widely held view that when news about an actively

---

[4] See Burton G. Malkiel, A Random Walk Down Wall Street 470-75 (rev. ed. 1999) (listing the leading articles in the area of market efficiency).

[5] See Eugene F. Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 Journal of Finance 383, 388 (1970); Eugene F. Fama, Efficient Capital Markets II, 46 Journal of Finance 1575 (1991).

B-67

traded security becomes public, prices adjust to reflect how that news impacts expectations about a company's expected future cash flows.[6]

14.    Shares of Gateway were traded in a market that satisfied the relevant definitions of efficiency for purposes of the ECMH.[7] Gateway shares traded in an open, developed, continuous, and liquid market in which a very substantial number of persons bought and sold, and in which trading information was widely available. Numerous securities analysts followed and reported on Gateway, as did a large number of investors. Gateway was an actively traded stock during the year through October 13, 2000, with average daily trading volume of more than two million shares. Finally, the information Gateway disclosed in its press release on October 12, 2000, was publicly available and widely distributed.

15.    This analysis suggests that the information Gateway disclosed in its press release on October 12, 2000, was reflected in Gateway's share price at least by the time the markets opened on October 13, 2000, if not before.[8] Accordingly, one could not reasonably conclude that all of Gateway's share price increase from the close on October 12, 2000, through the close on October 13, 2000, was caused by Gateway's disclosures.

---

[6] See Ronald J. Gilson & Reinier Kraakman, The Mechanisms of Market Efficiency, 70 Virginia Law Review 549, 571 (1984).

[7] See, e.g., Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989) (enumerating factors).

[8] Likewise, communications on investor message boards, though not conclusive evidence, suggest that Gateway's share price increased in response to these disclosures before the market opened on October 13, 2000. See, e.g.,
http://finance.messages.yahoo.com/bbs?.mm=FN&action=m&board=4686900&tid=gtw&sid=46 86900&mid=26981 (price increase to $46.25 by 4:56pm Eastern time);
http://finance.messages.yahoo.com/bbs?.mm=FN&action=m&board=4686900&tid=gtw&sid=46 86900&mid=26998 ($47.25 bid price at 5:33pm Eastern time);
http://finance.messages.yahoo.com/bbs?.mm=FN&action=m&board=4686900&tid=gtw&sid=46 86900&mid=27046 ($47.00 price at 11:50pm Eastern time).

B-68

### B.   Other Public Information

16.     Other public information also suggests that the increase in Gateway's share price on October 13, 2000, was due to factors other than Gateway's disclosures from the previous day.  October 13, 2000, was one of the best-performing days in history for shares of technology companies.

17.     The major indices of technology company shares increased dramatically that day: for example, the Nasdaq 100 Index rose 9.6% and the broader-based Nasdaq Composite Index rose 7.9%, the second-largest percentage increase in the history of that index.[9]  The share prices of many technology companies increased by 20% or more on October 13, 2000: for example, Cerner Corp., a software company, was up 22%; Echelon Corp., a software company, was up 46%; Exult Inc., an Internet services company, was up 35%; PMC-Sierra Inc., a communications chip manufacturer, was up 20%; and Red Hat Inc., a software company, was up 35%.[10]

18.     Shares of Dell Inc. rose almost 17% that day, an intraday price increase of even more than Gateway's intraday share price increase (Gateway's intraday share price increase was 11.2%, from an opening price of $47.75 to a closing price of $53.11).  This information also suggests that Gateway's share price increase during October 13, 2000, was not caused by the disclosures the previous day.

---

[9] See Chelsea Emery, Nasdaq Composite Surges to 2nd-Biggest Gain on Profit Optimism, Bloomberg News, October 13, 2000.

[10] See Juliann Walsh, U.S. Equity Movers Final: Echelon, Mypoints.com, PMC-Sierra, Bloomberg News, October 13, 2000.

13-69

## C.     Event Study

19.     Finally, I assessed the price reaction of Gateway's shares during the relevant period by using an event study methodology, a common approach to investigating how information affects share prices.  Event studies employ statistical techniques to isolate dates on which large relative changes in share prices occurred, and to help experts determine the causes of those changes.  More than 500 academic papers have been published in top finance journals showing through the use of event studies that stock prices react to information contained in media stories and analyst reports.[11]

20.     Following the standard approach, the event study methodology assumes that share prices move when news becomes public, based on the ECMH described above.  To perform the relevant event study in this matter, I collected daily price data for Gateway and several of its competitors, as well as price data for several stock indices, including the S&P 500 Index and the Nasdaq 100 Index.  Those data are attached to this report as Exhibit C.  I then performed a series of statistical regressions to determine which variables had the greatest explanatory power relative to the changes in Gateway's share price during the time period surrounding the events in question.

21.     I tested my conclusions with respect to numerous different indices, industry definitions, and time periods.  In my opinion, the specification of the model and relevant indices does not substantially affect the results of an event study in this case.  For example, I found that the time series variables with the greatest explanatory power were the daily percentage changes of the value of the Nasdaq 100 Index and the daily

---

[11] See S.P. Kothari & Jerold B. Warner, "Econometrics of Event Studies," working paper available at http:/papers.ssrn.com (October 20, 2004) (collecting data and citing numerous articles); see also J.Y. Campbell, A.W. Lo & A.C. MacKinlay, The Econometrics of Financial Markets (1997).

B-70

percentage changes of the price of shares of Dell Inc.  Yet even a simple regression based on those two variables alone, without including any other variables, rejected the hypothesis that the 22% increase in Gateway's share price was caused by factors other than the overall increase in the market and among Gateway's competitors.  To the contrary, event studies suggest that **if Gateway shares had simply mimicked the performance of the relevant market, the price of Gateway shares would have increased by roughly the same amount as the price actually increased on October 13, 2000**.  This regression analysis is attached to this report as Exhibit D.

## IV.   Corporate Governance at Gateway

22.     My second assignment was to assess the quality of Gateway's corporate governance during the relevant time period.  Below I set forth the basic attributes of good corporate governance, and then compare these attributes to those of Gateway.  In my opinion, Gateway's corporate governance was exemplary.

### A.     The Elements of Good Corporate Governance

23.     Corporate governance generally describes the mechanisms designed to bridge the separation of ownership and control of the large public corporation.[12]  For corporations that operate in the United States, **the governance system historically has**

---

[12] See Adolf A. Berle, Jr. & Gardiner C. Means, The Modern Corporation and Private Property (1932).

B-71

**focused on the role of the board of directors**.  Directors are the representatives of shareholders, and they owe fiduciary duties to shareholders pursuant to state law.[13]

24.    The U.S. approach to corporate governance has changed dramatically during the past five years, in response to a wave of corporate scandals, with Congress, the New York Stock Exchange, Nasdaq, and the Securities and Exchange Commission imposing additional duties on directors and officers.  Although I believe Gateway's corporate governance practices in 2000 compare favorably with those of many large public corporations today, I believe Gateway's corporate governance practices in this matter should be assessed as of the prevailing standards in 2000.[14]

25.    Even before the recent wave of corporate scandals, the SEC recognized that directors were the primary representatives of shareholders.  The SEC's chairman noted in 1998 that the key and basic corporate governance principle was that "a board acts as a fiduciary on behalf of a company's shareholders."[15]  The chairman noted that an especially important part of the corporate governance system was the link between the directors and a company's reporting and information systems.[16]  Not surprisingly, much

---

[13] See, e.g., *Francis v. United Jersey Bank*, 432 A.2d 814 (N.J. 1981) (discussing duty of supervision); *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996) (discussing duty to monitor corporate operations).

[14] Although some federal regulation was relevant to corporate governance in 2000, see, e.g., Securities Exchange Act of 1934, Section 10(b) (imposing disclosure obligations with respect to federal securities), the Sarbanes-Oxley Act of 2002 substantially increased the federal role in corporate law, and included provisions that federalized a number of areas of corporate governance, including internal controls over financial accounting and disclosure systems, areas that previously had operated, under state law standards, to bring information to senior officers and directors. See, e.g, Sarbanes-Oxley Act of 2002, Section 404 (imposing internal controls requirements).  However, these requirements did not exist during the times at issue here.

[15] See Remarks by Arthur Levitt, U.S. Securities and Exchange Commission, "Corporate Governance in the Information Age," March 12, 1998.

[16] Id.

*B-72*

of the focus of corporate governance practices during the late 1990s and through 2000 was on the role of the corporate board.

26.    As of 2000, an independent, well-functioning board of directors was the linchpin of good corporate governance, and the indicia of a well-functioning board included the independence of directors, as well as the board's size and structure. Important questions included: Were there separate committees to govern nomination of directors, compensation of directors and officers, and the audit function? Were those committees independent? In particular, were the audit committee and the outside auditor independent? Was there a separation between the chairman of the board and the CEO? Did the board include present or past CEOs of other companies? In general, did directors have the experience and expertise necessary to understand the company's reporting and information systems?

27.    Another important aspect of corporate governance at the time was the composition of share ownership. In this area, questions include: Was there a major shareholder or were there institutional investors who had the incentives and opportunity to play a monitoring function? Did directors have similar incentives, through actual or potential share ownership? How were directors and officers compensated? Did the corporation's voting system work efficiently and effectively? For example, did shareholder rights plans operate to deter a takeover? Did shareholders approve any option compensation plans?

28.    Several business groups and scholars have developed numerical rankings of corporate governance systems, with varying degrees of success.[17] Although many of

---

[17] See, e.g., http://www.issproxy.com/institutional/analytics/uscgqcriteria.jsp (listing 61 criteria used in calculating a "Corporate Governance Quotient," 18 of which relate to the board of

B-73

these rankings did not exist or were not prominent in 2000, it is worth noting that they focus on the same categories of factors enumerated above, including the board, the audit function, the role of shareholders, and the company's approach to compensating senior officers. In my opinion, these are the key areas of focus for determining the quality of a corporate governance system.

29.     It is important to be realistic about the responsibilities expected of board members and senior officers. Directors and executives are not expected to be aware of every detail associated with a large public company's operations. Nor are they held responsible for every corporate action. Instead, an effective corporate governance system balances the need to provide directors and senior officers with the information they need to govern the company effectively against the risk of overwhelming those individuals with too much information or with onerous responsibilities that would impede their ability to perform their appointed functions on behalf of shareholders. The best corporate governance systems balance these two factors.

30.     The analysis of a corporate governance system also should take into account the **differences between the roles of officers and the roles of directors**. The power to manage a company is vested in the board, which then delegates authority to officers. Officers are agents of the corporation and are subject to the control of directors, and corporate boards typically use contractual means to monitor and negotiate with officers. Historically, officers have not been subject to the same fiduciary duties or threat

---

directors); see also Paul A. Gompers, Joy L. Ishii, and Andrew Metrick, "Corporate Governance and Equity Prices," *The Quarterly Journal of Economics*, Volume 118(1), February 2003, 107-155. According to the methodology used by Gompers, Ishii, and Metrick, in 1995 Gateway had a "governance index" of 5 (with 1 being the best and 24 being the worst), putting Gateway in the top 10% of more than 12,000 companies considered.

*B-74*

of litigation as have directors. Indeed, the issue of whether officers owe any fiduciary duties to the corporation or to shareholders has been a controversial one, and until 2004, the Delaware Chancery Court, the trial court in the state where a majority of companies (including Gateway) are incorporated, did not even have personal jurisdiction over officers.[18]

31.     The responsibilities of senior officers, such as the defendants in this matter, typically are specified by contract. The CEO generally is responsible for a company's operations, marketing, strategy, financing, human resources, and corporate culture. If the CEO also is chairman of the board, the CEO must spend a great deal of time managing the board. The CEO of a large public corporation typically performs these tasks by delegating substantially authority to other officers and heads of business units. For example, a CEO typically would delegate responsibility for major accounting and financial functions to the CFO and to individuals who report to the CFO. Likewise, a CEO typically would delegate responsibility for a particular business unit to an executive vice president, who would oversee daily operations. Each of these officers would keep the CEO apprised of progress and problems, but the CEO typically would not be involved in the details associated with the business function, and might be involved only in a small number of high-level or strategic decisions.

32.     Similarly, the CFO would be responsible for a company's accounting and financial issues, but typically would not be involved in the details associated with these functions. Like the CEO, the CFO might be involved only in a small number of high-level or strategic decisions. The CFO of a public company typically would delegate

---

[18] Del. Code Ann. tit. 10, § 3114 (2003).

B-75

responsibility and would rely on other employees, as well as outside auditors. Depending on the size of the company, the same conclusions would be true of other senior officers as well.

33.     For example, a good corporate governance system would not require the CEO or CFO of a large public corporation to be involved in the details of the company's accounting for particular transactions, or even in its accounting policies. This would be particularly true if the officer lacked accounting expertise. Specialization is important in a large corporation, and senior officers must delegate substantial responsibility to individuals who understand particular business problems or functions better than the senior officers do. With respect to accounting issues, a good corporate governance system might minimize the amount of direct interaction between the CEO or other senior officers and the outside auditors, not only for efficiency purposes, but also to minimize the risk that the auditors would feel pressure to deliver a particular type of accounting treatment.

34.     The level of involvement one would expect of a particular officer depends on that officer's position as well as the size and complexity of the organization. A good corporate governance process will ensure that senior officers are able to delegate responsibility, but also that senior officers are informed of key issues and problems when they arise.

### B.     <u>Corporate Governance at Gateway</u>

35.     In my opinion, Gateway's approach to corporate governance was good and reasonable in the above respects. I will begin with the most important part of the

16

B-76

corporate governance process: the board.  During the relevant times, Gateway's board of

directors was composed of eight people, each of whom brought specialized expertise and

experience to the company.  **For a company of Gateway's size, the board was lean,**

**efficient, and extremely well qualified.  For a technology company in 2000, the**

**board was extraordinarily independent.**  It is worth briefly describing the background

of each director, to illustrate the overall strength of Gateway's board.[19]

36.    **Charles G. Carey**.  Mr. Carey became a director in 1996.  He was

chairman of the board and CEO of the Fox Television Division of Fox Inc. and co-chief

operating officer of News Corporation and the Fox Entertainment Group, Inc.  He had an

M.B.A. from Harvard University.

37.    **Elizabeth Dole**.  Ms. Dole became a director in May 2000.  She had

served as President of the Red Cross from 1991 to 1999, overseeing nearly 31,000 paid

and 1.3 million volunteer staff at the largest humanitarian organization in the world.  She

left the Red Cross in 1999 to pursue a campaign for President of the United States.  She

also had served as Secretary of Transportation, Secretary of Labor, and Deputy Assistant

to the President for Consumer Affairs.  She was a graduate of Duke University and

Harvard Law School, and also had a master's degree in education and government from

Harvard.

38.    **George H. Krauss**.  Mr. Krauss became a director in 1991.  He was a

corporate partner with the law firm of Kutak Rock in Omaha, Nebraska, where he had

worked for nearly thirty years and had been the firm's presiding partner.  He also had an

---

[19] The descriptions of the directors' backgrounds are drawn from Gateway's 2000 Proxy
Statement, April 6, 2000, at 3-4.

17

*B-77*

M.B.A. degree and had served on the board of a New York Stock Exchange listed company.

39.   **Douglas L. Lacey**.  Mr. Lacey became a director in 1989.  He was the managing partner of the Sioux City, Iowa, office of Nichols, Rise & Company, L.L.P., an accounting firm where he had worked for nearly three decades, since he received his undergraduate degree from Briar Cliff College in 1973.

40.   **James F. McCann**.  Mr. McCann became a director in 1996.  He had been President of 1-800-FLOWERS.com, Inc., since 1987, and served on several boards, including OfficeMax, Inc., Hofstra University, and Winthrop-University Hospital.

41.   **Richard D. Snyder**.  Mr. Snyder became a director in 1991.  He was CEO of Ardesta, LLC, a microsystems company, and president of Avalon Investments, Inc., a venture capital management company.  He served on various boards and was chairman of the Michigan Economic Development Corporation.  Mr. Snyder had served as a senior executive at Gateway, but resigned in August 1997.

42.   **Theodore W. Waitt**.  Mr. Waitt co-founded the Company in 1985 and had served as chairman of the board since 1993.  He also had been Gateway's CEO from 1993 until December 1999, when the board appointed Mr. Weitzen as CEO.

43.   **Jeffrey Weitzen**.  Mr. Weitzen became a director in 1998 when he joined Gateway as president and chief operating officer.  He became Gateway's CEO on January 1, 2000.  Before joining Gateway, he was a senior executive at AT&T.

44.   Although the New York Stock Exchange had not yet imposed its current independence rules at the times relevant here, Gateway arguably satisfied those requirements even in October 2000.  **My understanding is that of the eight directors,**

18

*B-78*

**only one was an employee of the company, and only two other directors were**

**previous employees.  A majority of the directors had never worked at Gateway.  The**

**positions of CEO and chairman of the board were split.  All of the other directors**

**had run institutions, and had substantial and relevant experience, including a**

**variety of accounting, business, financial, and legal expertise**.

45.    The board structure also was exemplary.  **The chairs of the**

**compensation and audit committees were not current or former Gateway**

**employees, and those committees were composed entirely of outside directors**.

During the 2000 fiscal year, the board met ten times, and the audit committee met six

times, more than the standard number of meetings one would expect.[20]

46.    The compensation committee designed programs to help attract and retain

key management critical to the success of the company, and to align compensation with

Gateway's business strategies, values, and management initiatives.  The entire board

determined the CEO's compensation, and the senior officers had detailed employment

agreements with Gateway.[21]  Director compensation was reasonable.[22]

47.    In addition, the directors held substantial numbers of shares.  A high level

of share ownership among directors is an important element of good corporate

governance, because share ownership helps to align the incentives of shareholders and

---

[20] Gateway 2001 Proxy Statement, April 4, 2001, at 4; Weitzen Depo. at 139-140.

[21] See Todd Depo. at 35.

[22] Directors were compensated at the rate of $6,000 per quarter, plus $1,000 per meeting of the
board, $500 per meeting of any committee of the board, and $200 per telephonic meeting
attended (up to a maximum of $1,500 per day for all meetings attended), plus an annual grant of
stock options.  Directors also were reimbursed for their expenses incurred in attending such
meetings.  Directors who were Gateway employees received no additional compensation for their
services as directors.  Gateway 2001 Proxy Statement at 5.

B-79

directors. As of March 24, 2000, Mr. Waitt owned 35.82% of Gateway's shares; Mr.

Snyder owned 1,216,000 shares; Mr. Weitzen owned 755,296 shares; Mr. Lacey owned

108,000 shares; and Messrs. Carey, Kraus, and McCann each owned 72,000 shares.[23]

48.     The audit committee was responsible for retaining Gateway's independent

accountants, consulting with them regarding the scope and timing of their audit, and

obtaining their report concerning the audited financial statements. During the relevant

times, the audit committee retained PricewaterhouseCoopers LLP, one of the leading and

most reputable accounting firms at the time, and PricewaterhouseCoopers opined that

"[i]n our opinion, the consolidated financial statements ... herein present fairly, in all

material respects, the consolidated financial position of Gateway, Inc."[24] As noted above,

the audit committee was composed of non-officers, and was chaired by an outside

director with extensive accounting expertise.

49.     Gateway followed a rigorous process with respect to accounting issues,

and involved internal officers, including the CFO, the controller, accountants, as well as

employees of PricewaterhouseCoopers. Mr. Manza, Gateway's controller, had a

background in accounting, including degrees in accounting and finance and an MBA, and

had worked as a CFO, controller, and accountant at various companies from 1983 until

1999, when Mr. Todd hired him.[25] Mr. Manza reported to Mr. Todd, and there were

approximately 400 employees in Mr. Manza's department.[26] Mr. Manza had primary

---

[23] Gateway 2000 Proxy Statement at 10 (noting that this data includes beneficial ownership of
Gateway shares that may be acquired pursuant to employee stock options).

[24] See Gateway, Inc. Form 10-K for the Fiscal Year Ended December 31, 1999, at 21.

[25] Manza Depo. at 10-12.  Mr. Manza obtained his CPA license in 1985.  Id. at 38.

[26] Id. at 22-25.

B-80

responsibility for accounting issues at Gateway, and was the main point of contact with Gateway's outside auditors from PricewaterhouseCoopers. Mr. Manza acted as a typical controller in the relationship with PricewaterhouseCoopers: he provided information and relied on PricewaterhouseCoopers employees to perform the outside audit function.[27]

50.    Mr. Todd did not have an accounting background, and relied on Mr. Manza and the rest of his team, as well as the outside auditors, with respect to accounting details.[28] Mr. Todd supervised Mr. Manza, but was not involved in detailed accounting decisions. Mr. Todd had a standing direction to Mr. Manza to give all documents to the outside auditors and to ensure that the outside auditors were comfortable with any Gateway transaction before signing a deal.[29] It is not uncommon for a CFO to have a primary background in operations, strategy, or finance, rather than accounting. Indeed, during 2000, the CFO of Apple Computer, a major competitor of Gateway, had an operations background, not an accounting background.[30]

51.    Like Mr. Todd, Mr. Weitzen did not have an accounting background. Mr. Weitzen was not involved in accounting decisions at all.[31] Instead, his role in the audit process was simply to confirm that the accountants had approved Gateway's approach.[32] Indeed, Mr. Weitzen had only limited interaction with personnel from

---

[27] Id. at 477.

[28] Todd Depo. at 269-77, 590, 598-90, 601-05.

[29] Todd Depo. at 215.

[30] See Apple Computer, Inc., Form 10-K for the Fiscal Year Ended September 30, 2000, at 63; see also Automatic Data Processing, Inc., Form 10-K for the Fiscal Year Ended June 30, 1995, at 10.

[31] Weitzen Depo. at 129.

[32] Id. at 132.

B-81

PricewaterhouseCoopers, and did not participate in any substantive meetings with outside auditors.[33]  In my opinion, this limited involvement was appropriate, given Mr. Weitzen's lack of expertise in accounting and the expertise at Gateway and its outside auditors.

52.    My understanding is that **shortly before and after Mr. Weitzen was hired as CEO in January 2000, Gateway instituted major changes to improve its corporate governance process.**[34]  Mr. Weitzen set up a system of regular meetings and planning functions for each of the business units.[35]  This system was consistent with the way well-managed companies operated at the time, and was consistent with Mr. Weitzen's experience at AT&T.[36]  Mr. Todd also made important changes: he hired Mr. Manza as controller, established an internal audit department, and arranged for a system of regular meetings on a range of issues.[37]

53.    Gateway also established a clear written code of ethics during this period.[38]  All new employees were given a copy of this code and signed a form indicating that they had been briefed on the code and understood what it meant.[39]  Gateway hired an ethics officer who conducted training and monitored compliance with the code of ethics.[40]  Gateway established an ethics and compliance hotline, a dedicated phone line,

---

[33] Id. at 256-57.

[34] Weitzen Depo. at 22, 127; Todd Depo. at 104-06.

[35] Weitzen Depo. at 100-01, 106.

[36] Id. at 114-15

[37] Todd Depo. at 105-09.

[38] Elliott Depo. at 43.

[39] Id. at 44.

[40] Id. at 43-44.

22

B-82

so that any employee with concerns could directly contact the ethics and compliance officer.[41]  Gateway implemented a process for contracting and for manager approval of contracts.[42]

54.    These are the types of processes one would expect from a company with good corporate governance.  They were designed to facilitate the flow of information to senior officers and directors, as the representatives of shareholders, and to minimize the conflicts between shareholders and managers.  Most importantly, these processes worked, particularly with respect to the audit function.  It appears that the audit committee was involved and active in its inquiries in response to investigations and reports.  Audit committee meetings were conducted in a typical manner with key officers attending, and with PricewaterhouseCoopers presenting relevant information to the audit committee.[43] In addition, Gateway promulgated a set of revenue recognition rules.[44]  In response to SEC Staff Accounting Bulletin No. 101, during the late summer of 2000, Gateway was finalizing a comprehensive policy for revenue recognition.[45]

55.    Gateway's voting process also was typical for a large public company.  Its bylaws provided that directors were elected by a plurality of the votes of common shares present (or represented by proxy) and entitled to vote at the annual meeting.[46]  Gateway

---

[41] Id. at 44.

[42] Id. at 137.

[43] Id. at 87-88.

[44] Id. at 46.

[45] Id. at 47.

[46] Gateway, Inc. Form 10-K for the Fiscal Year Ended December 31, 1999, Exhibit 3.2.

23

B-83

also established a shareholder rights agreement, consistent with the practices of many public companies at the time.[47]

56.     Finally, it is important to place Gateway's corporate governance processes in proper context, within a large, complex public corporation. When Mr. Weitzen became CEO, Gateway had approximately **21,000 full-time employees**, including 3,400 employees outside the United States.[48] Gateway had **39 subsidiaries, located throughout the world**,[49] and it owned or leased facilities in San Diego, California; North Sioux City, South Dakota; Vermillion, South Dakota; Kansas City, Missouri; Rio Rancho, New Mexico; Colorado Springs, Colorado; Lakewood, Colorado; Lake Forest, California; Hampton, Virginia; Salt Lake City, Utah; Dublin, Ireland; Malacca, Malaysia; Kuala Lumpur, Malaysia; Sydney, Australia; Yokohama, Japan; Tokyo, Japan; Osaka, Japan; Singapore; Hong Kong; and New Zealand, as well as hundreds of store locations throughout the world.[50]

57.     One would not expect the senior officers of such a large, complex institution to be aware of all of details associated with every transaction that occurs within the company. Nor would one expect the senior officers, including the CEO, CFO, and controller, to be aware of all of the accounting details associated with every transaction. Instead, good corporate governance of such a company would permit senior officers to rely on the experience of outside auditors in assessing the accounting

---

[47] Id., Exhibit 3.3.

[48] Id. at 8.

[49] Id., Exhibit 21.1.

[50] Id. at 11.

B-84

treatment for particular transactions. Indeed, it would not constitute good corporate governance practice to involve senior officers, particular the CEO, in accounting treatment decisions for particular transactions. Mr. Weitzen was a typical CEO in that he was not aware of such details, nor would one expect him to be. Moreover, given Mr. Weitzen's limited knowledge of accounting, from two courses he had taken, it would have made little sense to require that he become involved in detailed discussions of the accounting treatment for particular transactions.

58.     Finally, it is important to note that good corporate governance is consistent with creating incentives for employees to work especially hard, when necessary, at the end of each fiscal quarter. For better or worse, public companies are judged based on quarterly performance. Indeed, the SEC has promulgated and approved a network of regulations and accounting rules that ensure quarterly performance is the benchmark for public companies. In the United States, public companies are presented with Generally Accepted Accounting Principles, and within the confines of those rules the SEC's system of periodic disclosure creates incentives for managers to seek to maximize profit on a quarterly basis. Specifically, investors and analysts establish quarterly estimates for revenue and earnings, and managers seek to meet those estimates, within the framework established by the SEC and GAAP, in order to maximize shareholder value.

59.     As a policy matter, this system might not be ideal, but it is the system used by the SEC and the companies it regulates. Within this system, **it is perfectly appropriate for directors and officers to create incentives to ensure that a company, operating within the rules, is able to report earnings that equal or exceed analysts' quarterly estimates**. From a corporate governance perspective, the end of the quarter is

B-85

an especially important time.  It is the time companies make important public

announcements, and a corporate governance system should ensure that employees work

hard to meet estimates at this time, especially if the company's performance is below

expectations.  If a company has a good corporate governance system, senior managers

will be aware that revenues or earnings are falling short of analysts' estimates, and they

should create incentives for employees to work hard to close that gap.  The fact that

Gateway's officers endorsed working hard to "make numbers" or "close the gap" at the

end of a fiscal quarter is not usual.[51]  It is simply good corporate governance.


_____

Frank Partnoy


_____

Date

---

[51] Weitzen Depo. at 150, 153.

B-80

**Exhibit A – Resume of Professor Frank Partnoy**

**Frank Partnoy**
5998 Alcalá Park, San Diego, CA 92110-2492
619-260-2352 • fpartnoy@sandiego.edu

## Education

Yale Law School    J.D., 1992.
                   Thurman Arnold Prize, Potter Stewart Prize.

University of Kansas  B.A. mathematics, 1989, *summa cum laude*.
                      B.S. economics, 1989, *summa cum laude*.

## Employment

University of San Diego School of Law, San Diego, CA, 1997-.
        Professor, 2001-; Associate Professor, 1999-2001; Assistant Professor, 1997-99.

    Courses:    Corporations, Corporate Finance, Deals, Emerging Financial
                Markets, International Finance (at University of Paris I), Latin
                American Financial Markets, White Collar Offenses.

    Awards:     Herzog Endowed Scholar, 2003-04.
                Thorsnes Prize for Excellence in Teaching, 1998-99.

    Service:    Chair, Appointments Committee (2001-2003); Chair, Faculty
                Colloquium Committee (2000-2001); Chair, Junior Faculty
                Roundtable (1997-2001); Director, Law Alumni Board of
                Directors (1999-2001); Treasurer, Law Alumni Faculty Golf
                League (1997-2001); Member, Self-Study Committee (2004-05);
                Member, Appointments Committee (2004-06); Member,
                Curriculum Committee (2000-2005); Member, Development
                Committee (1998-2001); Member, Graduate Programs Committee
                (1997-1999).

Rady School of Management, University of California, San Diego, San Diego, CA
        Visiting Professor, 2005.

    Course:     Regulation and Innovation.

Covington & Burling, Washington, DC, 1995-97.

Derivative Products Group, Morgan Stanley & Co., New York, NY, 1994-95.

Emerging Markets Derivatives, CS First Boston, New York, NY, 1993-94.

Law Clerk, Hon. Michael B. Mukasey, U.S. District Judge, SDNY, New York, NY, 1992-93.

*B-87*

## Publications

## BOOKS

CORPORATIONS LAW AND POLICY: MATERIALS AND PROBLEMS (Thomson West 2005 Supp., 6th Ed. forthcoming 2006, with Jeffrey D. Bauman and Alan R. Palmiter).

INFECTIOUS GREED: HOW DECEIT AND RISK CORRUPTED THE FINANCIAL MARKETS (Henry Holt/Times Books 2003).

| | |
|---|---|
| Editions: | Paperback (Henry Holt/Owl Books 2004); Australian, British, Hong Kong. |
| Translations: | Korean, Spanish. |
| Reviews: | New York Times Book Review, Washington Post Book World, Wall Street Journal, London Times, Financial Times, several dozen others. |

F.I.A.S.C.O.: BLOOD IN THE WATER ON WALL STREET (W.W. Norton 1997).

| | |
|---|---|
| Editions: | Paperback (Penguin 1999); Australian, British, Hong Kong. |
| Translations: | Chinese, Japanese, German, Korean, Portuguese, Russian. |
| Awards: | Finalist, Financial Times/Booz-Allen Global Business Book Award, 1997. San Diego Union Tribune Author of the Year, 1997. |
| Reviews: | New York Times Book Review, Los Angeles Times Book Review, London Times, Financial Times, several dozen others. |

## BOOK CHAPTERS

*Enron and the Derivatives World*, in ENRON: CORPORATE FIASCOS AND THEIR IMPLICATIONS (Foundation Press 2004, Nancy B. Rapoport and Bala G. Dharan, eds.).

*ISDA, NASD, CFMA, and SDNY: The Four Horsemen of Derivatives Regulation?*, in BROOKINGS-WHARTON PAPERS ON FINANCIAL SERVICES (Brookings Institution Press 2002, Robert E. Litan and Richard Herring, eds.).

*The Paradox of Credit Ratings*, in THE ROLE OF CREDIT REPORTING SYSTEMS IN THE INTERNATIONAL ECONOMY (Kluwer Academic Publishers 2002, Richard M. Levitch, Giovanni Majnoni, and Carmen Reinhart, eds.).

## ARTICLES

*Finance and Patent Length* (unpublished 45-page manuscript).

*Mutual Funds, Financial Innovation, and the Product/Service Distinction*, __ JOURNAL OF BUSINESS & TECHNOLOGY LAW __ (forthcoming 2006) (invited symposium).

B-88

*Patents as Options*, __ WASHINGTON UNIVERSITY LAW QUARTERLY __ (forthcoming 2006) (invited symposium) (with Shaun P. Martin).

*How and Why Credit Rating Agencies are Not Like Other Gatekeepers*, BROOKINGS-TOKYO CLUB PAPERS ON FINANCIAL SERVICES __ (forthcoming 2006) (invited symposium)

*Financial Innovation and Corporate Law*, __ JOURNAL OF CORPORATION LAW __ (forthcoming 2006) (invited symposium).

*Encumbered Shares*, 2005 UNIVERSITY OF ILLINOIS LAW REVIEW 775 (2005) (with Shaun P. Martin).

*Synthetic Common Law*, 53 UNIVERSITY OF KANSAS LAW REVIEW 281 (2005).

*Strict Liability for Gatekeepers: A Reply to Professor Coffee*, 84 BOSTON UNIVERSITY LAW REVIEW 365 (2004) (invited symposium).

*A Revisionist View of Enron and the Sudden Death of "May,"* 48 VILLANOVA LAW REVIEW 1245 (2003) (invited symposium), reprinted in ENRON AND WORLD FINANCE: A CASE STUDY IN ETHICS (2006).

*Multinational Regulatory Competition and Single-Stock Futures*, 21 NORTHWESTERN JOURNAL OF LAW AND INTERNATIONAL BUSINESS 641 (2001) (invited symposium).

*Barbarians at the Gatekeepers?: A Proposal for a Modified Strict Liability Regime*, 79 WASHINGTON UNIVERSITY LAW QUARTERLY 491 (2001) (invited symposium).

*The Shifting Contours of Global Derivatives Regulation*, 22 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 421 (2001) (invited symposium).

*Why Markets Crash and What Law Can Do About It*, 61 UNIVERSITY OF PITTSBURGH LAW REVIEW 741 (2000).

*Adding Derivatives to the Corporate Law Mix*, 34 GEORGIA LAW REVIEW 599 (2000) (invited symposium).

*The Siskel and Ebert of Financial Markets: Two Thumbs Down for the Credit Rating Agencies*, 77 WASHINGTON UNIVERSITY LAW QUARTERLY 619 (1999), reprinted at 33 SECURITIES LAW REVIEW 161 (2001).

*Financial Derivatives and the Costs of Regulatory Arbitrage*, 22 JOURNAL OF CORPORATION LAW 211 (1997).

B-89

## ESSAYS AND OTHER PUBLICATIONS

*Investing in Fantasy Land*, FINANCIAL TIMES, Dec. 28, 2005, at 13.

*The Case against Alan Greenspan*, EUROMONEY, Sept. 1, 2005, at 90.

*Must-Reads for Budding Fraudsters*, FINANCIAL TIMES, Aug. 10, 2005, at 11.

*A Serious Question for All the Overpaid Bankers*, FINANCIAL TIMES, Aug. 4, 2005, at 15.

*Congress Should Open Up Credit Ratings to Competition*, FINANCIAL TIMES, Jun. 29, 2005, at 13.

*Wall Street's Franchise Is Fading*, FINANCIAL TIMES, Apr. 6, 2005, at 13.

*Cautionary Tales of Internet Stocks*, FINANCIAL TIMES, Feb. 14, 2005, at 19.

*Road Rules for Hedge Funds*, NEW YORK TIMES, Dec. 14, 2004.

*Financial Engineering and Law*, FINANCIAL ENGINEERING NEWS, Nov./Dec. 2004.

*Why Nobody Mentioned Markets*, FINANCIAL TIMES, Oct. 20, 2004, at 17.

*A Man's Game in Need of Women*, FINANCIAL TIMES, Jul. 26, 2004, at 17.

*The Way to a Politician's Heart*, FINANCIAL TIMES, Jun. 14, 2004, at 13.

*The Case for Smarter Prosecutions*, FINANCIAL TIMES, Mar. 11, 2004, at 21.

*The Real Mutual Fund Problem*, SAN DIEGO UNION-TRIBUNE, Dec. 5, 2003, at B-7.

*Financial Risk Management*, TREASURY & RISK MANAGEMENT, Jul./Aug. 2003, at 44.

*Want to Vote? Answer This ...*, NEW YORK TIMES, Jul. 28, 2003, at A17.

*The Wrong Way to Prosecute Fraud*, SAN DIEGO UNION-TRIBUNE, May 11, 2003, at G-3.

*A Comparative Political History of the CFMA and Sarbanes-Oxley*, FUTURES & DERIVATIVES LAW REPORT, Apr. 2003, at 4.

*Reaping a Bitter Harvest from the Years of Greed*, EVENING STANDARD, Apr. 23, 2003, at 34.

*Building a Library: Finance*, INDEPENDENT ON SUNDAY (LONDON), Apr. 20, 2003, at 13.

*B-90*

*Unsound Advice from the Sage of Omaha*, FINANCIAL TIMES, Apr. 3, 2003, at 19.

*The Rating Agency Paradox*, TREASURY & RISK MANAGEMENT, Dec./Jan. 2003, at 52.

*Enron and Derivatives*, FUTURES & DERIVATIVES LAW REPORT, 2002.

*Tracing the Roots of Enron's Downfall*, SAN DIEGO UNION-TRIBUNE, Jan. 27, 2002, at G3.

*What Dogs Can Teach Us About Securities Regulation: Why Fining Two Mutual Funds For "Window Dressing" Was A Mistake*, FINDLAW, Aug. 20, 2001, <http://writ.news.findlaw.com/commentary/ >.

*Some Policy Implications of Single-Stock Futures*, FUTURES & DERIVATIVES LAW REPORT, Mar. 2001, at 8.

*Derivatives on TV: A Tale of Two Derivatives Debacles in Prime-Time*, GREENBAG (2001) (with Kimberly D. Krawiec and Peter H. Huang), reprinted at 2 DERIVATIVES REP. 15 (2001).

*Stock Gambling on the Cheap*, NEW YORK TIMES, Dec. 21, 2000, at A39.

*Harassment on "The Street,"* THE READ, Jun. 22, 2000, <http://www.oxygen.com/read/>.

*Beating Regis: How to Win on "Who Wants to Be a Millionaire,"* FINDLAW, June 19, 2000, <http://writ.news.findlaw.com/commentary/ >.

*Strange New Math of Palm Inc.*, NEW YORK TIMES, Mar. 15, 2000, at A29.

*Decoding Greenspan*, OPEN COURT, AMERICAN LAWYER MEDIA, Apr. 1999 <http://www.lawnewsnetwork.com/opencourt/>.

*Comments on Proposed Bulgarian Pass-Through Bonds and Mortgage Bonds Act*, CENTRAL AND EAST EUROPEAN LAW INITIATIVE (CEELI), Feb. 9, 1999.

*Betting on Suing*, OPEN COURT, AMERICAN LAWYER MEDIA, Dec. 1998. <http://www.lawnewsnetwork.com/opencourt/>.

*Do You Know Where Your Money Is Now?*, MAIL ON SUNDAY, Oct. 25, 1998, at 45.

*Playing Roulette with the Global Economy*, NEW YORK TIMES, Sep. 30, 1998, at A17.

*High-Finance Fiction*, LOS ANGELES TIMES BOOK REVIEW, Feb. 8, 1998, at 16.

*Riding the Rap*, WORTH, Feb. 1998, at 113.

B-91

## Invited Talks and Panels

*Patents as Options*, Washington University in St. Louis Conference on Commercializing Innovation, Washington University School of Law, St. Louis, MO, Nov. 4, 2005.

*An Assessment of the Global Risks Associated with Synthetic Collateralized Debt Obligations*, Bayerische Hypo- und Vereinsbank AG Financial Institutions and Agency Funding Conference, Munich, Germany, Sep. 30, 2005.

*How and Why Credit Rating Agencies are Not Like Other Gatekeepers*, Brookings-Nomura Conference on Financial Services, The Brookings Institution, Washington, DC, Sep. 28, 2005.

*Capital Structure Primacy and the Firm as a Nexus of Option Contracts*, University of Iowa College of Law, Iowa City, IA, Sep. 9, 2005.

*Legislative Solutions for the Rating Agency Duopoly*, Sworn Testimony before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, U.S. House of Representatives Committee on Financial Services, Washington, DC, Jun. 29, 2005.

*Where Is the Risk?*, Euromoney Global Borrowers & Investors Forum, London, England, Jun. 23, 2005.

*Designing Groups: Voting Preferences and Path Dependence*, The Law and Society Association Annual Meeting, Las Vegas, NV, Jun. 2, 2005.

*Infectious Greed*, Wilson Lecture in Law and Business, Wake Forest University School of Law and Babcock School of Management, Winston-Salem, NC, Mar. 29, 2005.

*Encumbered Shares*, University of Kansas School of Law, Lawrence, KS, Feb. 28, 2005.

*Encumbered Shares*, Boalt Hall School of Law, Berkeley, CA, Jan. 24, 2005.

*Mutual Funds, Financial Innovation, and the Product/Service Distinction*, University of Maryland Law School, Baltimore, MD, Nov. 5, 2004.

*Encumbered Shares*, University of San Diego School of Law, San Diego, CA, Oct. 14, 2004.

*Director Ethics*, Corporate Directors' Forum, San Diego, CA, Oct. 6, 2004.

*Infectious Greed*, UCLA School of Law, Los Angeles, CA, Feb. 2, 2004.

*Are the Markets Out of Control?*, University of San Diego School of Law, San Diego, CA, Nov. 17, 2003.

B-92

*Recent Issues in Corporate Governance*, Keynote Address, Society of Actuaries Annual Investment Conference, Toronto, CA, Nov. 11, 2003.

*Corporate Voting and Encumbered Shares*, Washington University School of Law, St. Louis, MO, Oct. 21, 2003.

*Emerging Issues in Structured Finance*, Seoul National University College of Law, Seoul, Republic of Korea, Jun. 20, 2003.

*Structured Financial Products: Regulation, Law, and Policy*, Korean Securities Dealers Association, Seoul, Republic of Korea, Jun. 19, 2003.

*Credit Derivatives: Be Afraid, Be Very Afraid*, Grant's Interest Rate Observer Spring Investment Conference, New York, NY, Apr. 30, 2003.

*Financial Innovation and Accounting*, 57th Annual Conference of Accountants, University of Tulsa, Tulsa, OK, Apr. 29, 2003.

*Credit Derivatives and Insurance Regulation*, National Association of Insurance Commissioners National Meeting, San Diego, CA, Dec. 9, 2002.

*An Economic Reality Standard for Financial Market Regulation*, Goizueta Business School, Emory University, Atlanta, GA, Nov. 19, 2002.

*Research Studies of Individual Companies*, Conference on Field Study Methodologies in Legal Research and Teaching about Business, Georgetown Law School, Washington, D.C., Nov. 1, 2002.

*Enron and Derivatives*, George Washington University School of Law, Washington, D.C., Oct. 7, 2002.

*Enron and Derivatives*, Villanova Law School Symposium on Lessons from Enron, Villanova, PA, Oct. 5, 2002.

*Law and Finance*, Keynote Lecture, Courant Institute for Mathematical Finance, New York University, New York, NY, Oct. 3, 2002.

*Enron, Derivatives, and the Gatekeepers*, Thomas Jefferson School of Law, San Diego, CA, Feb. 26, 2002.

*The Fall of Enron: How Could It Have Happened?*, Sworn Testimony before the U.S. Senate Committee on Governmental Affairs, Washington, D.C., Jan. 24, 2002.

*The Next Stages of Financial Derivatives Regulation*, Brookings-Wharton Papers on Financial Services, Washington, D.C., Jan. 10-11, 2002.

B-93

*Terrorist Insider Trading, Enron, and Financial Derivatives*, Heller Ehrman White & McAuliffe, San Diego, CA, Dec. 5, 2001.

*The Paradox of Credit Ratings*, University of California at San Diego, San Diego, CA, Oct. 11, 2001.

*The Gatekeepers of Financial Markets*, Institute for Law and Economic Policy Conference on Corporate Accountability, Scottsdale, AZ, Mar. 10, 2001.

*The Paradox of Credit Ratings*, Conference on the Role of Credit Reporting Systems in the International Economy, Sponsored by The University of Maryland Center for International Economics, New York University Stern School of Business and The World Bank, Washington, D.C., Mar. 2, 2001.

*Financial Derivatives Regulation and Synthetic Common Law*, London Guildhall University Department of Law, London, England, Jan. 23, 2001.

*The Globalization of the Financial Derivatives Markets*, University of Pennsylvania School of Law, Philadelphia, PA, Jan. 19, 2001.

*The Future of Derivatives Regulation*, American Association of Law Schools Annual Conference, Section on Securities Regulation, San Francisco, CA, Jan. 6, 2001.

*Conference on Financial Derivatives* (Host and Moderator), University of San Diego School of Law, San Diego, CA, Nov. 10, 2000.

*Finance Entrepreneurs and Short-Duration Intellectual Property*, Law & Entrepreneurship Conference, Lewis & Clark Northwestern School of Law, Portland, OR, Oct. 20, 2000.

*Synthetic Common Law*, UCLA Second Annual Conference on Corporate Governance, UCLA Law School, Los Angeles, CA, Oct. 13, 2000.

*Synthetic Common Law*, University of North Carolina School of Law, Chapel Hill, NC, Oct. 5, 2000.

*Derivatives Regulation and the U.S. Thrift Industry*, Keynote Address, Office of Thrift Supervision West Region Annual Conference, Rohnert Park, CA, Aug. 29, 2000.

*Financial Derivatives and Popular Culture,* The Law & Society Annual Meeting, Miami, FL, May 27, 2000.

*Why Markets Crash and What Law Can Do About It*, Northeastern University School of Law, Boston, MA, Mar. 23, 2000.

B-94

*Rating Agencies: Substitute or Necessary Corollary to the Regulation of Debt Markets?*, Duke University Global Capital Markets Center Conference: Reexamining the Regulation of Capital Markets for Debt Securities, Washington, DC, Oct. 18-19, 1999.

*Adding Derivatives to the Corporate Law Mix*, University of Georgia School of Law Corporate Law Conference, Athens, GA, Oct. 15-16, 1999.

*Mark-to-Market for Publicly Traded Securities and Derivatives*, University of San Diego Tax Conference: Emerging Changes in Our Tax System? Exploring Potential Benefits and Problems, San Diego, CA, Mar. 19, 1999.

*The Siskel and Ebert of Financial Markets: Two Thumbs Down for the Credit Rating Agencies*, University of San Diego School of Law Faculty Colloquium, San Diego, CA, Jan. 15, 1999.

*Information Asymmetry, Suitability, and the Role of Derivatives Dealers*, Derivatives Strategy Derivatives Hall of Fame Conference, New York, NY, Feb. 9, 1998.

*The Culture and Economics of Derivatives Trading*, Keynote Address, North American Securities Administrators Association (NASAA), 80th Annual Conference, San Antonio, TX, Nov. 17, 1997.

Hundreds of media interviews, including The News Hour and NPR, 1997-date.

## Professional Licenses and Affiliations

Co-Chair, American Bar Association, Futures and Derivatives Litigation Subcommittee.
Member, Association of American Law Schools, Business Law Committee.
Member, New York and District of Columbia bars.
Series 3, 7, and 63 registered securities, options, and futures examinations.
Advisory Board Member, Financial Services Policy Institute.
Board Member, Futures and Derivatives Law Report.

B-95

## Exhibit B – Rule 26(a)(2)(B) disclosure of data or other information considered by Professor Frank Partnoy in forming his opinions:

Securities and Exchange Commission Deposition Transcripts of William Elliott, Robert Manza, John Todd, and Jeffrey Weitzen, 2002.

Wells Submission on Behalf of John Todd, February 29, 2003; Wells Submission on Behalf of Robert Manza, March 11, 2003; Wells Submission on Behalf of Jeffrey Weitzen, March 11, 2003.

Complaint, Securities and Exchange Commission v. John J. Todd, Robert D. Manza, and Jeffrey Weitzen, Complaint for Violations of the Securities Laws, Case No. 03-CV-02330 K (RBB), November 13, 2003.

Defendants' Answers to Complaint, January 13, 2004.

Defendant Jeffrey Weitzen's Confidential Early Neutral Evaluation Mediation Brief, with Exhibits, August 20, 2004; Defendants' Joint Early Neutral Evaluation Brief, August 2004.

Summary Judgment Motion filed by the Securities and Exchange Commission, with Memoranda, Statements of Uncontroverted Facts, and Exhibits, October 6, 2005.

Defendants' Joint Expert Witness Designation, November 15, 2005.

All data or other information referenced in the Expert Report of Professor Frank Partnoy, January 17, 2006.

*B-96*

Page 1

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Date | GTW Volume | GTW Open | GTW Close | DELL Open | DELL Close | AAPL Open | AAPL Close | AAPL Adj. Close* | SUNW Open | SUNW Close | SUNW Adj. Close* | NDX Close | SPX Close |
| 3 | 13-Oct-99 | 2,252,100 | 50.94 | 51.31 | 44.61 | 44.44 | 66.62 | 64.03 | 16.01 | 89.75 | 89.75 | 22.34 | 2,454.49 | 1,285.55 |
| 4 | 14-Oct-99 | 3,059,900 | 51.06 | 55.12 | 44.44 | 44.34 | 69.25 | 73.19 | 18.30 | 89.75 | 89.41 | 22.35 | 2,470.99 | 1,283.42 |
| 5 | 15-Oct-99 | 2,433,700 | 53.75 | 52.44 | 43.69 | 42.81 | 71.12 | 74.56 | 18.64 | 90.50 | 92.56 | 23.14 | 2,403.81 | 1,247.41 |
| 6 | 18-Oct-99 | 3,069,300 | 52.37 | 51.50 | 42.50 | 41.31 | 73.87 | 73.25 | 18.31 | 93.44 | 93.56 | 23.39 | 2,362.11 | 1,254.13 |
| 7 | 19-Oct-99 | 5,080,300 | 49.63 | 46.88 | 38.50 | 38.50 | 71.62 | 68.50 | 17.12 | 95.19 | 94.06 | 23.51 | 2,362.25 | 1,261.32 |
| 8 | 20-Oct-99 | 4,192,900 | 48.13 | 52.00 | 39.63 | 40.00 | 70.00 | 75.12 | 18.78 | 95.69 | 96.31 | 24.08 | 2,466.29 | 1,289.43 |
| 9 | 21-Oct-99 | 9,503,000 | 57.00 | 62.00 | 38.38 | 39.50 | 72.56 | 76.12 | 19.03 | 91.87 | 92.87 | 23.22 | 2,477.14 | 1,283.61 |
| 10 | 22-Oct-99 | 5,695,400 | 63.00 | 64.06 | 40.00 | 39.88 | 77.12 | 73.94 | 18.49 | 93.75 | 90.00 | 22.50 | 2,485.90 | 1,301.65 |
| 11 | 25-Oct-99 | 3,235,200 | 63.88 | 62.62 | 40.25 | 39.19 | 74.25 | 74.50 | 18.62 | 89.81 | 92.94 | 23.24 | 2,484.19 | 1,293.63 |
| 12 | 26-Oct-99 | 2,836,400 | 62.25 | 63.25 | 39.63 | 39.56 | 74.94 | 75.06 | 18.76 | 93.69 | 91.25 | 22.81 | 2,466.40 | 1,281.91 |
| 13 | 27-Oct-99 | 2,357,500 | 61.75 | 62.00 | 38.75 | 38.38 | 74.37 | 76.37 | 19.09 | 91.31 | 92.62 | 23.16 | 2,457.46 | 1,296.71 |
| 14 | 28-Oct-99 | 2,348,000 | 62.06 | 63.38 | 39.06 | 38.50 | 77.06 | 77.87 | 19.47 | 94.44 | 98.62 | 24.66 | 2,539.93 | 1,342.44 |
| 15 | 29-Oct-99 | 2,736,100 | 64.50 | 66.06 | 39.75 | 40.13 | 78.81 | 80.12 | 20.03 | 100.75 | 105.81 | 26.45 | 2,637.44 | 1,362.93 |
| 16 | 1-Nov-99 | 1,382,100 | 65.50 | 64.81 | 40.00 | 40.75 | 80.00 | 77.62 | 19.41 | 105.56 | 103.94 | 25.99 | 2,616.36 | 1,354.12 |
| 17 | 2-Nov-99 | 2,341,900 | 65.00 | 66.31 | 40.88 | 41.19 | 78.00 | 80.25 | 20.06 | 104.87 | 103.69 | 25.92 | 2,626.99 | 1,347.74 |
| 18 | 3-Nov-99 | 2,232,500 | 67.00 | 67.63 | 41.63 | 42.00 | 81.62 | 81.50 | 20.38 | 106.50 | 106.56 | 26.64 | 2,672.72 | 1,354.93 |
| 19 | 4-Nov-99 | 2,280,200 | 69.38 | 70.25 | 42.13 | 42.56 | 82.06 | 83.62 | 20.91 | 109.00 | 107.56 | 26.89 | 2,703.11 | 1,362.64 |
| 20 | 5-Nov-99 | 2,388,300 | 71.12 | 72.50 | 43.00 | 40.75 | 84.62 | 88.31 | 22.08 | 109.87 | 109.69 | 27.42 | 2,755.70 | 1,370.23 |
| 21 | 8-Nov-99 | 2,376,500 | 72.38 | 73.00 | 40.13 | 40.13 | 87.75 | 96.37 | 24.09 | 113.50 | 111.87 | 27.97 | 2,786.27 | 1,377.01 |
| 22 | 9-Nov-99 | 1,724,500 | 73.00 | 72.00 | 40.50 | 40.56 | 94.37 | 89.62 | 22.41 | 114.69 | 112.31 | 28.08 | 2,763.58 | 1,365.28 |
| 23 | 10-Nov-99 | 3,098,300 | 72.00 | 75.88 | 40.38 | 41.44 | 88.25 | 91.44 | 22.86 | 112.37 | 113.19 | 28.30 | 2,797.61 | 1,373.46 |
| 24 | 11-Nov-99 | 1,278,900 | 76.06 | 76.31 | 41.38 | 41.75 | 91.59 | 92.25 | 23.06 | 114.12 | 114.75 | 28.69 | 2,849.81 | 1,381.46 |
| 25 | 12-Nov-99 | 3,606,800 | 76.31 | 81.50 | 43.50 | 40.81 | 91.94 | 90.62 | 22.66 | 118.81 | 119.31 | 29.83 | 2,888.91 | 1,396.06 |
| 26 | 15-Nov-99 | 2,047,600 | 81.50 | 82.50 | 41.13 | 40.81 | 89.62 | 89.44 | 22.36 | 121.19 | 119.50 | 29.88 | 2,875.87 | 1,394.39 |
| 27 | 16-Nov-99 | 2,369,000 | 82.56 | 82.37 | 40.88 | 41.69 | 90.00 | 91.19 | 22.80 | 121.81 | 126.62 | 31.66 | 2,940.25 | 1,396.07 |
| 28 | 17-Nov-99 | 2,141,500 | 82.37 | 78.13 | 41.19 | 39.75 | 90.69 | 90.25 | 22.56 | 127.94 | 124.94 | 31.24 | 2,911.69 | 1,410.71 |
| 29 | 18-Nov-99 | 2,371,700 | 78.75 | 77.75 | 40.31 | 40.94 | 91.06 | 89.62 | 22.41 | 127.25 | 125.75 | 31.44 | 3,003.49 | 1,424.94 |
| 30 | 19-Nov-99 | 2,157,200 | 77.25 | 79.50 | 40.50 | 41.31 | 89.50 | 92.44 | 23.11 | 126.62 | 129.56 | 32.39 | 3,028.84 | 1,422.00 |
| 31 | 22-Nov-99 | 1,711,400 | 79.00 | 79.25 | 41.27 | 41.75 | 91.75 | 90.62 | 22.66 | 130.25 | 126.56 | 31.64 | 3,049.61 | 1,420.94 |
| 32 | 23-Nov-99 | 1,045,400 | 79.75 | 77.44 | 41.00 | 41.25 | 93.00 | 92.81 | 23.20 | 128.00 | 127.12 | 31.78 | 2,999.78 | 1,404.64 |
| 33 | 24-Nov-99 | 1,372,500 | 77.38 | 79.06 | 42.44 | 43.31 | 94.75 | 94.69 | 23.67 | 129.00 | 134.50 | 33.62 | 3,108.52 | 1,417.08 |
| 34 | 26-Nov-99 | 391,700 | 79.69 | 79.06 | 43.56 | 42.94 | 95.00 | 95.06 | 23.76 | 135.00 | 136.00 | 34.01 | 3,116.62 | 1,416.62 |
| 35 | 29-Nov-99 | 1,805,300 | 78.75 | 79.12 | 42.44 | 43.75 | 98.12 | 94.56 | 23.64 | 137.25 | 136.81 | 34.20 | 3,063.23 | 1,407.83 |
| 36 | 30-Nov-99 | 1,966,600 | 80.50 | 76.37 | 44.50 | 43.00 | 101.00 | 98.12 | 24.47 | 140.13 | 132.25 | 33.06 | 2,966.71 | 1,388.91 |
| 37 | 1-Dec-99 | 2,112,300 | 75.50 | 74.75 | 42.81 | 43.13 | 103.12 | 103.06 | 25.76 | 131.88 | 130.19 | 32.55 | 2,997.28 | 1,397.72 |
| 38 | 2-Dec-99 | 2,858,600 | 74.12 | 73.00 | 43.06 | 44.94 | 112.19 | 110.19 | 27.55 | 133.00 | 136.00 | 34.00 | 3,108.47 | 1,409.04 |
| 39 | 3-Dec-99 | 6,208,000 | 69.75 | 72.06 | 45.38 | 45.31 | 114.56 | 115.00 | 28.75 | 138.94 | 142.00 | 35.50 | 3,172.37 | 1,433.30 |
| 40 | 6-Dec-99 | 2,647,100 | 69.19 | 71.12 | 44.88 | 44.75 | 114.56 | 116.00 | 29.00 | 144.19 | 146.50 | 36.62 | 3,191.09 | 1,423.33 |

B-97

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 41 | 7-Dec-99 | 3,957,900 | 71.19 | 66.75 | 45.13 | 45.38 | 116.56 | 117.81 | 29.45 | 147.63 | 144.06 | 36.01 | 3,205.08 | 1,409.17 |
| 42 | 8-Dec-99 | 4,339,600 | 65.25 | 65.81 | 44.88 | 43.50 | 116.25 | 110.06 | 27.51 | 72.69 | 78.44 | 39.22 | 3,164.08 | 1,403.88 |
| 43 | 9-Dec-99 | 3,196,900 | 68.38 | 67.50 | 43.38 | 42.75 | 111.00 | 105.25 | 26.31 | 82.87 | 80.00 | 40.00 | 3,167.52 | 1,408.11 |
| 44 | 10-Dec-99 | 2,499,100 | 69.75 | 68.62 | 42.50 | 41.56 | 105.31 | 103.00 | 25.75 | 81.69 | 81.87 | 40.94 | 3,203.28 | 1,417.04 |
| 45 | 13-Dec-99 | 3,791,000 | 70.00 | 70.50 | 41.13 | 41.75 | 102.39 | 99.00 | 24.75 | 82.56 | 80.44 | 40.22 | 3,242.37 | 1,415.22 |
| 46 | 14-Dec-99 | 3,379,700 | 71.75 | 70.25 | 41.63 | 41.06 | 98.37 | 94.87 | 23.72 | 80.62 | 75.56 | 37.78 | 3,167.29 | 1,403.17 |
| 47 | 15-Dec-99 | 2,272,500 | 70.69 | 72.00 | 41.00 | 43.19 | 93.25 | 97.00 | 24.25 | 74.44 | 73.44 | 36.72 | 3,239.18 | 1,413.33 |
| 48 | 16-Dec-99 | 3,892,600 | 72.56 | 72.00 | 42.94 | 44.94 | 98.00 | 98.00 | 24.58 | 75.62 | 74.94 | 37.47 | 3,332.31 | 1,418.78 |
| 49 | 17-Dec-99 | 2,178,600 | 72.25 | 73.63 | 45.06 | 45.56 | 100.87 | 100.00 | 25.00 | 77.50 | 75.12 | 37.56 | 3,359.86 | 1,421.03 |
| 50 | 20-Dec-99 | 1,413,500 | 73.75 | 73.00 | 46.19 | 47.69 | 99.56 | 98.00 | 24.50 | 75.56 | 74.44 | 37.22 | 3,390.01 | 1,418.09 |
| 51 | 21-Dec-99 | 1,388,800 | 72.38 | 72.00 | 47.81 | 49.75 | 98.19 | 102.50 | 25.62 | 74.50 | 74.87 | 37.44 | 3,528.53 | 1,433.43 |
| 52 | 22-Dec-99 | 1,635,000 | 71.56 | 69.94 | 49.31 | 50.31 | 102.87 | 99.94 | 24.99 | 75.62 | 74.56 | 37.28 | 3,562.29 | 1,436.13 |
| 53 | 23-Dec-99 | 868,100 | 70.06 | 70.19 | 50.56 | 52.69 | 101.81 | 103.50 | 25.88 | 75.12 | 75.75 | 37.88 | 3,590.28 | 1,458.34 |
| 54 | 27-Dec-99 | 616,600 | 70.31 | 70.00 | 53.38 | 52.31 | 104.37 | 99.31 | 24.83 | 76.62 | 76.00 | 38.00 | 3,598.51 | 1,457.10 |
| 55 | 28-Dec-99 | 799,700 | 69.94 | 69.94 | 51.56 | 51.56 | 99.12 | 98.19 | 24.55 | 75.37 | 75.94 | 37.97 | 3,579.95 | 1,457.66 |
| 56 | 29-Dec-99 | 465,400 | 69.75 | 69.75 | 50.81 | 51.81 | 96.81 | 100.69 | 25.17 | 76.69 | 78.00 | 39.00 | 3,689.68 | 1,463.46 |
| 57 | 30-Dec-99 | 419,100 | 70.12 | 70.12 | 51.75 | 52.06 | 102.19 | 100.31 | 25.08 | 79.00 | 78.44 | 39.22 | 3,683.67 | 1,464.47 |
| 58 | 31-Dec-99 | 587,400 | 70.25 | 72.06 | 51.75 | 51.00 | 100.94 | 102.81 | 25.70 | 78.75 | 77.44 | 38.72 | 3,707.83 | 1,469.25 |
| 59 | 3-Jan-00 | 1,190,800 | 72.88 | 69.56 | 51.38 | 50.88 | 111.94 | 111.94 | 27.99 | 79.25 | 76.50 | 38.25 | 3,790.55 | 1,455.22 |
| 60 | 4-Jan-00 | 3,061,000 | 68.62 | 63.00 | 48.06 | 46.63 | 104.87 | 102.50 | 25.62 | 73.44 | 71.75 | 35.88 | 3,546.20 | 1,399.42 |
| 61 | 5-Jan-00 | 2,921,600 | 62.75 | 55.00 | 47.00 | 49.94 | 103.75 | 104.00 | 26.00 | 70.12 | 71.87 | 35.94 | 3,507.31 | 1,402.11 |
| 62 | 6-Jan-00 | 5,399,700 | 57.38 | 59.00 | 47.56 | 48.00 | 106.12 | 95.00 | 23.75 | 70.44 | 68.00 | 34.00 | 3,340.81 | 1,403.45 |
| 63 | 7-Jan-00 | 2,729,200 | 61.50 | 61.63 | 47.06 | 46.19 | 96.81 | 99.50 | 24.88 | 67.19 | 71.87 | 35.94 | 3,529.60 | 1,441.47 |
| 64 | 10-Jan-00 | 1,973,600 | 60.75 | 64.12 | 46.44 | 44.13 | 102.00 | 97.75 | 24.44 | 75.87 | 78.69 | 39.35 | 3,717.41 | 1,457.60 |
| 65 | 11-Jan-00 | 2,073,300 | 64.06 | 60.50 | 43.56 | 42.81 | 95.94 | 92.75 | 23.19 | 78.00 | 77.75 | 38.88 | 3,544.35 | 1,438.56 |
| 66 | 12-Jan-00 | 2,489,100 | 61.25 | 58.50 | 43.00 | 41.81 | 95.00 | 87.19 | 21.80 | 78.50 | 74.37 | 37.19 | 3,478.14 | 1,432.25 |
| 67 | 13-Jan-00 | 1,495,700 | 59.50 | 59.50 | 43.06 | 43.13 | 94.48 | 96.75 | 24.19 | 75.87 | 77.25 | 38.62 | 3,612.08 | 1,449.68 |
| 68 | 14-Jan-00 | 1,906,000 | 60.13 | 59.62 | 44.31 | 44.00 | 100.00 | 100.44 | 25.11 | 80.37 | 80.37 | 40.19 | 3,704.74 | 1,465.15 |
| 69 | 18-Jan-00 | 1,451,900 | 58.75 | 58.69 | 43.88 | 42.06 | 101.00 | 103.94 | 25.99 | 80.06 | 80.75 | 40.38 | 3,757.78 | 1,455.14 |
| 70 | 19-Jan-00 | 1,514,500 | 58.69 | 56.87 | 41.75 | 42.50 | 110.00 | 106.56 | 26.64 | 79.62 | 82.94 | 41.47 | 3,790.89 | 1,455.90 |
| 71 | 20-Jan-00 | 3,842,100 | 57.50 | 57.62 | 43.69 | 43.75 | 115.50 | 113.50 | 28.38 | 84.50 | 86.56 | 43.28 | 3,841.74 | 1,445.57 |
| 72 | 21-Jan-00 | 4,433,500 | 61.75 | 62.00 | 43.88 | 43.75 | 114.25 | 111.31 | 27.83 | 86.69 | 84.44 | 42.22 | 3,849.96 | 1,441.36 |
| 73 | 24-Jan-00 | 2,009,500 | 63.88 | 59.87 | 42.55 | 41.56 | 108.44 | 106.25 | 26.56 | 85.12 | 79.12 | 39.56 | 3,660.96 | 1,401.53 |
| 74 | 25-Jan-00 | 1,334,200 | 60.13 | 61.25 | 41.50 | 42.13 | 105.00 | 112.25 | 28.06 | 80.25 | 82.62 | 41.31 | 3,759.11 | 1,410.03 |
| 75 | 26-Jan-00 | 1,576,800 | 60.56 | 59.00 | 41.06 | 40.38 | 108.00 | 110.19 | 27.55 | 81.50 | 78.62 | 39.31 | 3,621.21 | 1,404.09 |
| 76 | 27-Jan-00 | 1,943,800 | 60.00 | 60.06 | 39.55 | 37.56 | 108.81 | 110.00 | 27.50 | 79.62 | 76.94 | 38.47 | 3,593.15 | 1,398.56 |
| 77 | 28-Jan-00 | 1,442,300 | 60.38 | 60.06 | 37.88 | 37.25 | 108.19 | 101.62 | 25.41 | 77.12 | 75.06 | 37.53 | 3,446.13 | 1,360.16 |
| 78 | 31-Jan-00 | 2,034,400 | 60.19 | 61.19 | 37.50 | 38.44 | 101.00 | 103.75 | 25.94 | 74.12 | 78.56 | 39.28 | 3,570.05 | 1,394.46 |
| 79 | 1-Feb-00 | 1,924,700 | 61.19 | 59.75 | 38.56 | 38.94 | 104.00 | 100.25 | 25.06 | 78.87 | 80.75 | 40.38 | 3,701.78 | 1,409.28 |
| 80 | 2-Feb-00 | 1,262,200 | 60.75 | 59.75 | 38.88 | 38.13 | 100.75 | 98.81 | 24.70 | 80.69 | 81.25 | 40.62 | 3,724.46 | 1,409.12 |

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 81 | 3-Feb-00 | 2,171,100 | 60.38 | 63.25 | 38.38 | 38.50 | 100.31 | 103.31 | 25.83 | 82.00 | 83.75 | 41.88 | 3,851.16 | 1,424.97 |
| 82 | 4-Feb-00 | 1,827,800 | 62.25 | 60.69 | 38.56 | 38.50 | 103.94 | 108.00 | 27.00 | 84.00 | 83.75 | 41.88 | 3,874.37 | 1,424.37 |
| 83 | 7-Feb-00 | 1,730,600 | 62.56 | 63.06 | 38.50 | 37.63 | 108.00 | 114.06 | 28.51 | 83.25 | 85.75 | 42.88 | 3,933.34 | 1,424.24 |
| 84 | 8-Feb-00 | 3,002,300 | 62.38 | 60.00 | 36.94 | 37.06 | 114.00 | 114.87 | 28.72 | 86.25 | 87.00 | 43.50 | 4,062.77 | 1,441.72 |
| 85 | 9-Feb-00 | 3,566,900 | 59.25 | 56.87 | 36.31 | 35.56 | 114.12 | 112.62 | 28.16 | 88.37 | 91.56 | 45.78 | 3,968.46 | 1,411.71 |
| 86 | 10-Feb-00 | 2,121,500 | 56.62 | 58.25 | 36.25 | 38.80 | 112.87 | 113.50 | 28.38 | 91.75 | 94.62 | 47.31 | 4,090.00 | 1,416.83 |
| 87 | 11-Feb-00 | 1,015,300 | 58.06 | 55.88 | 39.38 | 36.88 | 113.62 | 108.75 | 27.19 | 95.19 | 94.44 | 47.22 | 3,968.89 | 1,387.12 |
| 88 | 14-Feb-00 | 2,208,100 | 57.13 | 54.44 | 37.13 | 36.44 | 109.31 | 115.81 | 28.95 | 94.00 | 91.25 | 45.62 | 3,986.13 | 1,389.94 |
| 89 | 15-Feb-00 | 1,444,000 | 56.25 | 57.00 | 36.44 | 37.88 | 115.25 | 119.00 | 29.75 | 91.31 | 93.69 | 46.85 | 3,997.03 | 1,402.05 |
| 90 | 16-Feb-00 | 1,139,000 | 56.75 | 55.50 | 37.75 | 38.00 | 117.75 | 114.12 | 28.53 | 93.50 | 92.00 | 46.00 | 3,997.97 | 1,387.67 |
| 91 | 17-Feb-00 | 1,863,000 | 56.50 | 56.31 | 38.31 | 40.69 | 115.19 | 114.87 | 28.72 | 92.50 | 96.12 | 48.06 | 4,125.38 | 1,388.26 |
| 92 | 18-Feb-00 | 1,489,200 | 56.44 | 56.50 | 40.06 | 40.06 | 114.62 | 111.25 | 27.81 | 96.00 | 92.81 | 46.40 | 3,965.75 | 1,346.09 |
| 93 | 22-Feb-00 | 1,721,900 | 56.25 | 57.19 | 39.63 | 39.81 | 110.12 | 113.81 | 28.45 | 92.06 | 88.00 | 44.00 | 3,969.13 | 1,352.17 |
| 94 | 24-Feb-00 | 6,407,200 | 69.31 | 73.00 | 41.50 | 42.38 | 117.31 | 115.20 | 28.80 | 94.19 | 96.87 | 48.44 | 4,253.05 | 1,353.43 |
| 95 | 25-Feb-00 | 2,604,200 | 73.50 | 69.44 | 43.63 | 41.25 | 114.81 | 110.37 | 27.59 | 95.50 | 93.75 | 46.88 | 4,178.58 | 1,353.36 |
| 96 | 28-Feb-00 | 2,112,600 | 70.00 | 69.50 | 40.25 | 41.00 | 110.12 | 113.25 | 28.31 | 92.25 | 93.87 | 46.94 | 4,162.13 | 1,348.05 |
| 97 | 29-Feb-00 | 2,381,700 | 70.88 | 68.75 | 40.69 | 40.81 | 113.56 | 114.62 | 28.66 | 96.25 | 95.25 | 47.62 | 4,266.94 | 1,366.42 |
| 98 | 1-Mar-00 | 4,495,000 | 70.88 | 69.81 | 40.19 | 43.02 | 118.56 | 130.31 | 32.58 | 95.75 | 97.94 | 48.97 | 4,309.01 | 1,379.19 |
| 99 | 2-Mar-00 | 1,698,200 | 69.00 | 67.63 | 42.19 | 44.94 | 127.00 | 122.00 | 30.50 | 97.69 | 96.06 | 48.03 | 4,234.26 | 1,381.76 |
| 100 | 3-Mar-00 | 1,635,500 | 68.25 | 69.62 | 45.02 | 46.25 | 124.87 | 128.00 | 32.00 | 97.75 | 98.37 | 49.19 | 4,442.87 | 1,409.17 |
| 101 | 6-Mar-00 | 1,811,000 | 69.00 | 65.50 | 46.28 | 46.75 | 126.00 | 125.69 | 31.42 | 98.50 | 97.00 | 48.50 | 4,457.18 | 1,391.28 |
| 102 | 7-Mar-00 | 1,991,800 | 65.00 | 63.25 | 46.81 | 45.75 | 126.44 | 122.87 | 30.72 | 98.27 | 94.31 | 47.15 | 4,390.83 | 1,355.62 |
| 103 | 8-Mar-00 | 1,733,700 | 64.00 | 65.06 | 45.81 | 46.94 | 124.87 | 122.00 | 30.50 | 94.62 | 96.25 | 48.12 | 4,445.68 | 1,366.70 |
| 104 | 9-Mar-00 | 2,517,700 | 64.37 | 65.00 | 46.63 | 50.44 | 120.87 | 122.25 | 30.56 | 96.00 | 97.25 | 48.62 | 4,586.26 | 1,401.69 |
| 105 | 10-Mar-00 | 3,467,700 | 64.75 | 62.50 | 51.38 | 51.25 | 121.69 | 125.75 | 31.44 | 97.00 | 94.19 | 47.10 | 4,587.16 | 1,395.07 |
| 106 | 13-Mar-00 | 2,889,000 | 59.75 | 59.50 | 52.25 | 54.75 | 122.12 | 121.31 | 30.33 | 91.87 | 90.87 | 45.44 | 4,426.80 | 1,383.62 |
| 107 | 14-Mar-00 | 2,479,300 | 60.25 | 60.06 | 56.19 | 55.94 | 121.22 | 114.25 | 28.56 | 92.25 | 87.37 | 43.69 | 4,226.99 | 1,359.15 |
| 108 | 15-Mar-00 | 1,932,000 | 60.06 | 58.00 | 55.88 | 53.69 | 115.62 | 116.25 | 29.06 | 89.31 | 88.25 | 44.12 | 4,130.01 | 1,392.14 |
| 109 | 16-Mar-00 | 3,688,100 | 57.62 | 56.00 | 53.56 | 55.00 | 117.31 | 121.56 | 30.39 | 89.19 | 90.75 | 45.38 | 4,353.33 | 1,458.47 |
| 110 | 17-Mar-00 | 5,290,500 | 54.50 | 59.50 | 54.75 | 56.44 | 120.12 | 125.00 | 31.25 | 92.37 | 96.12 | 48.06 | 4,440.45 | 1,464.47 |
| 111 | 20-Mar-00 | 2,492,400 | 61.75 | 61.88 | 57.64 | 57.69 | 123.50 | 123.00 | 30.75 | 95.75 | 92.62 | 46.31 | 4,261.15 | 1,456.63 |
| 112 | 21-Mar-00 | 2,238,100 | 62.06 | 63.44 | 57.50 | 58.00 | 122.56 | 134.94 | 33.74 | 92.19 | 92.25 | 49.62 | 4,449.33 | 1,493.87 |
| 113 | 22-Mar-00 | 1,076,300 | 63.44 | 62.69 | 58.81 | 58.13 | 132.78 | 144.19 | 36.05 | 99.69 | 96.75 | 48.38 | 4,596.81 | 1,500.64 |
| 114 | 23-Mar-00 | 3,477,700 | 60.50 | 58.00 | 57.00 | 57.50 | 142.00 | 141.31 | 35.33 | 95.75 | 97.81 | 48.90 | 4,660.62 | 1,527.35 |
| 115 | 24-Mar-00 | 3,277,000 | 58.00 | 56.25 | 57.00 | 56.44 | 142.44 | 138.69 | 34.67 | 98.81 | 100.25 | 50.12 | 4,691.61 | 1,527.46 |
| 116 | 27-Mar-00 | 3,255,400 | 55.25 | 56.00 | 56.50 | 57.88 | 137.63 | 139.56 | 34.89 | 101.75 | 105.00 | 52.50 | 4,704.73 | 1,523.86 |
| 117 | 28-Mar-00 | 2,173,800 | 55.00 | 54.62 | 56.94 | 55.75 | 137.25 | 139.13 | 34.78 | 104.62 | 100.62 | 50.31 | 4,583.39 | 1,508.32 |
| 118 | 29-Mar-00 | 2,045,200 | 55.12 | 54.69 | 55.75 | 53.81 | 139.38 | 135.94 | 33.99 | 100.62 | 97.12 | 48.56 | 4,413.92 | 1,508.52 |
| 119 | 30-Mar-00 | 2,638,900 | 54.69 | 53.31 | 52.00 | 52.19 | 133.56 | 125.75 | 31.44 | 95.25 | 93.19 | 46.60 | 4,250.19 | 1,487.92 |
| 120 | 31-Mar-00 | 2,201,800 | 53.62 | 55.00 | 52.81 | 53.94 | 127.44 | 135.81 | 33.95 | 93.56 | 93.70 | 46.85 | 4,397.84 | 1,498.58 |

Page 4

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 121 | 3-Apr-00 | 3,229,800 | 56.75 | 55.50 | 53.75 | 53.38 | 135.50 | 133.31 | 33.33 | 93.87 | 89.81 | 44.90 | 4,077.02 | 1,505.97 |
| 122 | 4-Apr-00 | 2,517,700 | 55.44 | 54.06 | 53.94 | 54.31 | 132.63 | 127.31 | 31.83 | 91.06 | 90.00 | 45.00 | 4,034.17 | 1,494.73 |
| 123 | 5-Apr-00 | 3,211,900 | 54.06 | 57.00 | 53.00 | 53.92 | 126.47 | 130.38 | 32.60 | 87.50 | 88.75 | 44.38 | 4,030.26 | 1,487.37 |
| 124 | 6-Apr-00 | 2,196,200 | 58.00 | 55.88 | 55.31 | 51.56 | 130.63 | 125.19 | 31.30 | 90.31 | 92.69 | 46.35 | 4,086.73 | 1,501.34 |
| 125 | 7-Apr-00 | 1,453,700 | 56.19 | 56.50 | 52.38 | 55.19 | 127.25 | 131.75 | 32.94 | 93.87 | 98.81 | 49.40 | 4,291.53 | 1,516.35 |
| 126 | 10-Apr-00 | 2,227,000 | 58.25 | 56.75 | 54.94 | 54.44 | 131.69 | 125.00 | 31.25 | 98.94 | 91.00 | 45.50 | 3,998.26 | 1,504.46 |
| 127 | 11-Apr-00 | 1,647,100 | 56.50 | 57.53 | 53.50 | 55.44 | 123.50 | 119.44 | 29.86 | 90.00 | 87.87 | 43.94 | 3,909.21 | 1,500.59 |
| 128 | 12-Apr-00 | 3,139,500 | 57.56 | 55.25 | 54.50 | 51.38 | 119.00 | 109.25 | 27.31 | 88.06 | 80.00 | 40.00 | 3,633.63 | 1,467.17 |
| 129 | 13-Apr-00 | 2,962,000 | 55.31 | 52.00 | 51.25 | 51.69 | 111.50 | 113.81 | 28.45 | 81.87 | 77.75 | 38.88 | 3,553.81 | 1,440.51 |
| 130 | 14-Apr-00 | 5,515,600 | 52.00 | 51.50 | 50.50 | 47.63 | 109.31 | 111.87 | 27.97 | 79.50 | 76.50 | 38.25 | 3,207.96 | 1,356.56 |
| 131 | 17-Apr-00 | 3,217,000 | 51.44 | 52.50 | 46.25 | 48.75 | 109.50 | 123.87 | 30.97 | 77.62 | 84.87 | 42.44 | 3,529.45 | 1,401.44 |
| 132 | 18-Apr-00 | 2,333,300 | 53.25 | 55.12 | 48.94 | 50.50 | 123.50 | 126.87 | 31.72 | 86.75 | 92.06 | 46.03 | 3,715.81 | 1,441.61 |
| 133 | 19-Apr-00 | 1,869,400 | 55.06 | 55.00 | 50.38 | 49.56 | 126.19 | 121.12 | 30.28 | 92.50 | 88.75 | 43.88 | 3,583.07 | 1,427.47 |
| 134 | 20-Apr-00 | 1,144,000 | 55.25 | 54.88 | 49.38 | 49.94 | 123.69 | 118.87 | 29.72 | 88.62 | 87.75 | 43.88 | 3,505.29 | 1,434.54 |
| 135 | 24-Apr-00 | 1,596,200 | 53.50 | 53.06 | 47.25 | 47.75 | 115.00 | 120.50 | 30.12 | 82.70 | 87.62 | 43.81 | 3,353.53 | 1,429.86 |
| 136 | 25-Apr-00 | 1,737,800 | 54.94 | 56.94 | 48.56 | 51.13 | 122.12 | 128.31 | 32.08 | 89.94 | 93.75 | 46.88 | 3,621.56 | 1,477.44 |
| 137 | 26-Apr-00 | 1,640,500 | 56.50 | 55.19 | 51.38 | 50.00 | 126.62 | 121.31 | 30.33 | 92.62 | 89.56 | 44.78 | 3,505.71 | 1,460.99 |
| 138 | 27-Apr-00 | 1,664,200 | 55.00 | 55.25 | 48.38 | 51.75 | 117.19 | 126.75 | 31.69 | 86.75 | 93.00 | 46.50 | 3,692.57 | 1,464.92 |
| 139 | 28-Apr-00 | 1,334,500 | 56.00 | 55.31 | 52.25 | 50.13 | 127.12 | 124.06 | 31.01 | 93.62 | 91.94 | 45.97 | 3,773.18 | 1,452.43 |
| 140 | 1-May-00 | 1,021,500 | 55.88 | 56.00 | 50.69 | 51.06 | 124.87 | 124.31 | 31.08 | 92.94 | 92.00 | 46.00 | 3,829.84 | 1,468.25 |
| 141 | 2-May-00 | 1,945,700 | 56.94 | 55.94 | 50.63 | 49.81 | 123.25 | 117.87 | 29.47 | 91.25 | 88.25 | 44.12 | 3,627.31 | 1,446.29 |
| 142 | 3-May-00 | 1,421,000 | 55.00 | 53.00 | 49.63 | 49.31 | 118.94 | 115.06 | 28.76 | 87.50 | 87.37 | 43.69 | 3,562.16 | 1,415.10 |
| 143 | 4-May-00 | 1,126,600 | 53.12 | 52.25 | 49.06 | 47.25 | 115.12 | 110.69 | 27.67 | 87.31 | 85.62 | 42.81 | 3,570.73 | 1,409.57 |
| 144 | 5-May-00 | 965,400 | 52.50 | 53.44 | 47.50 | 49.88 | 110.81 | 113.12 | 28.28 | 85.06 | 90.50 | 45.25 | 3,688.36 | 1,432.63 |
| 145 | 8-May-00 | 2,505,600 | 53.69 | 50.06 | 47.94 | 47.94 | 112.09 | 110.12 | 27.53 | 89.00 | 85.37 | 42.69 | 3,521.60 | 1,424.17 |
| 146 | 9-May-00 | 2,099,100 | 50.06 | 50.50 | 48.06 | 46.81 | 110.31 | 105.44 | 26.36 | 85.87 | 82.12 | 41.06 | 3,445.26 | 1,412.14 |
| 147 | 10-May-00 | 1,595,800 | 50.44 | 48.25 | 46.13 | 44.94 | 104.06 | 99.31 | 24.83 | 80.50 | 77.81 | 38.90 | 3,244.73 | 1,383.05 |
| 148 | 11-May-00 | 2,021,400 | 48.25 | 50.00 | 45.19 | 44.69 | 100.37 | 102.81 | 25.70 | 78.87 | 76.81 | 38.40 | 3,381.57 | 1,407.81 |
| 149 | 12-May-00 | 1,931,100 | 51.25 | 53.38 | 48.75 | 49.88 | 107.62 | 107.62 | 26.91 | 79.25 | 81.50 | 40.75 | 3,406.25 | 1,420.96 |
| 150 | 15-May-00 | 1,116,400 | 52.63 | 53.00 | 49.44 | 50.56 | 106.00 | 101.00 | 25.25 | 81.50 | 84.31 | 42.15 | 3,512.11 | 1,452.36 |
| 151 | 16-May-00 | 1,192,800 | 52.94 | 52.50 | 51.25 | 49.88 | 104.52 | 105.69 | 26.42 | 86.62 | 87.62 | 43.81 | 3,646.89 | 1,466.04 |
| 152 | 17-May-00 | 721,300 | 52.56 | 51.75 | 49.02 | 49.13 | 103.62 | 101.37 | 25.34 | 85.75 | 86.31 | 43.15 | 3,550.50 | 1,447.80 |
| 153 | 18-May-00 | 882,200 | 51.00 | 50.25 | 48.25 | 47.88 | 103.00 | 100.75 | 25.19 | 85.94 | 80.87 | 40.44 | 3,426.35 | 1,437.21 |
| 154 | 19-May-00 | 1,517,700 | 50.25 | 49.25 | 46.63 | 46.94 | 99.25 | 94.00 | 23.50 | 79.44 | 77.25 | 38.62 | 3,260.64 | 1,406.95 |
| 155 | 22-May-00 | 1,249,000 | 49.25 | 47.38 | 46.88 | 45.94 | 93.75 | 89.94 | 22.49 | 77.06 | 79.87 | 39.94 | 3,264.71 | 1,400.72 |
| 156 | 23-May-00 | 1,074,500 | 47.75 | 47.25 | 45.81 | 43.94 | 90.50 | 85.81 | 21.45 | 78.62 | 71.87 | 35.94 | 3,023.42 | 1,373.86 |
| 157 | 24-May-00 | 1,975,200 | 46.25 | 46.94 | 43.53 | 45.25 | 86.19 | 87.69 | 21.92 | 71.00 | 76.37 | 38.19 | 3,180.31 | 1,399.05 |
| 158 | 25-May-00 | 1,551,300 | 46.81 | 47.87 | 45.50 | 43.75 | 88.50 | 87.27 | 21.82 | 76.62 | 72.87 | 36.44 | 3,099.28 | 1,381.52 |
| 159 | 26-May-00 | 794,200 | 47.69 | 46.81 | 43.50 | 42.38 | 88.00 | 86.37 | 21.59 | 72.75 | 73.25 | 36.62 | 3,101.44 | 1,378.02 |
| 160 | 30-May-00 | 1,148,800 | 47.25 | 52.63 | 42.50 | 44.00 | 87.62 | 87.56 | 21.89 | 75.25 | 80.00 | 40.00 | 3,414.03 | 1,422.45 |

X082-4726

B-101

Page 5

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 161 | 31-May-00 | 1,545,700 | 51.75 | 49.50 | 43.81 | 43.13 | 86.87 | 84.00 | 21.00 | 79.75 | 76.62 | 38.31 | 3,324.08 | 1,420.60 |
| 162 | 1-Jun-00 | 1,742,300 | 50.00 | 49.00 | 44.00 | 43.13 | 81.75 | 89.12 | 22.28 | 78.50 | 82.69 | 41.35 | 3,518.98 | 1,448.81 |
| 163 | 5-Jun-00 | 1,818,000 | 53.88 | 51.88 | 42.69 | 42.75 | 93.31 | 91.31 | 22.83 | 86.94 | 88.19 | 44.10 | 3,730.31 | 1,467.63 |
| 164 | 6-Jun-00 | 1,838,500 | 53.25 | 52.81 | 42.44 | 44.69 | 91.97 | 92.87 | 23.22 | 87.75 | 83.87 | 41.94 | 3,646.32 | 1,457.84 |
| 165 | 7-Jun-00 | 1,145,000 | 52.12 | 54.50 | 44.75 | 45.25 | 93.62 | 96.56 | 24.14 | 84.06 | 88.31 | 44.15 | 3,736.01 | 1,461.36 |
| 166 | 8-Jun-00 | 1,512,700 | 54.88 | 56.00 | 46.13 | 45.31 | 97.62 | 94.81 | 23.70 | 87.62 | 87.50 | 43.75 | 3,707.31 | 1,461.67 |
| 167 | 12-Jun-00 | 996,800 | 55.81 | 54.28 | 44.75 | 44.88 | 96.37 | 91.19 | 22.80 | 89.50 | 90.37 | 45.19 | 3,638.42 | 1,446.00 |
| 168 | 13-Jun-00 | 2,263,300 | 54.00 | 54.06 | 44.88 | 45.06 | 91.19 | 94.50 | 23.62 | 90.00 | 90.06 | 45.03 | 3,765.81 | 1,469.44 |
| 169 | 14-Jun-00 | 1,239,900 | 54.19 | 51.25 | 45.31 | 46.19 | 94.69 | 90.44 | 22.61 | 90.66 | 90.69 | 45.35 | 3,677.49 | 1,470.54 |
| 170 | 15-Jun-00 | 1,735,900 | 51.62 | 54.56 | 46.13 | 46.94 | 91.25 | 92.37 | 23.09 | 90.81 | 92.19 | 46.10 | 3,752.01 | 1,478.73 |
| 171 | 16-Jun-00 | 1,942,100 | 54.44 | 57.56 | 47.19 | 47.50 | 93.50 | 91.19 | 22.80 | 91.50 | 91.31 | 45.65 | 3,787.36 | 1,464.46 |
| 172 | 19-Jun-00 | 2,162,600 | 59.12 | 60.50 | 47.19 | 49.56 | 90.56 | 96.62 | 24.16 | 90.37 | 95.44 | 47.72 | 3,933.70 | 1,486.00 |
| 173 | 20-Jun-00 | 1,695,200 | 61.38 | 60.44 | 49.50 | 48.56 | 98.50 | 101.25 | 25.31 | 95.44 | 97.06 | 48.53 | 3,933.83 | 1,475.95 |
| 174 | 21-Jun-00 | 906,800 | 59.25 | 59.88 | 48.38 | 50.00 | 50.50 | 55.63 | 27.82 | 94.19 | 95.94 | 47.97 | 3,970.00 | 1,479.13 |
| 175 | 22-Jun-00 | 1,581,700 | 60.88 | 61.31 | 49.63 | 48.50 | 55.75 | 53.75 | 26.88 | 95.50 | 92.06 | 46.03 | 3,804.11 | 1,452.18 |
| 176 | 23-Jun-00 | 2,639,100 | 60.62 | 58.25 | 48.56 | 47.44 | 53.78 | 51.69 | 25.84 | 91.62 | 86.56 | 43.28 | 3,685.30 | 1,450.55 |
| 177 | 26-Jun-00 | 1,056,000 | 58.19 | 57.38 | 47.69 | 49.00 | 52.50 | 54.13 | 27.07 | 88.06 | 90.44 | 45.22 | 3,771.45 | 1,455.31 |
| 178 | 27-Jun-00 | 1,238,300 | 57.69 | 58.31 | 48.63 | 47.81 | 53.78 | 51.75 | 25.88 | 90.00 | 87.44 | 43.72 | 3,699.00 | 1,450.55 |
| 179 | 28-Jun-00 | 906,400 | 58.31 | 58.61 | 48.13 | 49.00 | 53.31 | 54.44 | 27.22 | 87.50 | 90.19 | 45.10 | 3,771.06 | 1,454.82 |
| 180 | 29-Jun-00 | 1,781,800 | 58.31 | 55.69 | 48.38 | 48.38 | 53.06 | 51.25 | 25.62 | 89.50 | 87.81 | 43.90 | 3,665.83 | 1,442.39 |
| 181 | 30-Jun-00 | 2,627,100 | 56.00 | 56.75 | 48.06 | 49.31 | 52.81 | 52.38 | 26.19 | 87.50 | 90.94 | 45.47 | 3,763.79 | 1,454.60 |
| 182 | 3-Jul-00 | 682,400 | 57.19 | 58.69 | 48.69 | 49.06 | 52.13 | 53.31 | 26.66 | 89.56 | 90.44 | 45.22 | 3,804.78 | 1,469.54 |
| 183 | 5-Jul-00 | 1,199,800 | 58.25 | 57.44 | 48.69 | 47.44 | 53.25 | 51.63 | 25.82 | 89.44 | 86.50 | 43.25 | 3,649.80 | 1,446.23 |
| 184 | 6-Jul-00 | 1,139,300 | 56.25 | 56.75 | 47.31 | 47.75 | 52.50 | 51.81 | 25.91 | 84.31 | 87.50 | 43.75 | 3,793.48 | 1,456.67 |
| 185 | 7-Jul-00 | 2,570,500 | 58.38 | 61.50 | 48.19 | 50.69 | 52.59 | 54.44 | 27.22 | 88.87 | 90.06 | 45.03 | 3,841.27 | 1,478.90 |
| 186 | 10-Jul-00 | 2,534,200 | 63.69 | 66.00 | 50.00 | 49.75 | 54.09 | 57.13 | 28.57 | 90.81 | 91.75 | 45.88 | 3,772.20 | 1,475.62 |
| 187 | 11-Jul-00 | 2,767,700 | 65.00 | 67.38 | 49.23 | 50.75 | 57.00 | 56.94 | 28.47 | 90.75 | 90.19 | 45.10 | 3,744.53 | 1,480.88 |
| 188 | 12-Jul-00 | 3,306,900 | 67.75 | 70.94 | 51.19 | 52.06 | 58.13 | 58.88 | 29.44 | 91.00 | 93.37 | 46.69 | 3,901.12 | 1,492.92 |
| 189 | 13-Jul-00 | 4,972,300 | 71.88 | 70.50 | 51.94 | 52.94 | 58.50 | 56.50 | 28.25 | 92.50 | 93.94 | 46.97 | 3,956.67 | 1,495.84 |
| 190 | 14-Jul-00 | 3,654,200 | 68.12 | 66.38 | 53.00 | 53.06 | 57.69 | 57.69 | 28.84 | 94.25 | 94.94 | 47.47 | 4,041.15 | 1,509.98 |
| 191 | 17-Jul-00 | 1,562,500 | 67.12 | 65.06 | 52.56 | 53.56 | 58.25 | 58.31 | 29.16 | 94.87 | 96.37 | 48.19 | 4,061.88 | 1,510.49 |
| 192 | 18-Jul-00 | 1,492,900 | 64.38 | 63.50 | 53.56 | 53.19 | 58.50 | 57.25 | 28.62 | 96.06 | 95.31 | 47.65 | 3,960.96 | 1,493.74 |
| 193 | 19-Jul-00 | 1,245,300 | 63.44 | 63.75 | 52.63 | 51.38 | 55.19 | 52.69 | 26.34 | 95.25 | 93.94 | 46.97 | 3,843.98 | 1,481.96 |
| 194 | 20-Jul-00 | 1,211,400 | 64.38 | 63.12 | 51.44 | 52.81 | 55.00 | 55.13 | 27.57 | 95.25 | 98.06 | 49.03 | 3,995.46 | 1,495.57 |
| 195 | 21-Jul-00 | 1,049,900 | 62.94 | 62.88 | 52.63 | 52.38 | 54.36 | 53.56 | 26.78 | 102.00 | 104.00 | 52.00 | 3,908.75 | 1,480.19 |
| 196 | 24-Jul-00 | 1,155,600 | 62.50 | 58.62 | 52.38 | 46.44 | 52.56 | 48.69 | 24.34 | 104.50 | 100.44 | 50.22 | 3,790.62 | 1,464.29 |
| 197 | 25-Jul-00 | 2,252,300 | 60.00 | 60.38 | 47.31 | 46.81 | 50.31 | 50.06 | 25.03 | 101.44 | 109.00 | 54.50 | 3,865.39 | 1,474.47 |
| 198 | 26-Jul-00 | 1,030,300 | 61.00 | 58.56 | 47.25 | 46.88 | 49.84 | 50.06 | 25.03 | 106.50 | 109.56 | 54.78 | 3,818.31 | 1,452.42 |
| 199 | 27-Jul-00 | 614,500 | 59.00 | 57.75 | 46.31 | 45.50 | 50.00 | 52.00 | 26.00 | 108.31 | 107.44 | 53.72 | 3,681.63 | 1,449.62 |
| 200 | 28-Jul-00 | 1,925,900 | 57.69 | 55.12 | 45.50 | 43.69 | 52.28 | 48.31 | 24.16 | 107.75 | 102.81 | 51.40 | 3,477.31 | 1,419.89 |

B-102

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 201 | 31-Jul-00 | 1,004,200 | 55.62 | 55.19 | 44.06 | 43.94 | 49.16 | 50.81 | 25.41 | 102.56 | 105.44 | 52.72 | 3,609.35 | 1,430.83 |
| 202 | 1-Aug-00 | 932,200 | 55.75 | 54.19 | 43.56 | 41.56 | 50.31 | 49.31 | 24.66 | 104.62 | 103.31 | 51.65 | 3,521.15 | 1,438.10 |
| 203 | 2-Aug-00 | 1,449,900 | 54.12 | 52.50 | 40.19 | 39.56 | 49.00 | 47.25 | 23.62 | 102.81 | 101.25 | 50.62 | 3,490.34 | 1,438.70 |
| 204 | 3-Aug-00 | 1,566,000 | 51.88 | 55.62 | 38.44 | 40.94 | 45.56 | 48.00 | 24.00 | 98.81 | 107.69 | 53.85 | 3,623.50 | 1,452.56 |
| 205 | 4-Aug-00 | 2,577,500 | 58.00 | 62.00 | 41.88 | 41.38 | 49.47 | 47.38 | 23.69 | 108.25 | 106.62 | 53.31 | 3,618.63 | 1,462.93 |
| 206 | 7-Aug-00 | 1,264,000 | 60.12 | 59.75 | 42.31 | 42.69 | 47.88 | 47.94 | 23.97 | 107.06 | 111.75 | 55.88 | 3,710.39 | 1,479.32 |
| 207 | 8-Aug-00 | 775,700 | 59.75 | 59.88 | 42.44 | 41.69 | 47.94 | 46.75 | 23.38 | 110.62 | 111.87 | 55.94 | 3,686.37 | 1,482.80 |
| 208 | 9-Aug-00 | 2,282,400 | 60.38 | 59.75 | 42.25 | 41.81 | 48.13 | 47.50 | 23.75 | 112.69 | 111.75 | 55.88 | 3,693.04 | 1,472.87 |
| 209 | 10-Aug-00 | 2,440,200 | 59.62 | 60.75 | 41.94 | 41.75 | 48.00 | 47.56 | 23.78 | 111.56 | 110.44 | 55.22 | 3,595.19 | 1,460.25 |
| 210 | 11-Aug-00 | 1,946,800 | 59.88 | 61.56 | 38.63 | 37.69 | 46.84 | 47.50 | 23.84 | 110.19 | 112.19 | 56.10 | 3,644.61 | 1,471.84 |
| 211 | 14-Aug-00 | 801,200 | 62.56 | 62.06 | 38.63 | 36.69 | 47.59 | 47.06 | 23.53 | 112.37 | 114.06 | 57.03 | 3,719.61 | 1,491.56 |
| 212 | 15-Aug-00 | 485,100 | 61.88 | 61.94 | 36.81 | 38.06 | 47.25 | 46.69 | 23.34 | 113.44 | 117.37 | 58.69 | 3,722.62 | 1,484.43 |
| 213 | 16-Aug-00 | 817,200 | 61.50 | 62.00 | 38.06 | 38.44 | 46.88 | 48.50 | 24.25 | 112.37 | 115.37 | 57.69 | 3,721.25 | 1,479.85 |
| 214 | 17-Aug-00 | 967,700 | 62.25 | 63.69 | 38.31 | 39.13 | 48.38 | 51.44 | 25.72 | 115.56 | 119.44 | 59.72 | 3,830.59 | 1,496.07 |
| 215 | 18-Aug-00 | 755,900 | 64.44 | 63.38 | 39.13 | 38.75 | 51.38 | 50.00 | 25.00 | 121.06 | 122.37 | 61.19 | 3,807.51 | 1,491.72 |
| 216 | 21-Aug-00 | 539,700 | 63.44 | 62.25 | 39.13 | 38.75 | 50.25 | 50.50 | 25.25 | 122.06 | 122.06 | 61.03 | 3,827.62 | 1,499.48 |
| 217 | 22-Aug-00 | 868,200 | 62.62 | 63.00 | 38.69 | 37.44 | 50.63 | 51.69 | 25.84 | 122.50 | 122.19 | 61.10 | 3,827.89 | 1,498.13 |
| 218 | 23-Aug-00 | 896,800 | 62.88 | 64.56 | 37.56 | 38.69 | 51.47 | 54.31 | 27.16 | 121.64 | 126.69 | 63.35 | 3,896.92 | 1,505.97 |
| 219 | 24-Aug-00 | 1,698,100 | 65.00 | 66.00 | 38.81 | 39.00 | 54.67 | 56.11 | 28.06 | 126.94 | 127.75 | 63.88 | 3,949.57 | 1,508.31 |
| 220 | 25-Aug-00 | 1,663,900 | 66.25 | 66.19 | 39.06 | 38.63 | 56.50 | 56.81 | 28.41 | 127.75 | 124.75 | 62.38 | 3,931.25 | 1,506.45 |
| 221 | 30-Aug-00 | 675,100 | 65.85 | 65.85 | 40.44 | 39.94 | 59.00 | 59.50 | 29.75 | 126.50 | 127.12 | 63.56 | 3,968.73 | 1,502.59 |
| 222 | 31-Aug-00 | 1,391,500 | 65.70 | 68.12 | 40.13 | 43.63 | 58.97 | 60.94 | 30.47 | 127.12 | 126.94 | 63.47 | 4,077.59 | 1,517.68 |
| 223 | 1-Sep-00 | 727,400 | 69.10 | 68.68 | 43.81 | 43.06 | 51.47 | 63.44 | 31.72 | 128.25 | 128.63 | 64.32 | 4,099.30 | 1,520.77 |
| 224 | 5-Sep-00 | 1,194,300 | 67.00 | 63.97 | 41.75 | 41.00 | 62.66 | 62.44 | 31.22 | 127.94 | 125.06 | 62.53 | 3,987.03 | 1,507.08 |
| 225 | 6-Sep-00 | 1,135,600 | 65.00 | 62.20 | 40.69 | 39.50 | 61.38 | 58.44 | 29.22 | 128.25 | 117.62 | 58.81 | 3,837.62 | 1,492.25 |
| 226 | 7-Sep-00 | 1,296,600 | 62.20 | 64.89 | 39.44 | 40.19 | 59.13 | 62.00 | 31.00 | 124.75 | 123.94 | 61.97 | 3,953.36 | 1,502.51 |
| 227 | 8-Sep-00 | 1,122,200 | 64.25 | 62.58 | 40.69 | 38.88 | 61.63 | 58.88 | 29.44 | 119.37 | 120.75 | 60.38 | 3,813.44 | 1,494.50 |
| 228 | 11-Sep-00 | 1,512,200 | 62.40 | 62.91 | 39.13 | 38.31 | 61.38 | 58.44 | 29.22 | 123.44 | 115.25 | 57.62 | 3,706.74 | 1,489.26 |
| 229 | 12-Sep-00 | 1,138,800 | 63.00 | 63.01 | 38.50 | 37.44 | 57.34 | 57.55 | 28.88 | 119.91 | 114.31 | 57.15 | 3,666.87 | 1,481.99 |
| 230 | 13-Sep-00 | 3,118,000 | 62.50 | 58.70 | 36.69 | 38.31 | 56.75 | 58.00 | 29.00 | 116.37 | 118.19 | 59.10 | 3,741.75 | 1,484.91 |
| 231 | 14-Sep-00 | 3,208,200 | 58.65 | 60.72 | 36.88 | 36.63 | 58.56 | 56.86 | 28.43 | 119.94 | 117.50 | 58.75 | 3,737.42 | 1,480.87 |
| 232 | 15-Sep-00 | 2,436,400 | 60.00 | 59.15 | 37.31 | 35.75 | 57.75 | 55.23 | 27.61 | 118.12 | 113.06 | 56.53 | 3,676.33 | 1,465.81 |
| 233 | 18-Sep-00 | 1,239,200 | 59.70 | 59.20 | 35.94 | 34.44 | 55.25 | 60.66 | 30.33 | 113.12 | 115.25 | 57.62 | 3,585.52 | 1,444.51 |
| 234 | 19-Sep-00 | 1,316,500 | 59.50 | 60.25 | 34.94 | 36.31 | 59.75 | 59.94 | 29.97 | 115.06 | 117.69 | 58.85 | 3,756.40 | 1,459.90 |
| 235 | 20-Sep-00 | 1,512,400 | 60.25 | 59.45 | 36.56 | 38.56 | 59.41 | 61.05 | 30.52 | 117.12 | 119.69 | 59.85 | 3,790.45 | 1,451.34 |
| 236 | 21-Sep-00 | 2,193,000 | 59.65 | 51.00 | 38.44 | 37.94 | 58.50 | 56.69 | 28.34 | 118.25 | 116.44 | 58.22 | 3,718.15 | 1,449.05 |
| 237 | 22-Sep-00 | 2,956,700 | 51.01 | 55.50 | 33.25 | 35.94 | 50.31 | 52.19 | 26.09 | 111.75 | 118.06 | 59.03 | 3,701.18 | 1,448.72 |
| 238 | 25-Sep-00 | 1,424,500 | 56.25 | 56.72 | 35.88 | 34.31 | 52.75 | 53.50 | 26.75 | 119.31 | 118.00 | 59.00 | 3,622.10 | 1,439.03 |
| 239 | 26-Sep-00 | 1,727,900 | 56.00 | 53.61 | 34.50 | 33.63 | 53.31 | 51.44 | 25.72 | 118.62 | 117.50 | 58.75 | 3,582.59 | 1,427.21 |
| 240 | 27-Sep-00 | 1,644,800 | 53.61 | 49.04 | 33.75 | 32.44 | 51.75 | 48.94 | 24.47 | 119.25 | 117.94 | 58.97 | 3,571.90 | 1,426.57 |

X601728

B-103

X064729

Page 7

Exhibit C - Pricing Data

|  | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 241 | 28-Sep-00 | 2,496,900 | 50.00 | 54.00 | 32.56 | 33.44 | 49.31 | 53.50 | 26.75 | 117.44 | 123.62 | 61.81 | 3,725.15 | 1,458.29 |
| 242 | 29-Sep-00 | 7,500,800 | 48.50 | 48.25 | 32.50 | 30.81 | 28.19 | 25.75 | 12.88 | 122.94 | 116.75 | 58.38 | 3,570.61 | 1,436.51 |
| 243 | 2-Oct-00 | 4,066,700 | 47.00 | 48.78 | 32.00 | 29.25 | 26.69 | 24.25 | 12.12 | 118.81 | 113.56 | 56.78 | 3,457.97 | 1,436.23 |
| 244 | 3-Oct-00 | 3,209,500 | 51.40 | 50.00 | 30.00 | 28.56 | 24.94 | 22.31 | 11.15 | 114.12 | 108.37 | 54.19 | 3,353.34 | 1,426.46 |
| 245 | 4-Oct-00 | 1,953,200 | 49.70 | 51.90 | 28.81 | 28.19 | 22.37 | 23.62 | 11.81 | 106.00 | 111.45 | 55.72 | 3,453.36 | 1,434.32 |
| 246 | 5-Oct-00 | 3,331,500 | 49.15 | 49.13 | 25.62 | 25.19 | 23.50 | 22.06 | 11.03 | 109.44 | 109.75 | 54.88 | 3,424.32 | 1,436.28 |
| 247 | 6-Oct-00 | 2,234,600 | 50.50 | 46.48 | 25.50 | 25.31 | 22.69 | 22.19 | 11.10 | 109.50 | 107.50 | 53.75 | 3,311.94 | 1,408.99 |
| 248 | 9-Oct-00 | 1,382,100 | 46.65 | 48.00 | 26.00 | 25.62 | 22.62 | 21.75 | 10.88 | 106.50 | 106.81 | 53.40 | 3,318.90 | 1,402.03 |
| 249 | 10-Oct-00 | 2,324,900 | 47.00 | 45.91 | 25.69 | 24.25 | 21.62 | 20.87 | 10.44 | 104.25 | 103.19 | 51.60 | 3,188.29 | 1,387.02 |
| 250 | 11-Oct-00 | 2,344,900 | 44.40 | 44.62 | 23.62 | 23.00 | 20.12 | 19.62 | 9.81 | 99.25 | 101.87 | 50.94 | 3,100.53 | 1,364.59 |
| 251 | 12-Oct-00 | 3,180,200 | 46.50 | 43.63 | 24.00 | 23.19 | 20.31 | 20.00 | 10.00 | 103.06 | 97.94 | 48.97 | 3,004.45 | 1,329.78 |
| 252 | 13-Oct-00 | 6,012,500 | 47.75 | 53.11 | 23.37 | 27.31 | 20.25 | 22.06 | 11.03 | 95.62 | 111.00 | 55.50 | 3,277.77 | 1,374.17 |
| 253 | 16-Oct-00 | 2,330,200 | 53.00 | 50.77 | 26.94 | 25.36 | 22.31 | 21.50 | 10.75 | 112.31 | 114.56 | 57.28 | 3,249.46 | 1,374.62 |
| 254 | 17-Oct-00 | 2,023,200 | 50.78 | 49.82 | 25.62 | 24.37 | 21.69 | 20.12 | 10.06 | 115.87 | 111.37 | 55.69 | 3,172.19 | 1,349.97 |
| 255 | 18-Oct-00 | 1,727,900 | 48.70 | 50.05 | 24.00 | 26.25 | 19.44 | 20.12 | 10.06 | 106.06 | 110.31 | 55.15 | 3,139.31 | 1,342.13 |
| 256 | 19-Oct-00 | 1,583,200 | 53.10 | 55.00 | 27.94 | 28.81 | 19.16 | 18.94 | 9.47 | 118.94 | 117.69 | 58.85 | 3,402.95 | 1,384.76 |
| 257 | 20-Oct-00 | 1,807,100 | 54.30 | 56.98 | 28.81 | 28.44 | 19.06 | 19.50 | 9.75 | 117.69 | 118.69 | 59.35 | 3,456.61 | 1,396.93 |
| 258 | 23-Oct-00 | 2,001,800 | 55.00 | 54.40 | 28.44 | 27.50 | 20.27 | 20.37 | 10.19 | 118.87 | 118.75 | 59.38 | 3,422.00 | 1,395.78 |
| 259 | 24-Oct-00 | 2,373,000 | 54.65 | 49.98 | 27.69 | 26.81 | 20.69 | 18.87 | 9.44 | 116.50 | 117.81 | 58.90 | 3,353.26 | 1,398.13 |
| 260 | 25-Oct-00 | 3,129,300 | 49.98 | 48.01 | 26.87 | 25.87 | 19.06 | 18.50 | 9.25 | 116.50 | 108.62 | 54.31 | 3,107.61 | 1,364.90 |
| 261 | 26-Oct-00 | 2,901,200 | 47.99 | 47.85 | 26.12 | 27.75 | 18.81 | 18.50 | 9.25 | 109.87 | 102.00 | 51.00 | 3,167.14 | 1,364.44 |
| 262 | 27-Oct-00 | 1,612,000 | 49.40 | 50.29 | 28.37 | 27.94 | 18.87 | 18.56 | 9.28 | 105.39 | 103.19 | 51.60 | 3,175.25 | 1,379.58 |
| 263 | 30-Oct-00 | 1,554,900 | 50.36 | 50.60 | 27.75 | 28.81 | 19.12 | 19.31 | 9.65 | 102.06 | 104.00 | 52.00 | 3,081.07 | 1,398.66 |
| 264 | 31-Oct-00 | 2,800,900 | 51.00 | 51.61 | 29.19 | 29.50 | 19.75 | 19.56 | 9.78 | 105.06 | 110.87 | 55.44 | 3,282.30 | 1,429.40 |
| 265 | 1-Nov-00 | 1,308,900 | 50.75 | 50.95 | 28.87 | 30.44 | 19.44 | 20.50 | 10.25 | 108.50 | 105.87 | 52.94 | 3,225.27 | 1,421.22 |
| 266 | 2-Nov-00 | 2,513,100 | 51.70 | 50.40 | 31.25 | 31.81 | 21.12 | 22.31 | 11.15 | 107.81 | 109.06 | 54.53 | 3,308.48 | 1,428.32 |
| 267 | 3-Nov-00 | 1,258,300 | 51.40 | 50.40 | 32.00 | 32.56 | 23.00 | 22.25 | 11.12 | 113.50 | 113.06 | 56.53 | 3,321.91 | 1,426.69 |
| 268 | 6-Nov-00 | 1,725,400 | 49.30 | 47.95 | 32.63 | 31.50 | 22.44 | 21.44 | 10.72 | 113.50 | 110.69 | 55.35 | 3,290.47 | 1,432.19 |
| 269 | 7-Nov-00 | 2,827,900 | 48.30 | 51.36 | 32.00 | 32.56 | 21.50 | 21.31 | 10.65 | 110.69 | 111.44 | 55.72 | 3,279.57 | 1,431.87 |
| 270 | 8-Nov-00 | 1,465,200 | 51.20 | 48.00 | 32.50 | 30.31 | 21.37 | 20.06 | 10.03 | 111.00 | 100.31 | 50.15 | 3,059.09 | 1,409.28 |
| 271 | 9-Nov-00 | 2,149,900 | 46.75 | 46.20 | 28.69 | 28.37 | 19.87 | 19.87 | 10.10 | 97.89 | 97.62 | 48.81 | 3,057.06 | 1,400.14 |
| 272 | 10-Nov-00 | 5,371,700 | 44.00 | 39.74 | 23.44 | 23.00 | 19.36 | 19.06 | 9.53 | 93.81 | 89.19 | 44.60 | 2,890.26 | 1,365.98 |
| 273 | 13-Nov-00 | 3,692,300 | 39.25 | 39.00 | 22.75 | 24.12 | 18.75 | 19.37 | 9.69 | 85.06 | 85.31 | 42.65 | 2,836.62 | 1,351.26 |
| 274 | 14-Nov-00 | 2,252,600 | 40.90 | 40.95 | 25.25 | 25.81 | 19.94 | 20.25 | 10.12 | 88.62 | 94.00 | 47.00 | 3,039.50 | 1,382.95 |
| 275 | 15-Nov-00 | 1,795,400 | 41.00 | 41.65 | 26.00 | 25.19 | 19.87 | 19.87 | 9.94 | 94.75 | 93.94 | 46.97 | 3,076.70 | 1,389.81 |
| 276 | 16-Nov-00 | 1,685,700 | 41.00 | 39.13 | 25.00 | 24.94 | 19.50 | 19.00 | 9.50 | 91.81 | 87.25 | 43.62 | 2,925.16 | 1,372.32 |
| 277 | 17-Nov-00 | 2,232,300 | 40.00 | 39.73 | 24.87 | 24.94 | 19.19 | 18.50 | 9.25 | 88.62 | 89.31 | 44.65 | 2,934.81 | 1,367.72 |
| 278 | 20-Nov-00 | 4,742,000 | 38.15 | 36.20 | 24.44 | 23.37 | 18.59 | 18.94 | 9.47 | 87.19 | 81.62 | 40.81 | 2,792.41 | 1,342.62 |
| 279 | 21-Nov-00 | 2,570,500 | 36.85 | 34.64 | 23.56 | 23.62 | 19.19 | 18.81 | 9.40 | 82.75 | 85.12 | 42.56 | 2,786.53 | 1,347.35 |
| 280 | 22-Nov-00 | 2,027,200 | 34.64 | 33.20 | 23.37 | 23.00 | 18.81 | 18.50 | 9.25 | 83.50 | 80.00 | 40.00 | 2,668.25 | 1,322.36 |

B-104

Page 8

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 281 | 24-Nov-00 | 1,350,300 | 33.70 | 33.50 | 23.62 | 24.37 | 18.86 | 19.31 | 9.65 | 83.19 | 84.87 | 42.44 | 2,830.09 | 1,341.77 |
| 282 | 27-Nov-00 | 2,541,900 | 33.50 | 32.15 | 24.94 | 24.44 | 19.87 | 18.69 | 9.35 | 88.36 | 88.19 | 44.10 | 2,769.32 | 1,348.97 |
| 283 | 28-Nov-00 | 1,932,300 | 32.50 | 31.00 | 24.19 | 22.44 | 18.69 | 18.03 | 9.02 | 88.50 | 81.25 | 40.62 | 2,621.11 | 1,336.09 |
| 284 | 29-Nov-00 | 6,710,300 | 30.80 | 29.50 | 22.50 | 21.81 | 18.09 | 17.56 | 8.78 | 81.62 | 79.75 | 39.88 | 2,602.85 | 1,341.93 |
| 285 | 30-Nov-00 | 23,286,400 | 19.85 | 19.00 | 20.06 | 19.25 | 16.69 | 16.50 | 8.25 | 76.31 | 76.06 | 38.03 | 2,506.54 | 1,314.95 |
| 286 | 1-Dec-00 | 12,090,000 | 19.00 | 19.12 | 19.94 | 18.44 | 17.00 | 17.06 | 8.53 | 78.00 | 76.94 | 38.47 | 2,549.74 | 1,315.23 |
| 287 | 4-Dec-00 | 4,358,800 | 19.25 | 17.96 | 19.25 | 18.81 | 17.19 | 16.69 | 8.35 | 77.06 | 78.87 | 39.44 | 2,554.40 | 1,324.97 |
| 288 | 5-Dec-00 | 4,232,200 | 18.00 | 18.78 | 19.56 | 20.25 | 16.94 | 17.00 | 8.50 | 83.94 | 91.75 | 45.88 | 2,852.87 | 1,376.54 |
| 289 | 6-Dec-00 | 5,786,500 | 17.00 | 17.00 | 19.37 | 18.00 | 14.63 | 14.31 | 7.16 | 46.69 | 44.25 | 44.25 | 2,743.70 | 1,351.46 |
| 290 | 7-Dec-00 | 3,153,400 | 17.45 | 16.82 | 17.94 | 17.44 | 14.44 | 14.31 | 7.16 | 43.75 | 42.81 | 42.81 | 2,719.91 | 1,343.55 |
| 291 | 8-Dec-00 | 3,411,800 | 17.75 | 17.50 | 18.44 | 18.56 | 14.81 | 15.06 | 7.53 | 43.38 | 38.94 | 38.94 | 2,895.39 | 1,369.89 |
| 292 | 11-Dec-00 | 3,189,800 | 18.00 | 17.52 | 18.75 | 20.06 | 15.19 | 15.19 | 7.59 | 39.75 | 34.00 | 34.00 | 2,972.91 | 1,380.20 |
| 293 | 12-Dec-00 | 4,725,100 | 17.60 | 17.60 | 19.94 | 21.70 | 15.25 | 15.38 | 7.69 | 35.13 | 33.88 | 33.88 | 2,863.21 | 1,371.18 |
| 294 | 13-Dec-00 | 3,511,400 | 17.95 | 17.68 | 21.50 | 20.44 | 15.56 | 15.00 | 7.50 | 35.56 | 31.75 | 31.75 | 2,748.88 | 1,359.99 |
| 295 | 14-Dec-00 | 3,620,500 | 17.70 | 18.79 | 19.81 | 19.94 | 15.03 | 14.44 | 7.22 | 31.37 | 31.69 | 31.69 | 2,639.26 | 1,340.93 |
| 296 | 15-Dec-00 | 4,426,300 | 18.50 | 19.00 | 19.12 | 19.87 | 14.56 | 14.06 | 7.03 | 30.75 | 30.44 | 30.44 | 2,543.09 | 1,312.15 |
| 297 | 18-Dec-00 | 4,535,700 | 18.75 | 17.40 | 19.94 | 19.50 | 14.56 | 14.25 | 7.12 | 30.69 | 28.56 | 28.56 | 2,543.09 | 1,322.74 |
| 298 | 19-Dec-00 | 2,924,800 | 17.25 | 17.70 | 19.25 | 18.25 | 14.38 | 14.00 | 7.00 | 28.56 | 26.94 | 26.94 | 2,399.63 | 1,305.60 |
| 299 | 20-Dec-00 | 2,751,500 | 17.60 | 17.60 | 17.25 | 16.62 | 13.78 | 14.38 | 7.19 | 25.62 | 27.44 | 27.44 | 2,210.32 | 1,264.74 |
| 300 | 21-Dec-00 | 2,584,700 | 17.05 | 17.09 | 16.31 | 17.19 | 14.25 | 14.06 | 7.03 | 27.37 | 26.94 | 26.94 | 2,224.84 | 1,274.86 |
| 301 | 22-Dec-00 | 2,889,800 | 17.10 | 18.12 | 17.25 | 18.37 | 14.13 | 15.00 | 7.50 | 28.31 | 31.87 | 31.87 | 2,436.26 | 1,305.95 |
| 302 | 26-Dec-00 | 1,361,400 | 18.18 | 18.02 | 17.81 | 17.50 | 14.88 | 14.69 | 7.34 | 31.70 | 30.31 | 30.31 | 2,404.60 | 1,315.19 |
| 303 | 27-Dec-00 | 1,414,100 | 18.03 | 18.49 | 17.19 | 18.00 | 14.34 | 14.81 | 7.41 | 30.00 | 30.37 | 30.37 | 2,460.21 | 1,328.92 |
| 304 | 28-Dec-00 | 2,359,600 | 18.95 | 18.89 | 17.62 | 17.94 | 14.38 | 14.81 | 7.41 | 29.81 | 28.94 | 28.94 | 2,464.62 | 1,334.22 |
| 305 | 29-Dec-00 | 2,194,000 | 18.50 | 17.99 | 17.56 | 17.44 | 14.69 | 14.88 | 7.44 | 28.75 | 27.87 | 27.87 | 2,341.70 | 1,320.28 |
| 306 | 2-Jan-01 | 1,941,400 | 18.00 | 17.25 | 17.50 | 17.50 | 14.88 | 14.88 | 7.44 | 28.12 | 25.44 | 25.44 | 2,128.78 | 1,283.27 |
| 307 | 3-Jan-01 | 6,116,800 | 16.75 | 18.90 | 17.12 | 20.00 | 14.50 | 16.37 | 8.19 | 25.06 | 33.00 | 33.00 | 2,528.38 | 1,347.56 |
| 308 | 4-Jan-01 | 6,041,000 | 18.91 | 21.75 | 19.72 | 19.19 | 18.14 | 17.06 | 8.53 | 32.25 | 31.00 | 31.00 | 2,460.00 | 1,333.34 |
| 309 | 5-Jan-01 | 3,077,500 | 21.50 | 19.46 | 19.31 | 19.00 | 16.94 | 16.37 | 8.19 | 31.73 | 28.00 | 28.00 | 2,267.85 | 1,298.35 |
| 310 | 8-Jan-01 | 1,579,300 | 19.46 | 18.91 | 18.56 | 19.12 | 16.94 | 16.56 | 8.28 | 28.00 | 28.19 | 28.19 | 2,281.54 | 1,295.86 |
| 311 | 9-Jan-01 | 1,966,700 | 19.70 | 18.87 | 19.06 | 19.75 | 16.81 | 17.19 | 8.60 | 28.86 | 29.44 | 29.44 | 2,311.40 | 1,300.80 |
| 312 | 10-Jan-01 | 1,883,500 | 19.10 | 19.94 | 20.23 | 21.31 | 16.69 | 16.56 | 8.28 | 28.19 | 29.06 | 29.06 | 2,413.71 | 1,313.27 |
| 313 | 11-Jan-01 | 7,525,300 | 20.90 | 22.90 | 21.06 | 22.81 | 16.25 | 18.00 | 9.00 | 28.62 | 31.94 | 31.94 | 2,524.29 | 1,326.82 |
| 314 | 12-Jan-01 | 6,733,100 | 20.00 | 21.10 | 22.44 | 22.12 | 17.87 | 17.19 | 8.60 | 30.94 | 30.44 | 30.44 | 2,506.05 | 1,318.55 |
| 315 | 16-Jan-01 | 1,767,600 | 20.05 | 20.16 | 22.12 | 21.50 | 17.44 | 17.12 | 8.56 | 30.62 | 31.37 | 31.37 | 2,470.72 | 1,326.65 |
| 316 | 17-Jan-01 | 3,336,100 | 21.40 | 20.23 | 21.94 | 22.69 | 17.56 | 16.81 | 8.40 | 32.88 | 32.38 | 32.38 | 2,558.67 | 1,329.47 |
| 317 | 18-Jan-01 | 4,143,800 | 20.23 | 22.38 | 22.98 | 24.19 | 17.81 | 18.69 | 9.35 | 33.31 | 34.88 | 34.88 | 2,670.47 | 1,347.97 |
| 318 | 19-Jan-01 | 5,244,000 | 23.75 | 23.69 | 25.94 | 25.62 | 19.44 | 19.50 | 9.75 | 32.63 | 30.87 | 30.87 | 2,655.77 | 1,342.54 |
| 319 | 22-Jan-01 | 3,087,200 | 22.25 | 21.45 | 24.25 | 25.50 | 19.06 | 19.25 | 9.62 | 30.56 | 30.50 | 30.50 | 2,643.13 | 1,342.90 |
| 320 | 23-Jan-01 | 2,529,900 | 22.50 | 22.15 | 25.50 | 26.37 | 19.31 | 20.50 | 10.25 | 30.75 | 31.56 | 31.56 | 2,730.05 | 1,360.40 |

B-105

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 321 | 24-Jan-01 | 2,810,000 | 23.00 | 22.21 | 27.06 | 27.12 | 20.62 | 20.50 | 10.25 | 31.81 | 32.75 | 32.75 | 2,726.45 | 1,364.30 |
| 322 | 25-Jan-01 | 3,621,400 | 22.10 | 20.50 | 26.94 | 26.44 | 20.56 | 19.94 | 9.97 | 32.69 | 31.19 | 31.19 | 2,595.85 | 1,357.51 |
| 323 | 26-Jan-01 | 2,932,900 | 20.50 | 20.77 | 25.87 | 26.50 | 19.50 | 19.56 | 9.78 | 30.87 | 31.19 | 31.19 | 2,631.78 | 1,354.95 |
| 324 | 29-Jan-01 | 2,710,000 | 21.20 | 21.66 | 26.25 | 28.44 | 19.56 | 21.69 | 10.85 | 31.19 | 33.56 | 33.56 | 2,694.53 | 1,364.17 |
| 325 | 30-Jan-01 | 5,848,000 | 22.85 | 20.98 | 28.25 | 28.12 | 21.56 | 21.75 | 10.88 | 32.88 | 32.06 | 32.06 | 2,686.14 | 1,373.73 |
| 326 | 31-Jan-01 | 4,775,100 | 21.20 | 21.24 | 28.00 | 26.12 | 21.50 | 21.62 | 10.81 | 32.31 | 30.56 | 30.56 | 2,593.00 | 1,366.01 |
| 327 | 1-Feb-01 | 2,106,300 | 21.50 | 20.73 | 26.37 | 25.94 | 20.69 | 21.12 | 10.56 | 30.81 | 31.12 | 31.12 | 2,607.16 | 1,373.47 |
| 328 | 2-Feb-01 | 3,694,500 | 21.25 | 19.71 | 26.69 | 25.19 | 21.12 | 20.62 | 10.31 | 31.37 | 29.19 | 29.19 | 2,472.18 | 1,349.47 |
| 329 | 5-Feb-01 | 2,162,300 | 20.48 | 19.68 | 24.56 | 24.44 | 20.50 | 20.19 | 10.10 | 28.69 | 27.87 | 27.87 | 2,467.30 | 1,354.31 |
| 330 | 6-Feb-01 | 2,832,900 | 19.75 | 20.75 | 24.56 | 26.87 | 20.16 | 21.12 | 10.56 | 28.37 | 27.81 | 27.81 | 2,473.24 | 1,352.26 |
| 331 | 7-Feb-01 | 2,169,100 | 20.69 | 20.43 | 26.44 | 26.50 | 20.66 | 20.75 | 10.38 | 27.00 | 26.56 | 26.56 | 2,409.66 | 1,340.89 |
| 332 | 8-Feb-01 | 2,592,900 | 20.55 | 20.04 | 26.25 | 26.06 | 20.56 | 20.75 | 10.38 | 27.25 | 25.87 | 25.87 | 2,355.67 | 1,332.53 |
| 333 | 9-Feb-01 | 2,249,900 | 19.86 | 18.75 | 25.27 | 23.50 | 20.50 | 19.69 | 9.56 | 25.69 | 24.56 | 24.56 | 2,261.77 | 1,314.76 |
| 334 | 12-Feb-01 | 1,371,400 | 18.75 | 19.60 | 22.81 | 23.25 | 19.06 | 19.12 | 9.85 | 24.50 | 25.50 | 25.50 | 2,286.76 | 1,330.31 |
| 335 | 13-Feb-01 | 2,034,800 | 19.87 | 19.65 | 23.06 | 22.25 | 19.94 | 19.12 | 9.56 | 25.87 | 25.12 | 25.12 | 2,208.40 | 1,318.80 |
| 336 | 14-Feb-01 | 2,041,100 | 19.25 | 19.25 | 21.75 | 22.94 | 19.19 | 19.50 | 9.75 | 25.44 | 26.69 | 26.69 | 2,305.82 | 1,315.92 |
| 337 | 15-Feb-01 | 2,347,800 | 19.90 | 19.76 | 23.50 | 25.00 | 19.69 | 20.06 | 10.03 | 27.44 | 27.19 | 27.19 | 2,371.04 | 1,326.61 |
| 338 | 16-Feb-01 | 2,981,900 | 20.20 | 20.95 | 23.00 | 23.50 | 19.00 | 19.00 | 9.50 | 25.11 | 23.19 | 23.19 | 2,212.51 | 1,301.53 |
| 339 | 20-Feb-01 | 2,014,300 | 19.55 | 18.06 | 23.31 | 22.00 | 19.19 | 18.31 | 9.15 | 23.75 | 22.25 | 22.25 | 2,095.11 | 1,278.94 |
| 340 | 21-Feb-01 | 2,084,500 | 17.81 | 18.25 | 21.37 | 20.62 | 18.25 | 18.87 | 9.44 | 20.00 | 19.62 | 19.62 | 2,058.54 | 1,255.27 |
| 341 | 22-Feb-01 | 2,552,800 | 18.05 | 17.58 | 20.62 | 21.94 | 19.06 | 18.81 | 9.40 | 19.44 | 20.81 | 20.81 | 2,032.42 | 1,252.82 |
| 342 | 23-Feb-01 | 4,844,800 | 17.58 | 18.05 | 21.67 | 23.25 | 18.62 | 18.81 | 9.40 | 19.62 | 20.81 | 20.81 | 2,056.06 | 1,245.86 |
| 343 | 26-Feb-01 | 1,990,900 | 18.10 | 17.81 | 22.87 | 22.81 | 19.06 | 19.50 | 9.75 | 21.50 | 20.75 | 20.75 | 2,097.64 | 1,267.65 |
| 344 | 27-Feb-01 | 3,752,400 | 17.25 | 16.72 | 22.44 | 22.25 | 19.28 | 19.37 | 9.69 | 20.75 | 19.81 | 19.81 | 1,964.52 | 1,257.94 |
| 345 | 28-Feb-01 | 4,145,600 | 17.00 | 17.20 | 22.12 | 21.87 | 19.37 | 18.25 | 9.12 | 20.06 | 19.87 | 19.87 | 1,908.32 | 1,239.94 |
| 346 | 1-Mar-01 | 6,083,600 | 16.00 | 15.75 | 21.06 | 21.50 | 17.81 | 18.75 | 9.38 | 19.69 | 20.06 | 20.06 | 1,968.02 | 1,241.23 |
| 347 | 2-Mar-01 | 5,389,900 | 15.75 | 15.45 | 20.94 | 22.06 | 18.31 | 19.25 | 9.62 | 19.25 | 19.62 | 19.62 | 1,881.34 | 1,234.18 |
| 348 | 5-Mar-01 | 2,698,700 | 15.46 | 16.07 | 23.12 | 23.44 | 19.37 | 20.37 | 10.19 | 20.00 | 20.94 | 20.94 | 1,916.68 | 1,241.41 |
| 349 | 6-Mar-01 | 3,623,600 | 16.60 | 16.97 | 24.87 | 26.19 | 20.72 | 21.50 | 10.75 | 21.87 | 22.25 | 22.25 | 1,976.31 | 1,253.80 |
| 350 | 7-Mar-01 | 2,808,300 | 17.80 | 17.72 | 26.50 | 25.94 | 21.31 | 21.25 | 10.62 | 23.19 | 22.06 | 22.06 | 1,996.23 | 1,261.89 |
| 351 | 8-Mar-01 | 1,687,700 | 17.30 | 17.26 | 25.75 | 26.12 | 20.69 | 20.81 | 10.40 | 21.69 | 20.31 | 20.31 | 1,938.15 | 1,264.74 |
| 352 | 9-Mar-01 | 1,927,800 | 17.05 | 15.85 | 25.44 | 23.37 | 20.62 | 20.25 | 10.12 | 20.03 | 17.44 | 17.44 | 1,813.02 | 1,233.42 |
| 353 | 12-Mar-01 | 1,887,600 | 15.70 | 15.16 | 22.37 | 22.06 | 19.69 | 18.62 | 9.31 | 17.00 | 17.06 | 17.06 | 1,680.64 | 1,180.16 |
| 354 | 13-Mar-01 | 2,675,900 | 15.00 | 15.90 | 22.69 | 23.94 | 18.87 | 19.56 | 9.78 | 17.69 | 19.12 | 19.12 | 1,789.70 | 1,197.66 |
| 355 | 14-Mar-01 | 2,903,800 | 15.10 | 16.09 | 22.81 | 24.37 | 18.50 | 20.44 | 10.22 | 18.31 | 18.44 | 18.44 | 1,745.13 | 1,166.71 |
| 356 | 15-Mar-01 | 3,375,300 | 16.40 | 14.91 | 25.31 | 24.19 | 20.87 | 19.69 | 9.85 | 19.31 | 18.06 | 18.06 | 1,697.92 | 1,173.56 |
| 357 | 16-Mar-01 | 2,347,500 | 14.51 | 14.86 | 23.06 | 23.69 | 19.00 | 19.62 | 9.81 | 17.87 | 18.19 | 18.19 | 1,647.51 | 1,150.53 |
| 358 | 19-Mar-01 | 2,538,700 | 15.00 | 16.26 | 23.62 | 24.87 | 19.75 | 20.56 | 10.28 | 18.50 | 19.06 | 19.06 | 1,730.46 | 1,170.81 |
| 359 | 20-Mar-01 | 1,932,200 | 16.27 | 15.51 | 25.00 | 24.44 | 20.72 | 19.69 | 9.85 | 19.44 | 17.37 | 17.37 | 1,614.47 | 1,142.62 |
| 360 | 21-Mar-01 | 1,768,700 | 15.50 | 15.60 | 24.00 | 24.69 | 19.78 | 20.12 | 10.06 | 17.69 | 18.37 | 18.37 | 1,605.04 | 1,122.14 |

B-106

X004732

Page 10

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 361 | 22-Mar-01 | 2,265,400 | 15.80 | 16.86 | 25.06 | 26.25 | 20.37 | 21.62 | 10.81 | 18.75 | 18.87 | 18.87 | 1,701.90 | 1,117.58 |
| 362 | 23-Mar-01 | 2,633,400 | 17.32 | 17.67 | 26.97 | 27.44 | 22.06 | 23.00 | 11.50 | 19.37 | 18.25 | 18.25 | 1,705.02 | 1,139.83 |
| 363 | 26-Mar-01 | 1,642,800 | 17.80 | 16.97 | 27.87 | 25.69 | 23.13 | 21.78 | 10.89 | 18.87 | 17.24 | 17.24 | 1,676.90 | 1,152.69 |
| 364 | 27-Mar-01 | 1,709,500 | 16.97 | 17.00 | 25.62 | 27.00 | 21.94 | 22.87 | 11.44 | 17.50 | 17.41 | 17.41 | 1,735.63 | 1,182.17 |
| 365 | 28-Mar-01 | 1,590,700 | 16.90 | 16.53 | 26.56 | 26.44 | 22.08 | 22.17 | 11.09 | 17.00 | 15.85 | 15.85 | 1,602.22 | 1,153.29 |
| 366 | 29-Mar-01 | 2,651,200 | 16.50 | 16.80 | 25.94 | 26.94 | 22.55 | 22.53 | 11.27 | 15.43 | 14.70 | 14.70 | 1,563.14 | 1,147.95 |
| 367 | 30-Mar-01 | 1,797,500 | 16.81 | 16.81 | 27.12 | 25.69 | 22.55 | 22.07 | 11.03 | 15.28 | 15.37 | 15.37 | 1,573.25 | 1,160.33 |
| 368 | 2-Apr-01 | 1,717,700 | 16.81 | 15.95 | 25.81 | 25.81 | 22.09 | 21.59 | 10.80 | 14.85 | 15.19 | 15.19 | 1,516.58 | 1,145.87 |
| 369 | 3-Apr-01 | 1,742,100 | 15.87 | 15.87 | 23.62 | 23.44 | 21.36 | 20.24 | 10.12 | 14.72 | 14.08 | 14.08 | 1,399.05 | 1,106.46 |
| 370 | 4-Apr-01 | 2,705,200 | 15.05 | 15.05 | 22.62 | 22.19 | 19.76 | 19.50 | 9.75 | 13.96 | 13.86 | 13.86 | 1,370.75 | 1,103.25 |
| 371 | 5-Apr-01 | 3,286,000 | 16.10 | 16.50 | 24.44 | 25.19 | 20.60 | 20.87 | 10.44 | 14.81 | 14.68 | 14.68 | 1,519.05 | 1,151.44 |
| 372 | 6-Apr-01 | 3,994,300 | 16.50 | 14.69 | 24.75 | 24.81 | 20.80 | 20.59 | 10.30 | 14.57 | 14.14 | 14.14 | 1,448.16 | 1,128.43 |
| 373 | 9-Apr-01 | 1,391,700 | 14.90 | 14.65 | 25.31 | 24.89 | 20.69 | 20.54 | 10.27 | 14.33 | 13.04 | 13.04 | 1,481.22 | 1,137.59 |
| 374 | 10-Apr-01 | 2,603,000 | 14.98 | 15.48 | 25.33 | 26.26 | 20.90 | 22.04 | 11.02 | 13.47 | 14.65 | 14.65 | 1,597.87 | 1,168.38 |
| 375 | 11-Apr-01 | 3,314,600 | 15.95 | 15.00 | 27.33 | 26.74 | 22.98 | 21.80 | 10.90 | 16.07 | 16.31 | 16.31 | 1,647.36 | 1,165.89 |
| 376 | 12-Apr-01 | 1,674,600 | 15.00 | 15.95 | 26.41 | 27.92 | 21.42 | 22.42 | 11.21 | 16.13 | 17.09 | 17.09 | 1,714.29 | 1,183.50 |
| 377 | 16-Apr-01 | 1,261,900 | 15.64 | 15.65 | 27.39 | 27.11 | 22.09 | 21.44 | 10.72 | 16.80 | 16.34 | 16.34 | 1,650.21 | 1,191.68 |
| 378 | 17-Apr-01 | 1,996,200 | 15.35 | 15.46 | 26.85 | 26.35 | 21.20 | 20.40 | 10.20 | 15.63 | 16.04 | 16.04 | 1,671.51 | 1,191.81 |
| 379 | 18-Apr-01 | 4,809,700 | 16.80 | 17.30 | 27.90 | 28.47 | 21.57 | 22.79 | 11.40 | 17.45 | 18.58 | 18.58 | 1,830.79 | 1,238.16 |
| 380 | 19-Apr-01 | 3,776,600 | 18.00 | 18.16 | 28.91 | 30.49 | 25.55 | 25.72 | 12.86 | 19.59 | 19.71 | 19.71 | 1,953.28 | 1,253.69 |
| 381 | 20-Apr-01 | 4,670,500 | 17.10 | 18.04 | 30.63 | 30.12 | 24.93 | 25.04 | 12.52 | 19.87 | 19.71 | 19.71 | 1,933.57 | 1,242.98 |
| 382 | 23-Apr-01 | 1,824,000 | 17.85 | 18.04 | 29.99 | 29.35 | 24.34 | 24.25 | 12.12 | 18.90 | 17.57 | 17.57 | 1,811.89 | 1,242.36 |
| 383 | 24-Apr-01 | 5,088,300 | 17.70 | 18.01 | 28.97 | 25.85 | 24.33 | 24.03 | 12.02 | 17.58 | 17.08 | 17.08 | 1,762.21 | 1,209.47 |
| 384 | 25-Apr-01 | 3,151,700 | 18.02 | 18.25 | 26.12 | 26.99 | 24.21 | 24.72 | 12.36 | 17.11 | 16.05 | 16.05 | 1,814.33 | 1,234.75 |
| 385 | 26-Apr-01 | 3,376,000 | 18.30 | 18.75 | 27.54 | 25.32 | 24.33 | 24.69 | 12.35 | 16.46 | 15.78 | 15.78 | 1,763.33 | 1,234.52 |
| 386 | 27-Apr-01 | 2,571,800 | 19.00 | 19.00 | 25.06 | 26.00 | 25.20 | 26.20 | 13.10 | 16.49 | 17.38 | 17.38 | 1,810.47 | 1,253.05 |
| 387 | 30-Apr-01 | 2,893,800 | 19.60 | 19.00 | 26.77 | 26.24 | 26.70 | 25.49 | 12.74 | 17.54 | 17.12 | 17.12 | 1,855.15 | 1,249.46 |
| 388 | 1-May-01 | 3,596,100 | 18.80 | 18.80 | 26.34 | 26.73 | 26.34 | 26.59 | 12.97 | 17.20 | 18.98 | 18.98 | 1,919.01 | 1,266.44 |
| 389 | 2-May-01 | 2,496,600 | 18.55 | 19.01 | 26.25 | 24.93 | 25.97 | 26.34 | 13.30 | 19.66 | 20.44 | 20.44 | 1,962.42 | 1,267.43 |
| 390 | 3-May-01 | 1,842,000 | 18.82 | 18.39 | 26.25 | 25.84 | 26.34 | 25.75 | 12.48 | 19.80 | 19.80 | 19.80 | 1,877.80 | 1,248.58 |
| 391 | 4-May-01 | 1,092,900 | 18.05 | 18.78 | 26.34 | 25.91 | 24.24 | 24.96 | 12.88 | 19.71 | 19.75 | 19.75 | 1,924.12 | 1,266.61 |
| 392 | 7-May-01 | 1,870,800 | 18.55 | 18.35 | 26.00 | 24.83 | 25.35 | 24.57 | 12.48 | 18.70 | 19.54 | 19.54 | 1,895.41 | 1,263.51 |
| 393 | 8-May-01 | 2,118,800 | 18.35 | 18.00 | 26.65 | 24.60 | 24.93 | 23.98 | 12.28 | 20.00 | 19.86 | 19.86 | 1,929.24 | 1,261.20 |
| 394 | 9-May-01 | 1,831,000 | 17.57 | 17.75 | 24.46 | 24.60 | 24.14 | 23.98 | 11.99 | 19.18 | 19.26 | 19.26 | 1,876.60 | 1,255.54 |
| 395 | 10-May-01 | 1,349,900 | 18.10 | 17.74 | 25.09 | 24.40 | 24.21 | 23.00 | 11.50 | 19.85 | 18.88 | 18.88 | 1,838.32 | 1,255.18 |
| 396 | 11-May-01 | 1,059,900 | 17.60 | 17.53 | 24.32 | 24.48 | 23.01 | 22.85 | 11.43 | 18.85 | 18.85 | 18.85 | 1,795.06 | 1,245.67 |
| 397 | 14-May-01 | 1,195,900 | 17.53 | 17.75 | 24.28 | 24.19 | 22.89 | 23.29 | 11.65 | 18.93 | 18.11 | 18.11 | 1,821.20 | 1,245.92 |
| 398 | 15-May-01 | 1,215,200 | 17.76 | 17.69 | 24.26 | 24.49 | 23.37 | 23.18 | 11.59 | 18.23 | 17.45 | 17.45 | 1,797.08 | 1,248.92 |
| 399 | 16-May-01 | 2,065,300 | 17.44 | 18.39 | 24.00 | 25.38 | 23.26 | 24.10 | 12.05 | 17.49 | 18.67 | 18.67 | 1,899.47 | 1,284.99 |
| 400 | 17-May-01 | 2,409,000 | 18.51 | 19.00 | 25.53 | 25.88 | 24.23 | 23.55 | 11.77 | 18.78 | 18.82 | 18.82 | 1,925.14 | 1,288.49 |

B-107

Exhibit C - Pricing Data

Page 11

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 401 | 18-May-01 | 1,671,000 | 18.75 | 18.65 | 24.97 | 24.79 | 23.36 | 23.53 | 11.77 | 18.76 | 19.97 | 19.97 | 1,927.69 | 1,291.96 |
| 402 | 21-May-01 | 1,564,200 | 18.49 | 18.95 | 24.71 | 25.84 | 23.63 | 23.56 | 11.78 | 20.03 | 22.96 | 22.96 | 2,052.57 | 1,312.83 |
| 403 | 22-May-01 | 1,423,000 | 19.13 | 19.08 | 25.76 | 25.94 | 24.00 | 23.50 | 11.75 | 23.42 | 22.76 | 22.76 | 2,042.93 | 1,309.38 |
| 404 | 23-May-01 | 1,086,700 | 19.23 | 18.75 | 27.11 | 26.81 | 23.75 | 23.23 | 11.61 | 22.34 | 21.49 | 21.49 | 1,957.56 | 1,289.05 |
| 405 | 24-May-01 | 724,400 | 18.50 | 18.84 | 26.82 | 26.67 | 23.29 | 23.20 | 11.60 | 21.70 | 21.46 | 21.46 | 2,003.37 | 1,293.17 |
| 406 | 25-May-01 | 863,400 | 18.76 | 18.43 | 26.78 | 27.00 | 23.20 | 22.76 | 11.38 | 21.55 | 20.47 | 20.47 | 1,960.74 | 1,277.89 |
| 407 | 29-May-01 | 1,370,600 | 18.01 | 17.47 | 26.70 | 25.65 | 22.32 | 21.47 | 10.73 | 19.48 | 18.67 | 18.67 | 1,873.53 | 1,267.93 |
| 408 | 30-May-01 | 2,010,200 | 17.37 | 16.74 | 26.70 | 24.41 | 20.76 | 19.78 | 9.89 | 17.10 | 16.25 | 16.25 | 1,779.00 | 1,248.08 |
| 409 | 31-May-01 | 2,978,200 | 16.74 | 16.70 | 24.50 | 24.36 | 19.80 | 19.95 | 9.98 | 16.32 | 16.47 | 16.47 | 1,799.89 | 1,255.82 |
| 410 | 1-Jun-01 | 1,353,700 | 16.71 | 17.06 | 24.71 | 24.61 | 20.13 | 20.89 | 10.44 | 16.69 | 16.63 | 16.63 | 1,840.83 | 1,260.67 |
| 411 | 4-Jun-01 | 1,303,800 | 17.36 | 16.68 | 24.83 | 25.00 | 21.08 | 20.66 | 10.33 | 16.78 | 16.08 | 16.08 | 1,838.84 | 1,267.11 |
| 412 | 5-Jun-01 | 2,285,000 | 16.58 | 16.87 | 25.24 | 26.22 | 20.80 | 20.94 | 10.47 | 16.22 | 17.02 | 17.02 | 1,923.90 | 1,283.57 |
| 413 | 6-Jun-01 | 1,755,200 | 16.92 | 16.40 | 26.26 | 25.26 | 20.93 | 20.73 | 10.36 | 18.35 | 17.61 | 17.61 | 1,903.84 | 1,270.03 |
| 414 | 7-Jun-01 | 2,238,000 | 16.40 | 16.50 | 25.13 | 25.61 | 20.71 | 21.66 | 10.83 | 17.73 | 18.03 | 18.03 | 1,963.31 | 1,276.96 |
| 415 | 8-Jun-01 | 1,197,300 | 16.25 | 16.59 | 26.26 | 25.69 | 21.65 | 21.32 | 10.66 | 18.09 | 17.01 | 17.01 | 1,896.22 | 1,264.96 |
| 416 | 11-Jun-01 | 897,700 | 16.25 | 16.23 | 25.29 | 25.26 | 21.05 | 20.04 | 10.02 | 17.12 | 16.88 | 16.88 | 1,846.50 | 1,254.39 |
| 417 | 12-Jun-01 | 712,500 | 16.10 | 16.45 | 25.75 | 26.10 | 19.77 | 20.31 | 10.15 | 16.55 | 17.20 | 17.20 | 1,852.03 | 1,255.85 |
| 418 | 13-Jun-01 | 966,300 | 16.55 | 16.25 | 26.19 | 25.19 | 21.42 | 20.47 | 10.23 | 17.19 | 16.25 | 16.25 | 1,790.21 | 1,241.60 |
| 419 | 14-Jun-01 | 1,306,800 | 16.20 | 15.86 | 24.94 | 25.04 | 20.04 | 19.88 | 9.94 | 16.11 | 15.50 | 15.50 | 1,711.39 | 1,219.87 |
| 420 | 15-Jun-01 | 2,180,700 | 15.86 | 15.90 | 24.74 | 24.32 | 20.10 | 20.44 | 10.22 | 15.40 | 15.19 | 15.19 | 1,701.53 | 1,214.36 |
| 421 | 18-Jun-01 | 1,298,400 | 15.89 | 15.10 | 24.55 | 23.92 | 20.41 | 20.33 | 10.16 | 15.30 | 14.43 | 14.43 | 1,666.49 | 1,208.43 |
| 422 | 19-Jun-01 | 1,069,300 | 15.69 | 15.31 | 24.54 | 23.67 | 20.85 | 20.19 | 10.10 | 15.34 | 14.66 | 14.66 | 1,675.90 | 1,212.58 |
| 423 | 20-Jun-01 | 1,352,200 | 15.02 | 15.37 | 22.98 | 23.45 | 20.00 | 21.67 | 10.84 | 14.13 | 14.18 | 14.18 | 1,721.56 | 1,223.14 |
| 424 | 21-Jun-01 | 1,421,600 | 15.45 | 15.29 | 23.42 | 23.50 | 21.55 | 22.49 | 11.24 | 14.38 | 14.33 | 14.33 | 1,751.22 | 1,237.04 |
| 425 | 22-Jun-01 | 892,600 | 15.29 | 15.05 | 23.73 | 23.41 | 22.48 | 22.26 | 11.13 | 14.64 | 14.47 | 14.47 | 1,727.47 | 1,235.35 |
| 426 | 25-Jun-01 | 1,607,800 | 15.15 | 14.86 | 24.10 | 24.25 | 22.50 | 23.99 | 11.99 | 14.77 | 15.04 | 15.04 | 1,743.90 | 1,218.60 |
| 427 | 26-Jun-01 | 1,587,900 | 14.72 | 14.89 | 24.24 | 25.00 | 23.34 | 23.75 | 11.88 | 14.57 | 14.93 | 14.93 | 1,751.62 | 1,216.76 |
| 428 | 27-Jun-01 | 1,013,600 | 14.89 | 14.78 | 24.15 | 25.74 | 23.83 | 23.34 | 11.67 | 15.12 | 14.95 | 14.95 | 1,756.02 | 1,211.07 |
| 429 | 28-Jun-01 | 2,237,800 | 15.07 | 15.07 | 25.99 | 26.42 | 23.05 | 23.54 | 11.77 | 15.21 | 15.60 | 15.60 | 1,808.94 | 1,226.20 |
| 430 | 29-Jun-01 | 3,061,600 | 15.08 | 16.45 | 26.65 | 26.15 | 23.66 | 23.25 | 11.62 | 15.68 | 15.72 | 15.72 | 1,830.19 | 1,224.38 |
| 431 | 2-Jul-01 | 2,157,400 | 16.50 | 15.95 | 26.38 | 26.87 | 23.64 | 23.90 | 11.95 | 15.96 | 15.77 | 15.77 | 1,830.19 | 1,236.72 |
| 432 | 3-Jul-01 | 638,700 | 15.89 | 15.95 | 26.60 | 26.91 | 23.51 | 23.84 | 11.92 | 15.63 | 15.91 | 15.91 | 1,822.16 | 1,234.45 |
| 433 | 5-Jul-01 | 2,189,000 | 15.97 | 15.50 | 26.61 | 26.21 | 23.60 | 23.19 | 11.60 | 15.64 | 15.17 | 15.17 | 1,751.00 | 1,219.24 |
| 434 | 6-Jul-01 | 3,076,200 | 15.44 | 14.60 | 26.02 | 25.63 | 22.76 | 22.03 | 11.02 | 14.87 | 13.68 | 13.68 | 1,668.59 | 1,190.59 |
| 435 | 9-Jul-01 | 1,157,600 | 14.60 | 14.80 | 25.77 | 26.70 | 22.09 | 22.70 | 11.35 | 14.18 | 14.82 | 14.82 | 1,697.05 | 1,198.78 |
| 436 | 10-Jul-01 | 1,842,000 | 14.80 | 14.07 | 27.08 | 25.61 | 22.95 | 21.14 | 10.57 | 15.26 | 14.07 | 14.07 | 1,624.95 | 1,181.52 |
| 437 | 11-Jul-01 | 1,657,100 | 14.00 | 14.11 | 25.56 | 25.98 | 21.03 | 22.54 | 11.27 | 14.04 | 13.98 | 13.98 | 1,641.56 | 1,180.18 |
| 438 | 12-Jul-01 | 3,302,400 | 14.59 | 15.16 | 26.70 | 27.37 | 23.30 | 24.36 | 12.18 | 14.69 | 15.35 | 15.35 | 1,750.13 | 1,208.14 |
| 439 | 13-Jul-01 | 1,772,800 | 15.16 | 15.76 | 27.10 | 27.95 | 24.13 | 24.85 | 12.43 | 15.42 | 15.64 | 15.64 | 1,751.11 | 1,215.68 |
| 440 | 16-Jul-01 | 1,488,100 | 15.76 | 15.24 | 27.59 | 27.12 | 24.88 | 23.96 | 11.98 | 15.72 | 15.01 | 15.01 | 1,685.74 | 1,202.45 |

B-108

Page 12

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 441 | 17-Jul-01 | 1,305,300 | 15.24 | 15.81 | 27.12 | 28.74 | 23.98 | 25.10 | 12.55 | 14.80 | 14.59 | 14.59 | 1,729.55 | 1,214.44 |
| 442 | 18-Jul-01 | 1,249,600 | 15.49 | 15.47 | 27.95 | 27.20 | 21.78 | 20.79 | 10.40 | 14.15 | 13.99 | 13.99 | 1,666.87 | 1,207.71 |
| 443 | 19-Jul-01 | 2,576,600 | 15.61 | 14.59 | 28.06 | 28.38 | 21.23 | 19.96 | 9.98 | 14.36 | 14.44 | 14.44 | 1,695.89 | 1,215.02 |
| 444 | 20-Jul-01 | 12,785,200 | 13.00 | 10.99 | 27.97 | 27.89 | 21.70 | 19.98 | 9.99 | 15.24 | 15.03 | 15.03 | 1,676.46 | 1,210.85 |
| 445 | 23-Jul-01 | 6,919,000 | 11.00 | 10.04 | 27.94 | 26.56 | 20.09 | 19.54 | 9.77 | 15.24 | 14.42 | 14.42 | 1,629.93 | 1,191.03 |
| 446 | 24-Jul-01 | 2,604,000 | 10.25 | 9.99 | 26.56 | 26.61 | 19.39 | 19.09 | 9.55 | 14.42 | 14.90 | 14.90 | 1,604.86 | 1,171.65 |
| 447 | 25-Jul-01 | 2,931,100 | 10.00 | 9.74 | 28.01 | 28.01 | 19.12 | 18.47 | 9.23 | 15.53 | 15.53 | 15.53 | 1,627.86 | 1,190.49 |
| 448 | 26-Jul-01 | 1,478,600 | 9.74 | 9.67 | 27.87 | 27.87 | 18.48 | 18.59 | 9.30 | 15.38 | 16.09 | 16.09 | 1,673.39 | 1,202.93 |
| 449 | 27-Jul-01 | 2,760,000 | 9.45 | 10.20 | 27.46 | 27.46 | 18.75 | 18.96 | 9.48 | 16.05 | 16.29 | 16.29 | 1,683.18 | 1,205.82 |
| 450 | 30-Jul-01 | 1,766,100 | 10.10 | 9.93 | 27.64 | 27.64 | 19.12 | 18.93 | 9.47 | 16.35 | 15.52 | 15.52 | 1,670.03 | 1,202.52 |
| 451 | 31-Jul-01 | 3,520,300 | 9.95 | 10.49 | 27.76 | 26.93 | 19.27 | 18.79 | 9.40 | 15.80 | 16.29 | 16.29 | 1,683.61 | 1,211.23 |
| 452 | 1-Aug-01 | 3,654,600 | 10.59 | 10.60 | 27.44 | 27.18 | 19.01 | 19.06 | 9.53 | 16.55 | 17.35 | 17.35 | 1,729.53 | 1,215.93 |
| 453 | 2-Aug-01 | 3,342,800 | 11.15 | 11.21 | 27.83 | 28.43 | 19.65 | 19.82 | 9.91 | 17.86 | 18.17 | 18.17 | 1,751.45 | 1,220.75 |
| 454 | 3-Aug-01 | 1,306,600 | 11.25 | 11.19 | 28.27 | 28.07 | 19.89 | 19.50 | 9.75 | 17.80 | 17.72 | 17.72 | 1,725.90 | 1,214.35 |
| 455 | 6-Aug-01 | 1,068,400 | 11.35 | 11.11 | 27.51 | 27.84 | 19.04 | 19.13 | 9.56 | 17.32 | 17.13 | 17.13 | 1,702.84 | 1,200.48 |
| 456 | 7-Aug-01 | 1,242,100 | 11.17 | 11.20 | 27.64 | 27.71 | 19.33 | 19.25 | 9.62 | 17.02 | 17.08 | 17.08 | 1,696.37 | 1,204.40 |
| 457 | 8-Aug-01 | 1,748,200 | 11.15 | 11.09 | 27.61 | 26.64 | 19.26 | 18.90 | 9.45 | 16.93 | 17.25 | 17.25 | 1,626.20 | 1,183.53 |
| 458 | 9-Aug-01 | 1,165,700 | 11.19 | 10.97 | 27.60 | 26.64 | 18.96 | 19.05 | 9.52 | 16.51 | 16.76 | 16.76 | 1,628.92 | 1,183.43 |
| 459 | 10-Aug-01 | 1,162,200 | 11.03 | 11.03 | 26.61 | 26.91 | 19.04 | 19.02 | 9.51 | 16.45 | 16.22 | 16.22 | 1,617.45 | 1,190.16 |
| 460 | 13-Aug-01 | 659,700 | 11.06 | 11.00 | 27.03 | 27.02 | 19.10 | 19.09 | 9.55 | 16.00 | 16.37 | 16.37 | 1,653.27 | 1,191.29 |
| 461 | 14-Aug-01 | 932,900 | 11.20 | 10.90 | 27.09 | 26.57 | 19.20 | 18.73 | 9.36 | 16.42 | 15.89 | 15.89 | 1,629.95 | 1,186.73 |
| 462 | 15-Aug-01 | 795,900 | 11.00 | 10.43 | 26.18 | 25.50 | 18.76 | 18.44 | 9.22 | 15.91 | 14.77 | 14.77 | 1,572.03 | 1,178.02 |
| 463 | 16-Aug-01 | 1,590,500 | 10.43 | 10.24 | 25.08 | 25.38 | 18.27 | 18.65 | 9.32 | 14.61 | 14.71 | 14.71 | 1,581.98 | 1,181.66 |
| 464 | 17-Aug-01 | 2,134,100 | 10.03 | 10.10 | 24.01 | 23.00 | 18.00 | 18.07 | 9.03 | 14.38 | 14.03 | 14.03 | 1,516.58 | 1,161.97 |
| 465 | 20-Aug-01 | 2,891,000 | 10.25 | 10.00 | 22.93 | 22.72 | 18.14 | 18.12 | 9.06 | 14.03 | 14.33 | 14.33 | 1,535.99 | 1,171.41 |
| 466 | 21-Aug-01 | 2,195,000 | 10.03 | 10.00 | 22.76 | 22.01 | 18.14 | 17.92 | 8.96 | 14.34 | 13.90 | 13.90 | 1,480.74 | 1,157.26 |
| 467 | 22-Aug-01 | 1,066,500 | 10.09 | 9.79 | 22.42 | 22.15 | 17.94 | 18.21 | 9.10 | 14.33 | 13.68 | 13.68 | 1,515.41 | 1,165.31 |
| 468 | 23-Aug-01 | 6,598,500 | 9.64 | 8.61 | 22.16 | 21.83 | 18.20 | 17.81 | 8.90 | 13.72 | 13.82 | 13.82 | 1,496.98 | 1,162.09 |
| 469 | 24-Aug-01 | 3,185,500 | 8.80 | 8.55 | 22.12 | 23.12 | 18.00 | 18.57 | 9.28 | 14.08 | 14.97 | 14.97 | 1,579.62 | 1,184.93 |
| 470 | 27-Aug-01 | 1,514,100 | 8.55 | 8.50 | 23.06 | 23.05 | 18.60 | 18.92 | 9.46 | 14.78 | 14.50 | 14.50 | 1,578.33 | 1,179.21 |
| 471 | 28-Aug-01 | 2,489,700 | 8.43 | 8.60 | 23.06 | 22.65 | 18.90 | 18.40 | 9.20 | 14.14 | 13.56 | 13.56 | 1,526.30 | 1,161.51 |
| 472 | 29-Aug-01 | 3,260,200 | 9.00 | 8.79 | 22.79 | 21.80 | 18.44 | 17.83 | 8.91 | 13.68 | 13.43 | 13.43 | 1,499.76 | 1,148.56 |
| 473 | 30-Aug-01 | 1,828,800 | 8.75 | 8.67 | 21.00 | 21.13 | 17.74 | 17.83 | 8.91 | 11.67 | 11.07 | 11.07 | 1,453.90 | 1,129.03 |
| 474 | 31-Aug-01 | 2,319,700 | 8.67 | 8.97 | 20.74 | 21.38 | 17.73 | 18.55 | 9.27 | 11.00 | 11.45 | 11.45 | 1,469.70 | 1,133.58 |
| 475 | 4-Sep-01 | 3,139,300 | 9.25 | 8.92 | 21.86 | 22.31 | 18.50 | 18.25 | 9.12 | 11.50 | 10.95 | 10.95 | 1,424.12 | 1,132.94 |
| 476 | 5-Sep-01 | 2,333,600 | 9.00 | 8.93 | 22.39 | 22.38 | 18.24 | 18.55 | 9.27 | 10.93 | 10.63 | 10.63 | 1,415.30 | 1,131.74 |
| 477 | 6-Sep-01 | 1,283,300 | 8.72 | 8.65 | 22.02 | 21.50 | 18.40 | 17.72 | 8.86 | 10.37 | 10.46 | 10.46 | 1,361.69 | 1,106.40 |
| 478 | 7-Sep-01 | 1,768,500 | 8.50 | 8.51 | 21.29 | 21.55 | 17.50 | 17.28 | 8.64 | 10.20 | 10.59 | 10.59 | 1,354.27 | 1,085.78 |
| 479 | 10-Sep-01 | 1,035,800 | 8.30 | 8.46 | 21.25 | 22.57 | 17.00 | 17.37 | 8.69 | 10.30 | 10.29 | 10.29 | 1,365.39 | 1,092.54 |
| 480 | 17-Sep-01 | 2,887,800 | 8.20 | 7.25 | 20.50 | 20.70 | 16.00 | 16.99 | 8.49 | 9.37 | 9.85 | 9.85 | 1,252.70 | 1,038.77 |

B-109

Exhibit C - Pricing Data

| | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 481 | 18-Sep-01 | 3,697,200 | 7.25 | 6.35 | 20.87 | 19.79 | 16.90 | 16.28 | 8.14 | 10.03 | 9.18 | 9.18 | 1,224.64 | 1,032.74 |
| 482 | 19-Sep-01 | 3,419,400 | 6.52 | 6.60 | 19.69 | 19.08 | 16.50 | 17.02 | 8.51 | 9.28 | 9.10 | 9.10 | 1,208.23 | 1,016.10 |
| 483 | 20-Sep-01 | 2,715,500 | 6.55 | 6.50 | 18.16 | 17.48 | 16.29 | 15.68 | 7.84 | 8.76 | 8.47 | 8.47 | 1,166.27 | 984.54 |
| 484 | 21-Sep-01 | 3,212,000 | 5.90 | 5.99 | 16.15 | 16.63 | 14.80 | 15.73 | 7.86 | 7.80 | 7.96 | 7.96 | 1,126.95 | 965.80 |
| 485 | 24-Sep-01 | 1,815,200 | 6.20 | 6.17 | 17.12 | 18.60 | 16.11 | 16.45 | 8.23 | 8.33 | 8.73 | 8.73 | 1,191.02 | 1,003.45 |
| 486 | 25-Sep-01 | 1,735,100 | 6.10 | 5.98 | 18.73 | 19.16 | 16.14 | 15.54 | 7.77 | 8.86 | 8.69 | 8.69 | 1,187.77 | 1,012.27 |
| 487 | 26-Sep-01 | 2,126,800 | 6.08 | 5.79 | 19.37 | 18.16 | 15.81 | 15.15 | 7.57 | 8.91 | 8.44 | 8.44 | 1,143.48 | 1,007.04 |
| 488 | 27-Sep-01 | 2,112,900 | 5.85 | 5.55 | 18.14 | 18.04 | 15.25 | 15.51 | 7.76 | 8.38 | 7.91 | 7.91 | 1,144.27 | 1,018.61 |
| 489 | 28-Sep-01 | 2,893,200 | 5.50 | 5.45 | 18.34 | 18.53 | 15.71 | 15.51 | 7.76 | 8.13 | 8.27 | 8.27 | 1,168.37 | 1,040.94 |
| 490 | 1-Oct-01 | 2,885,100 | 5.10 | 4.90 | 18.43 | 18.71 | 15.49 | 15.54 | 7.77 | 8.31 | 8.13 | 8.13 | 1,151.24 | 1,038.55 |
| 491 | 2-Oct-01 | 3,074,800 | 4.90 | 4.65 | 18.45 | 18.54 | 15.43 | 15.05 | 7.53 | 8.13 | 8.01 | 8.01 | 1,159.37 | 1,051.33 |
| 492 | 3-Oct-01 | 5,719,100 | 4.25 | 4.70 | 18.32 | 20.64 | 14.95 | 14.98 | 7.49 | 7.95 | 9.00 | 9.00 | 1,249.41 | 1,072.28 |
| 493 | 4-Oct-01 | 3,149,700 | 5.20 | 4.85 | 22.18 | 22.32 | 15.35 | 15.88 | 7.94 | 9.46 | 9.29 | 9.29 | 1,260.66 | 1,069.63 |
| 494 | 5-Oct-01 | 3,917,600 | 5.10 | 5.00 | 21.85 | 22.56 | 15.40 | 16.14 | 8.07 | 8.76 | 9.87 | 9.87 | 1,271.73 | 1,071.38 |
| 495 | 8-Oct-01 | 2,148,200 | 4.83 | 5.09 | 21.93 | 23.12 | 15.57 | 16.20 | 8.10 | 9.46 | 9.60 | 9.60 | 1,279.63 | 1,062.44 |
| 496 | 9-Oct-01 | 1,598,100 | 5.11 | 4.98 | 23.05 | 22.65 | 16.05 | 16.00 | 8.00 | 9.57 | 9.07 | 9.07 | 1,244.56 | 1,056.75 |
| 497 | 10-Oct-01 | 1,111,200 | 5.06 | 5.01 | 22.44 | 23.22 | 16.10 | 16.82 | 8.41 | 9.02 | 9.09 | 9.09 | 1,304.68 | 1,080.99 |
| 498 | 11-Oct-01 | 2,327,600 | 5.10 | 5.59 | 23.50 | 24.97 | 16.92 | 17.74 | 8.87 | 9.39 | 9.78 | 9.78 | 1,389.87 | 1,097.43 |
| 499 | 12-Oct-01 | 3,478,000 | 5.69 | 5.77 | 24.39 | 24.13 | 17.31 | 18.01 | 9.01 | 9.80 | 10.04 | 10.04 | 1,393.84 | 1,091.65 |

B-110

## Exhibit D - Regression Panels

SUMMARY OUTPUT 1

| Regression Statistics | |
|---|---|
| Multiple R | 0.574037197 |
| R Square | 0.329518704 |
| Adjusted R Square | 0.322677058 |
| Standard Error | 0.041811234 |
| Observations | 496 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 5 | 0.420993568 | 0.084198714 | 48.1636597 | 1.62315E-40 |
| Residual | 490 | 0.856607865 | 0.001748179 | | |
| Total | 495 | 1.277601433 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | -0.00275752 | 0.001879765 | -1.46695087 | 0.143030924 | -0.006450917 | 0.00093587 | -0.006450917 | 0.000935871 |
| DELL | 0.284198467 | 0.059499872 | 4.776455128 | 2.36057E-06 | 0.167292105 | 0.40110483 | 0.167292105 | 0.40104829 |
| NDX | 0.330183613 | 0.116274705 | 2.839685678 | 0.004703549 | 0.101725091 | 0.55864214 | 0.101725091 | 0.558642135 |
| AAPL | 0.163375206 | 0.047852784 | 3.41421249 | 0.000692966 | 0.06935324 | 0.25739717 | 0.06935324 | 0.257397171 |
| SUNW | 0.027237099 | 0.044056859 | 0.618226069 | 0.536713574 | -0.059326569 | 0.11380077 | -0.059326569 | 0.113800767 |
| SPX | 0.086943096 | 0.246736787 | 0.352371844 | 0.724710921 | -0.397849548 | 0.57173574 | -0.397849548 | 0.571735741 |

B-111

Exhibit D - Regression Panels

SUMMARY OUTPUT 2

| Regression Statistics | |
|---|---|
| Multiple R | 0.573443215 |
| R Square | 0.328837121 |
| Adjusted R Square | 0.324744664 |
| Standard Error | 0.041747369 |
| Observations | 496 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 3 | 0.420122777 | 0.140040926 | 80.35201217 | 2.5617E-42 |
| Residual | 492 | 0.857478656 | 0.001742843 | | |
| Total | 495 | 1.277601433 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | -0.002281528 | 0.001874919 | -1.5015 4507 | 0.133856133 | -0.006499112 | 0.00086856 | -0.006499112 | 0.00086856 |
| DELL | 0.288699156 | 0.059056654 | 4.888511939 | 1.3776E-06 | 0.172664804 | 0.40473351 | 0.172664804 | 0.404733508 |
| NDX | 0.383403821 | 0.074772243 | 5.127622338 | 4.2263E-07 | 0.236491523 | 0.53031612 | 0.236491523 | 0.530316119 |
| AAPL | 0.166791857 | 0.047422186 | 3.517169342 | 0.000476581 | 0.073616876 | 0.25996684 | 0.073616876 | 0.259966838 |

B-112

Exhibit D - Regression Panels

SUMMARY OUTPUT 3

| Regression Statistics | |
|---|---|
| Multiple R | 0.558535499 |
| R Square | 0.311961903 |
| Adjusted R Square | 0.309170674 |
| Standard Error | 0.042226052 |
| Observations | 496 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 2 | 0.398562975 | 0.199281487 | 111.7650454 | 9.36435E-41 |
| Residual | 493 | 0.879038459 | 0.001783039 | | |
| Total | 495 | 1.277601433 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | -0.00272181 | 0.001896227 | -1.43537991 | 0.151812988 | -0.006447488 | 0.00100388 | -0.006447488 | 0.00100387877 |
| DELL | 0.336112347 | 0.058156795 | 5.779416588 | 1.33055E-08 | 0.221846606 | 0.45037809 | 0.221846606 | 0.450378087 |
| NDX | 0.474210861 | 0.070978035 | 6.681093104 | 6.42214E-11 | 0.334754109 | 0.61366761 | 0.334754109 | 0.613667613 |

B-113

Exhibit D - Regression Panels

SUMMARY OUTPUT 4

| Regression Statistics | |
|---|---|
| Multiple R | 0.628081219 |
| R Square | 0.394486017 |
| Adjusted R Square | 0.389543046 |
| Standard Error | 0.043693053 |
| Observations | 248 (1 yr post) |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 2 | 0.304718136 | 0.152359068 | 79.8074669 | 2.04273E-27 |
| Residual | 245 | 0.467725303 | 0.001909083 | | |
| Total | 247 | 0.772443438 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | -0.00605992 | 0.00279934 | -2.16895511 | 0.03104837 | -0.01156311 | -0.00055672 | -0.011563112 | -0.000556723 |
| DELL | 0.425857343 | 0.080703817 | 5.276793056 | 2.89353E-07 | 0.266895529 | 0.58481916 | 0.266895529 | 0.584819157 |
| NDX | 0.427661418 | 0.102259939 | 4.182101242 | 4.0248E-05 | 0.226240644 | 0.62908219 | 0.226240644 | 0.629082193 |

B-114